1  PHILIP A. GASTEIER (State Bar No. 130043)
JEFFREY S. KWONG (State Bar No. 288239)
2  LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
Los Angeles, California 90034
4  Telephone: (310) 229-1234
Facsimile: (310) 229-1244
5  Email: PAG@LNBYG.COM; JSK@LNBYG.COM
Attorneys for Edward M. Wolkowitz, Chapter 7 Trustee
6

7  **UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
8  **LOS ANGELES DIVISION**

9  In re:                                 | Chapter 7

10 PACIFIC THEATRES                        | Lead Case No.: 2:21-bk-15007-BB
EXHIBITION CORP., et al.,
11                                         | Jointly administered with:
Debtors.                    | 2:21-bk-15008-BB (Pacific Theatres Entertainment
12                                         | Corporation)
                                        | 2:21-bk-15009-BB (Pacific Cinemas Corporation)
13 ─────────────────────────              | 2:21-bk-15010-BB (Glendale Americana Theatre, LLC)
                                        | 2:21-bk-15011-BB (ArcLight Cinema Company)
14 ☒ Affects all Debtors                  | 2:21-bk-15012-BB (ArcLight Visions, Inc.)

15 ☐ Affects Pacific Theatres
Exhibition Corporation only            | **TRUSTEE'S MOTION FOR ORDER APPROVING**
16                                         | **(A) COMPROMISE WITH BANK OF AMERICA**
☐ Affects Pacific Theatres             | **AND THE DT PARTIES; (B) SALE OF**
17 Entertainment Corporation              | **TRADEMARKS AND NAMES AND RELATED**
                                        | **INTELLECTUAL PROPERTY FREE AND CLEAR**
18 ☐ Affects Pacific Cinemas              | **OF LIENS, CLAIMS AND INTERESTS, SUBJECT**
Corporation only                       | **TO HIGHER AND BETTER BIDS, AND**
19                                         | **APPROVAL OF BID REQUIREMENTS; AND (C)**
☐ Affects Glendale Americana           | **ASSIGNMENT OF LICENSE AGREEMENTS;**
20 Theatre, LLC only                      | **MEMORANDUM OF POINTS AND**
                                        | **AUTHORITIES; SUPPORTING DECLARATION**
21 ☐ Affects ArcLight Cinema
Company only                           | [11 U.S.C. §§ 105(a), 363(b), (f) and (m); Bankruptcy
22                                         | Rule 9019]
☐ Affects ArcLight Visions, Inc.
23 only                                    |
                                        | DATE:        November 16, 2022
24                                         | TIME:        10:00 a.m.
                                        | PLACE:       Courtroom "1539"
25                                         |              255 East Temple Street
                                        |              Los Angeles, California 90012
26

27

28

1

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES..................................................5

I. JURISDICTION AND VENUE ..............................................................................5

II. INTRODUCTION ...................................................................................................5

III. FACTUAL SUMMARY ........................................................................................7

    A.    The Cases. ........................................................................................7

    B.    Secured Financing Arrangements. ....................................................8

    C.    Related Party Transactions. .............................................................10

    D.    Current Assets and Loan Status. .....................................................13

    E.    The Sale, Purchase and Compromise Agreement. ...........................14

    F.    The Sale. ..........................................................................................16

IV. ARGUMENT ........................................................................................................18

A. The Court Should Approve The Agreement and Compromise Pursuant To Rule 9019. 18

    1.    The Probability Of Success.............................................................20

    2.    Impediments to Collection ..............................................................20

    3.    Complexity of Issues, Expense, Inconvenience and Delay ..............20

    4.    The Compromise Benefits The Estate's Creditors...........................21

B. The Trustee Has Complied With All Applicable Notice Requirements For A Sale. .......21

C. The Sale Of The Purchased Assets Should Be Approved Because Good Business Reasons Exist, The Purchase Price As To Be Determined By Auction Is Fair And Reasonable, And The Proposed Sale Is In The Best Interests Of The Estates And Creditors. ..........................................................................................................22

    1.    Sound Business Purpose. ................................................................22

    2.    Fair and Reasonable Price...............................................................23

    3.    Adequate Marketing........................................................................25

    4.    Accurate and Reasonable Notice. ....................................................25

D. The Purchaser Should Be Entitled to the Protections of Section 363(m) of the

i

**Bankruptcy Code** ................................................................................ **25**

**E. The Court Should Approve The Sale Of The Purchased Assets Free And Clear Of Liens, Claims And Interests.** ....................................................................... **26**

    1.    The Sale Should Be Approved Under 11 U.S.C. § 363 (f)(1) As To Unsecured Claims. ............................................................................. 27

    2.    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(2). ........................... 27

    3.    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(4). ............................ 28

    4.    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(5). ............................ 28

**VI. CONCLUSION** ......................................................................................... **30**

**DECLARATION OF EDWARD M. WOLKWOTIZ** ........................................ **32**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Alpha Industries, Inc.*,
    84 B.R. 703 (Bankr. Mont. 1988) ...................................................................24

*Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services, Inc.)*,
    762 F.2d 185 (2d Cir. 1985)........................................................................19

*In re Atlanta Packaging Products, Inc.*,
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ...........................................................24

*Big Shanty Land Corp. v. Comer Properties, Inc.*,
    61 B.R. 272 (Bankr. N.D. Ga. 1985) ...........................................................23

*In re Blair*,
    538 F.2d 849 (9th Cir. 1976) ......................................................................19

*In re Canyon Partnership*,
    55 B.R. 520 (Bankr. S.D. Cal. 1985) ...........................................................23

*Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*,
    94 B.R. 343 (Bankr. E.D. Pa. 1988) ...........................................................27

*Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*,
    391 B.R. 25 (9th Cir. B.A.P. 2008)........................................................27, 29

*Compak Companies, LLC v. Johnson*,
    415 B.R. 334 (N.D.Ill. 2009) ......................................................................27

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983), *cert. denied* 464 U.S. 822 (1983)...........................19

*Ewell v. Diebert (In re Ewell)*,
    958 F. 2d 276 (9th Cir. 1992) ......................................................................25

*In re Filtercorp, Inc. v. Gateway Venture Partners III, L.P.*,
    163 F.3d 570 (9th Cir. 1998) ......................................................................26

*In re Food Barn Stores, Inc.*,
    107 F.3d 558 (8th Cir. 1997) ......................................................................23

*In re General Store of Beverly Hills*,
    11 B.R. 539 (9th Cir. BAP 1981) ...............................................................19

*In re Gerwer*,
    898 F.2d 730 (9th Cir. 1990) ......................................................................26

*In re Heissenger Resources, Ltd.*,
    67 B.R. 378 (C.D. Ill. 1986) ..................................................................................19

*In re Jolan, Inc.*,
    2009 WL 1163928 (Bankr. W.D. Wash. 2009) ................................................29, 30

*In re Karpe*,
    84 B.R. 926 (Bankr. M.D.Pa. 1988) ......................................................................25

*In re Lee Way Holding Co.*,
    120 B.R. 881 (Bankr. S.D. Ohio 1990) ..................................................................19

*In re Lionel Corp.*,
    722 F.2d 1063 (2d Cir. 1983) ..........................................................................22, 23

*In re Mama's Original Foods, Inc.*,
    234 B.R. 500 (C.D. Cal. 1999) ..............................................................................22

*Martin v. Kane (In re A & C Properties)*,
    784 F.2d 1377 (9th Cir. 1986), *cert. denied* 479 U.S. 854 (1986)....................18, 19

*Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*,
    36 B.R. 856 (Bankr. W.D. Mo. 1984) ....................................................................27

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972), *cert. denied sub nom. Benson v. Newman*, 409
    U.S. 1039 (1972) ....................................................................................................19

*In re Pisces Leasing Corp.*,
    66 B.R. 671 (E.D.N.Y. 1986) ................................................................................26

*Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*,
    327 F.3d 537 (7th Cir. 2003) ................................................................................27

*In re Suchy*,
    786 F.2d 900 (9th Cir. 1985) ................................................................................26

*In re The Landing*,
    156 B.R. 246 (Bankr. E.D. Mo. 1993)....................................................................22

*In re Trans World Airlines, Inc.*,
    322 F.3d 283 (3d Cir. 2003)....................................................................................27

*United States v. Alaska National Bank (In re Walsh Constr., Inc.)*,
    669 F.2d 1325 (9th Cir. 1982) ..............................................................................18

*Walter v. Sunwest Bank (In re Walter)*,
    83 B.R. 14 (9th Cir. B.A.P. 1988)..........................................................................23

*In re Wilde Horse Enterprises, Inc.*,
   136 B.R. 830 (Bankr. C.D. Cal. 1991)..................................................................22, 24

*Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*,
   839 F.2d 610 (9th Cir. 1988) ...................................................................................18

**Federal Statutes**

11 U.S.C.
   § 102(1)(A) ..............................................................................................................21
   §§ 105(a), 363, and 365 ............................................................................................2
   §§ 105(a), 363(b), (f) and (m)..................................................................2, 5, 6, 32
   § 363 .......................................................................................................................25
   § 363(b)(1) ..............................................................................................................21
   § 363(f).............................................................................................................26, 27
   § 363 (f)(1) .............................................................................................................27
   § 363(f)(1), (2), (4) and (5) ....................................................................................30
   § 363(f)(2) ........................................................................................................27, 28
   § 363(f)(4) ..............................................................................................................28
   § 363(f)(5) ..................................................................................................28, 29, 30

28 U.S.C.
   §§ 157 and 1334.........................................................................................................5
   § 157(b)(2)(A), (N) and (O) .....................................................................................5
   §§ 1408 and 1409 ......................................................................................................5

Bankruptcy Code
   § 363(b) ...........................................................................................................22, 23
   § 363(b)(2) ..............................................................................................................21
   § 363(m)..............................................................................................3, 25, 26, 31

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE; BANK OF AMERICA, N.A.; STATE OF CALIFORNIA, EMPLOYMENT DEVELOPMENT DEPARTMENT; WEST CENTRAL FOODS INC.; ARCLIGHT AB; ARCLIGHT CREATIVE GROUP, INC.; ARCLIGHT INC.; ARCLIGHT FILMS PTY. LTD.; DARCLIGHT FILMS PTY. LTD.; ARCLIGHT FILMS INTERNATIONAL PTY. LTD; ARCLIGHT FILMS CANADA, INC.; DT OPERATOR, LLC; WINCAL, LLC; THE OFFICE OF THE UNITED STATES TRUSTEE; AND PARTIES IN INTEREST:**

Edward M. Wolkowitz, the duly appointed Chapter 7 Trustee (the "<u>Trustee</u>") for the bankruptcy estates (the "<u>Estates</u>") of Pacific Theatres Exhibition Corp. ("<u>Exhibition</u>"), Pacific Theatres Entertainment Corporation ("<u>Entertainment</u>"), ArcLight Cinema Company ("<u>ACC</u>"), Arclight Visions, Inc. ("<u>AVI</u>"), Glendale Americana Theatre, LLC ("<u>GAT</u>"), and Pacific Cinemas Corporation ("<u>PCC</u>"), the debtors (collectively, the "<u>Debtors</u>"), hereby moves (the "<u>Motion</u>") this Court for an order approving (a) the compromise and settlement (the "<u>Compromise</u>") among the Trustee; Bank of America, N.A., as lender and administrative agent ("<u>BofA</u>" or "<u>Administrative Agent</u>"); DT Participant, LLC, a Delaware limited liability company ("<u>DTP</u>"); The Decurion Corporation, a California corporation, Decurion Management Company ("<u>DMC</u>"), Dome Center, LLC ("<u>DC</u>"), and WinCal, LLC ("<u>WinCal</u>" and, together with DTP, DMC and DC, collectively, the "<u>DT Parties</u>"), as memorialized in the Sale, Purchase and Compromise Agreement, dated as of October 21, 2022 (the "<u>Agreement</u>"), a copy of which is attached hereto and made a part hereof as **<u>Exhibit A,</u>** pursuant to Bankruptcy Rule 9019; (b) the sale of trademarks and names and related intellectual property as more specifically described in the Agreement (referred to herein and therein, the "<u>Intellectual Property</u>"), free and clear of liens, claims and interests (together with the assignment of the Assigned License Agreements referred to below, the "<u>Sale</u>"), pursuant to 11 U.S.C. §§ 105(a), 363(b), (f) and (m), to DTP or to such party as presents a higher and better qualified bid in accordance with this Motion; and (c) the assignment of the license agreements identified on Exhibit 4 to the Agreement (the "<u>Assigned License Agreements</u>"), and related rights.

The Motion is based upon 11 U.S.C. §§ 105(a), 363, and 365; Rules 2002, 6004, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>"); Local Bankruptcy Rules 2002-1 and 6004-1; the accompanying Memorandum of Points and

Authorities; the Declaration of the Trustee and Request for Judicial Notice submitted in support of the Motion; the entire record of the Debtors' bankruptcy cases; the statements, arguments and representations of counsel to be made at the hearing on the Motion; and any other evidence properly presented to the Court at, or prior to, the hearing on the Motion.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

1.      finding that the notice given by the Trustee in connection with the Compromise, the Sale and the hearing on the Motion is adequate, sufficient, proper and complies with all applicable provisions of the Bankruptcy Code and Bankruptcy Rules;

2.      granting the Motion in its entirety;

3.      approving the Compromise and the Agreement;

4.      approving the Sale of the Purchased Assets, including the assignment of the Assigned License Agreements and related rights, to DTP, or a successful qualified overbidder, and finding that the non-debtor counterparties thereto are deemed to have consented to such assignment, in each case, free and clear of liens, claims and interests;

5.      authorizing the Trustee to execute and deliver any and all documents and take such actions as may be reasonably necessary to consummate the Sale and the Compromise;

6.      in the event the Sale is completed to a successful qualified overbidder, authorizing the Trustee to effect distribution of Sale proceeds in accordance with the Agreement;

7.      finding that DTP (or a successful qualified overbidder) is a good faith buyer entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code;

8.      waiving the provisions of Bankruptcy Rule 6004 (h); and

///
///
///
///
///
///

9.    granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  October 21, 2022

EDWARD M. WOLKOWITZ,
CHAPTER 7 TRUSTEE

By:    /s/Philip A. Gasteier
    Philip A. Gasteier
    Jeffrey S. Kwong
    LEVENE, NEALE, BENDER, YOO
        & GOLUBCHIK L.L.P.
    Attorneys for Edward M. Wolkowitz,
    Chapter 7 Trustee

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## <u>JURISDICTION AND VENUE</u>

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to the administration of the Debtors' bankruptcy estates and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of these cases and proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested in this Motion are (i) Sections 105(a), and 363(b), (f) and (m) of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (ii) Rules 2002(a)(2), 6004 (a), (c), and (f), 6006, 9006, 9007, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and (iii) Local Bankruptcy Rules 2002-1, 6004-1 and 9013-1.

## II.

## <u>INTRODUCTION</u>

Edward M. Wolkowitz, the duly appointed Chapter 7 Trustee (the "<u>Trustee</u>") for the bankruptcy estates (the "<u>Estates</u>") of Pacific Theatres Exhibition Corp. ("<u>Exhibition</u>"), Pacific Theatres Entertainment Corporation ("<u>Entertainment</u>"), ArcLight Cinema Company ("<u>ACC</u>"), Arclight Visions, Inc. ("<u>AVI</u>"), Glendale Americana Theatre, LLC ("<u>GAT</u>"), and Pacific Cinemas Corporation ("<u>PCC</u>"), the debtors in the above-captioned Chapter 7 cases (collectively, the "<u>Debtors</u>"), seeks entry of an order approving (a) the compromise (the "<u>Compromise</u>") among the Trustee; Bank of America, N.A., as lender and administrative agent ("<u>BofA</u>" or "<u>Administrative Agent</u>"); DT Participant, LLC, a Delaware limited liability company ("<u>DTP</u>"); The Decurion Corporation, a California corporation, Decurion Management Company ("<u>DMC</u>"), Dome Center, LLC ("<u>DC</u>"), and WinCal, LLC ("<u>WinCal</u>" and, together with DTP, DMC and DC, collectively, the "<u>DT Parties</u>"), as memorialized in the Sale, Purchase and Compromise Agreement dated as of October 21, 2022 (the "<u>Agreement</u>"), a copy of which is attached hereto and made a part hereof as <u>Exhibit A</u> pursuant to Bankruptcy Rule 9019; (b) the sale of trademarks and names and related intellectual property as more specifically described in the Agreement (referred to herein and therein as, the "<u>Intellectual Property</u>"), free and clear of liens,

claims and interests (together with the assignment of the Assigned License Agreements referred to below, the "Sale"), pursuant to 11 U.S.C. §§ 105(a), 363(b), (f) and (m), to DTP or to such party as presents a higher and better qualified bid in accordance with this Motion; and (c) the assignment of the Assigned License Agreements, and related rights.

BofA, is a lender and the administrative agent under Loan Documents (as defined below) for a secured loan facility provided to Entertainment and guaranteed by the other Debtors. Administrative Agent asserted that as of the Petition Date (as defined below), the outstanding principal amount owing under the Loan Documents was $6,355,500.00, plus accrued and unpaid interest and other costs and expenses, all of which is secured by a security interest in substantially all of the Debtors' assets. After turnover of certain collections and proceeds from the Trustee, and collections and proceeds from abandoned assets, Administrative Agent reports that the remaining outstanding principal amount owing as of September 9, 2022 was $4,521,935.69, plus accrued and unpaid interest and other costs and expenses, which included a principal amount of $1,166,435.69 owing to BofA, as lender, and $3,355,500.00 owing to DTP, as participant.

At the present time, the remaining identified assets of the Debtors included in the Estates consist of (i) the trademarks, word marks and design marks listed in Exhibit 1 to the Agreement (the "Marks"), Domain Names listed in Exhibit 2 to the Agreement (the "Domain Names"), the other Intellectual Property, and license agreements for the Marks listed in Exhibit 4 to the Agreement (the "Assigned License Agreements") to be assigned pursuant to this Motion; (ii) existing or anticipated proceeds from the sales of liquor licenses (the "Liquor License Proceeds"); (iii) potential recoveries from class actions and other actions that the Trustee believes are commercial tort claims (the "Trustee Commercial Claims"); and (iv) collections from other sources, including but not limited to refunds, royalty payments, and account turnover (the "Existing Estate Collections"). The Trustee asserts that the Liquor License Proceeds and Trustee Commercial Claims are not subject to a perfected security interest of Administrative Agent. The Trustee and Administrative Agent have not reached any agreement as to whether the

Existing Estate Collections or the Trustee Commercial Claims are subject to a perfected security interest of Administrative Agent.

Pursuant to the Agreement, (i) the Trustee will sell the Intellectual Property and assign the Assigned License Agreements to DTP pursuant to a credit bid by Administrative Agent, subject to any qualified higher and better bids; (ii) Administrative Agent (as well as BofA and DTP as lenders) will waive deficiency claims and release any security interest (other than as to any proceeds of the Sale to a higher and better qualified bidder); (iii) the Estates will retain the Liquor License Proceeds, the Trustee Commercial Claims and the Existing Estate Collections; and (iv) the Trustee and the Estates, on the one hand, and BofA and the DT Parties, on the other hand, will exchange mutual releases.

The Trustee has concluded that approval of the Compromise and the Sale are in the best interests of the Estates and creditors, and therefore urges the Court to grant the Motion.

**III.**

**FACTUAL SUMMARY**

A.      The Cases.

1.      Until it was forced to cease operations in March 2020 due to the Covid-19 Pandemic, Exhibition operated numerous motion picture theatres at leased premises ("Leased Premises") in various locations throughout the United States. With very limited exceptions, prior to the Petition Date, in one form or another, Exhibition surrendered possession of various Leased Premises to the respective landlords, as well as the tangible personal property of Exhibition remaining in the Leased Premises, subject, however, to rights of third parties including its secured lender and any equipment lessors.

2.      On June 18, 2021 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 7 of the Bankruptcy Code.

3.      On or shortly after the Petition Date, Edward M. Wolkowitz was duly appointed as the Trustee of the Debtors' Estates. The Debtors' Chapter 7 cases (each a "Case" and collectively, the "Cases") were ordered jointly administered under Lead Case No. 2:21-bk-15007-BB, by order entered July 7, 2021.

B. <u>Secured Financing Arrangements</u>.

4.      As of November 30, 2018, BofA, as administrative agent and lender, and Entertainment, as borrower, entered into that certain Second Amended and Restated Credit Agreement (as amended, the "<u>Credit Agreement</u>") for a loan to Entertainment (the "<u>Loan</u>"). Although BofA was the only lender under the Credit Agreement at that time, the Credit Agreement allowed for the addition of other lenders, with BofA to continue to serve as Administrative Agent for the Loan.

5.      Also as of November 30, 2018, (i) PCC, the immediate parent of Entertainment, executed an Amended and Restated Holdings Guaranty (the "<u>Holdings Guaranty</u>"); and (ii) Exhibition, AVI, ACC, and GAT (collectively, the "<u>Subsidiary Guarantors</u>") executed an Amended and Restated Subsidiary Guaranty (the "<u>Subsidiary Guaranty</u>", and collectively with the Holdings Guaranty, the "<u>Guarantees</u>"), in each case guaranteeing the Obligations (as defined in the Credit Agreement) of Entertainment under the Credit Agreement, and acknowledging that the Guarantied Obligations (as defined in the Guarantees) were being incurred for and would inure to their benefit and, in the case of the Subsidiary Guarantors, that a portion of the Loan proceeds may be advanced to them.

6.      Entertainment and the Subsidiary Guarantors (collectively the "<u>Grantors</u>"), also executed that certain Second Amended and Restated Master Security Agreement, dated November 30, 2018 (as subsequently amended, the "<u>Security Agreement</u>") in favor of Administrative Agent.

7.      Pursuant to Section 1 of the Security Agreement, the Grantors granted to Administrative Agent a security interest in, among other things, substantially all assets of the Grantors, including but not limited to "all General Intangibles, including all intellectual property, … [and] all Goods, including Inventory, Equipment and Fixtures" (collectively, the "<u>Collateral</u>"). <u>See</u> Security Agreement, ¶1(e) and (f).

8.      Administrative Agent perfected its lien and security interest in the Collateral by filing UCC-1 financing statements with the State of California Secretary of State's Office on February 25, 2008 as to each of ACC, Entertainment, Exhibition, PCC and AVI, and with the

Delaware Department of State's Office on June 27, 2013 as to GAT, and thereafter timely filing applicable continuation statements (collectively, the "Financing Statements").

9. Also as of November 30, 2018, PCC and Entertainment each executed a Grant of Trademark Security Interest in favor of Administrative Agent. Administrative Agent filed various Trademark Assignments with the United States Patent and Trademark Office in regard to its security interest in trademarks held by PCC and Entertainment.

10. The Credit Agreement, the Security Agreement, the Grants of Trademark Security Interest, the Financing Statements, the Guarantees, and all other agreements, documents, and instruments evidencing, securing, or otherwise relating to the Loan, including but not limited to the amendments, are referred to herein as the "Loan Documents." Copies of the Credit Agreement, the Security Agreement, the Grants of Trademark Security Interest, the Financing Statements, and the Guarantees are attached to the original Proof of Claim filed November 19, 2021, by BofA in the Exhibition Case ("BofA POC").[1]

11. As of November 9, 2020, BofA, as administrative agent and lender, Entertainment (as borrower), PCC, and the Subsidiary Guarantors entered into a Waiver, Consent and Amendment Number Three to Second Amended and Restated Credit Agreement (the "Third Amendment"). The Third Amendment, among other things, (i) modified the existing credit commitment; (ii) provided for a "Delayed Draw Term Loan Commitment" in the aggregate original amount of $6,500,000 ("Delayed Draw Commitment"); (iii) provided for the consent by BofA to the Transactions (as defined below); and (iv) provided for the consent by Entertainment (as borrower) to the sale by the lenders to DTP of a 100% participation in the Delayed Draw Commitment.

12. As of May 7, 2021, BofA, as administrative agent and lender, Entertainment (as borrower), PCC, and the Subsidiary Guarantors entered into an Amendment Number Four to Second Amended and Restated Credit Agreement (the "Fourth Amendment"). The Fourth

---

[1] A copy of the BofA POC is attached to the Trustee's Request for Judicial Notice, filed contemporaneously herewith ("RJN"), as Exhibit 1. BofA filed substantially identical proofs of claim in the Cases of the other Debtors, including Entertainment and ACC.

Amendment, among other things, (i)  identified defaults and terminated the existing credit commitments, including but not limited to the Delayed Draw Term Loan Commitment; (ii) provided for optional and discretionary funding of protective advances (the "Protective Advances") to Entertainment for the purpose of preserving and/or maximizing the value of the Collateral and continuing operations to the extent necessary in connection therewith; and (iii) acknowledged that an anticipated tax refund was a part of the Collateral, to be paid over to Administrative Agent.

13.    DTP and BofA, as administrative agent and as lender, entered into a Participation Agreement dated as of November 9, 2020, as amended by a First Amendment to Participation Agreement dated May 7, 2021, and a Second Amendment to Participation Agreement dated May 25, 2021  (as amended, the "Participation Agreement"), pursuant to which, among other things and as more specifically set forth in the Participation Agreement, BofA agreed to sell to DTP (i) an undivided, junior and subordinate 100% interest in the Protective Advances not to exceed $1,593,500 and (ii) an undivided last-out, junior and subordinate 100% interest in the Delayed Draw Term Loans (as defined in the Credit Agreement) outstanding at any time in a principal amount not to exceed $6,500,000 (the "Existing Term Loans").

C. Related Party Transactions.

14.    On or about November 9, 2020 (the "Closing Date"), Exhibition, Entertainment (together with Exhibition, "Pacific Theatres"), ACC, DT Operator, LLC ("DT Operator"), DC, and WinCal entered into certain transactions collectively intended to, among other things, terminate a lease entered into by Exhibition and restructure certain lease obligations of another lease entered into by Exhibition (Exhibition was in default of both leases), provide Pacific Theatres with additional liquidity, and grant certain intellectual property rights to DT Operator and WinCal. As a result of these transactions (the "Transactions"), Pacific Theatres received $17 million in new liquidity. The Transactions, each of which was contingent upon all of the others, and all of which closed contemporaneously, can be summarized as follows:[2]

---

[2]    The Transactions are described in the Statements of Financial Affairs of Entertainment and ACC, copies of which are attached to the RJN as Exhibits 2 and 3.

(a) Lease Termination and Forbearance with respect to the Arclight Lease (as such term is defined below): On or about the Closing Date, Exhibition, as tenant, and DC, as landlord of "Arclight Hollywood" (the "Arclight Premises"), entered into a lease termination and release agreement (the "Lease Termination Agreement") for the purpose of terminating that certain Theatre Lease for the Cinerama Dome, Los Angeles, California, dated May 5, 2000 (the "Arclight Lease"). Pursuant to the Lease Termination Agreement, the Arclight Lease was terminated and Exhibition vacated and surrendered possession of the Arclight Premises and all furniture, fixtures, equipment and other personal property located on or at the Arclight Premises. In consideration for the Lease Termination Agreement, DT Operator (on behalf of DC) paid Exhibition $10.5 million (the "Lease Termination Payment"). As further consideration for the lease termination, DC also agreed to forebear upon exercising or pursuing remedies against Exhibition on account of outstanding rent due and owing under the ArcLight Lease as of the Closing Date for an agreed period.

(b) On or about the Closing Date, Exhibition applied $9 million of the Lease Termination Payment to pay down the outstanding principal balance under the Credit Agreement. The remaining $1.5 million of the Lease Termination Payment provided liquidity for Pacific Theatres for its needs.

(c) DT Operator entered into a transition services agreement with Exhibition, under which DT Operator would reimburse Exhibition for expenses incurred as a result of any transition services rendered by Exhibition. DT Operator thereafter entered into a services agreement with Entertainment, under which DT Operator would reimburse Entertainment for expenses incurred as a result of any services rendered by Entertainment.

(d) Modification of Winnetka Lease: On or about the Closing Date, WinCal, as landlord, and Exhibition, as tenant of "Pacific Theatres Winnetka" pursuant to that certain Lease, dated January 18, 1997 (as amended, the "Pacific Winnetka Lease"), entered into a lease modification and forbearance agreement providing for the payment of

11

only "percentage rent" from the Closing Date through the remainder of the lease term. WinCal also agreed to forbear for an agreed period from exercising or pursuing remedies against Exhibition on account of outstanding rent due and owing under the Pacific Winnetka Lease as of the Closing Date.

(e)    Intellectual Property Licenses and Exclusive Territory: On or about the Closing Date, Entertainment granted to WinCal certain intellectual property licenses. Also, on or about the Closing Date, ACC and Entertainment granted to DT Operator certain intellectual property licenses, and agreed not to operate under the names "Arclight" or "Pacific Theatres" in the general Hollywood vicinity (subject to permitted exceptions).[3]

(f)    Financing Transaction: In connection with these Transactions, DTP purchased a $6.5 million participation in the Existing Term Loans.

15.    DT Operator, DC, DTP and WinCal are affiliates of Pacific Theatres, ACC and the other Debtors. All of the Transactions were approved solely by the independent directors of Pacific Theatres. Prior to approving these Transactions, the independent directors of Pacific Theatres obtained a third-party valuation of the Arclight Lease and related property.

D. Current Assets and Loan Status.

16.    In their filed Schedules of Assets, ACC and Entertainment, respectively, listed the Marks. Administrative Agent asserts that its security interest continues to attach to all of the Marks and related Intellectual Property.[4]

17.    As of the Petition Date, Administrative Agent asserted that it was owed under the Loan Documents the outstanding principal amount of $6,355,500.00, plus accrued and unpaid interest and other costs and expenses. Administrative Agent reported that this principal amount consisted of $3,000,000.00 owing to BofA, as Lender, and $3,355,500.00 owing to DTP, as

---

[3]    Copies of the Trademark License Agreement (Pacific Winnetka Theatre), dated as of November 9, 2020, by and between Entertainment and WinCal, and the Trademark License Agreement (Arclight Hollywood), dated as of November 9, 2020, by and among ACC, Entertainment and DT Operator, LLC, produced by the Debtors are attached hereto as Exhibits B and C, respectively.

[4]    Copies of the Schedules filed by Entertainment and ACC are attached to the RJN as Exhibits 2 and 3.

participant. Copies of documents evidencing the pre-petition history of the Loan are attached to the BofA POC.[5]

18.    Pursuant to that *Stipulation for Relief from Automatic Stay* between Exhibition, the Trustee and Administrative Agent that was approved by Order entered December 3, 2021 [Docket # 138],[6] the Trustee turned over to Administrative Agent a California tax refund to Exhibition in the amount of $1,301,347.81.

19.    Pursuant to that *Stipulation Regarding Disposition Of Theatres Tangible Personal Property* between the Trustee and Administrative Agent that was approved by Order entered February 3, 2022 [Docket # 163],[7] the Trustee sold certain tangible personal property ("FF&E") of Exhibition that had not been previously surrendered by Exhibition, and abandoned the remaining FF&E that had been surrendered to lessors.  Administrative Agent asserted and asserts that its security interest continues to attach to all of the FF&E that has not previously been released by Administrative Agent, and the Trustee does not contest that such FF&E constitutes Administrative Agent's Collateral. The Trustee delivered to or on behalf of Administrative Agent $255,564.82 in proceeds of the sale of FF&E by the Trustee.  Administrative Agent reported that it subsequently received $525,000.00 in gross proceeds from disposition of its remaining FF&E collateral.

20.    As of the date of the Agreement, Administrative Agent asserts that it is owed under the Loan Documents the outstanding principal amount of $4,521,935.69, plus accrued and unpaid interest and other costs and expenses (collectively, the "Current Loan Balance"), including principal of $1,166,436.69 owing to BofA, as lender, and principal of $3,355,500.00 owing to DTP as participant under the Existing Term Loans.[8]

21.    In addition to the Liquor License Proceeds, which the Trustee asserts are not

---

[5]    See RJN, Exhibit 1.

[6]    See RJN, Exhibit 4.

[7]    See RJN, Exhibit 5.

[8]    See Amended Proof of Claim filed by BofA on September 29, 2022 in the Exhibition Case, a copy of which is attached to the RJN as Exhibit 6. BofA filed substantially identical amended proofs of claim in the Cases of the other Debtors, including Entertainment and ACC.

subject to a perfected security interest of Administrative Agent, as of September 30, 2022, the Trustee had collected and was holding Existing Estate Collections in the amount of approximately $178,572.95.[9]  The Trustee also is pursuing the Trustee Commercial Claims. The Trustee and Administrative Agent have not reached any agreement as to whether the Existing Estate Collections or the Trustee Commercial Claims are subject to a perfected security interest of Administrative Agent.

E.    <u>The Sale, Purchase and Compromise Agreement.</u>

22.    The DT Parties and BofA, in its capacities as administrative agent and lender, have advised the Trustee that they have reached a separate agreement (attached as Exhibit 3 to the Agreement), which will, among other things, (a) allow DTP, through Administrative Agent, to credit bid the Current Loan Balance, or part thereof, in payment for the Purchased Assets (as defined below), and (b) allow Administrative Agent to waive any remaining deficiency claim under the Credit Agreement, both on the terms set forth in the Agreement. This Motion provides a summary of the Agreement for the convenience of the Court and all parties in interest.  In the case of any ambiguity or conflict between this Motion and the Agreement, the Agreement shall control.

23.    The Agreement provides for the Sale of the Purchased Assets to DTP on a credit bid, subject however to the possibility of higher and better qualified bids, and for the mutual release of claims between the Trustee and the Estates, on the one hand, and BofA, DTP and related entities, on the other hand. Pursuant to the Agreement, Administrative Agent (as well as BofA and DTP as lenders) will waive deficiency claims and release any security interest (other than as to any proceeds of sale to a higher and better qualified bidder), and the Estates will retain the Liquor License Proceeds, the Trustee Commercial Claims and the Existing Estate Collections, as well as any further collections.

24.    The Agreement also provides for the assignment to DTP of the Assigned License Agreements, copies of which are attached hereto as Exhibits B, C and E through G, inclusive.

---

[9]    A true and correct copy of the Trustee's Form 2, showing receipts and disbursements for Exhibition through September 27, 2022, is attached hereto and made a part hereof as <u>Exhibit D</u>.

The Assigned License Agreements are primarily licenses out and royalty free. The licenses to DT Operator and Wincal are discussed in paragraphs 18–20 above.  The Assignment Agreement dated as of December 19, 2001, by and between ACC, Arclight Inc., and Arclight AB, a Swedish company, also contains a limited license to ACC for use outside the United States.  DTP has requested that the Trustee seek approval to assign that agreement, along with the other Assigned License Agreements to DTP. The DT Parties have advised the Trustee that to the best of their knowledge there has been no default by ACC under any of the Assigned License Agreements.

25.     As a result of the Agreement, the Estates will be relieved of any potential dispute regarding whether the Liquor License Proceeds and Trustee Commercial Claims are Collateral subject to a perfected security interest of Administrative Agent (the Trustee asserts that they are not). The Estates will also be able to retain the Existing Estate Collections, which arguably fall within the Collateral. The Estates will also be relieved of deficiency claims and claims by the DT Parties and their affiliates.

26.     The Agreement is made as a compromise of the parties' respective rights, defenses and claims, without any admission of liability or wrongdoing of any nature on the part of any party. The Agreement includes other terms and provisions that the Trustee believes are customary in agreements of this kind.   All negotiations with BofA and the DT Parties were conducted at arms' length and in good faith.  The outcome of such negotiations is the Agreement and other supporting documents attached thereto.  The Trustee believes the consideration in connection with the Sale, including the credit bid by Administrative Agent, is fair.  There has been no fraud or collusion between any parties, including the Trustee, BofA, the DT Parties, and any other party with respect to the Sale, including other possible bidders.

27.     The effectiveness of the Agreement and the Sale of the Purchased Assets are contingent in all respects upon and shall become binding only upon the date the order by the Bankruptcy Court approving the terms of the Agreement and the Sale of the Purchased Assets becomes final and no longer subject to appeal in the Cases.  In the event the Bankruptcy Court denies such approval, the Agreement shall be null and void.

F.  The Sale.

28.     The Agreement provides for the Sale of the Intellectual Property, including the Marks and Domain Names, free and clear of liens, claims and interests, and the assignment of the Assigned License Agreements, together with related rights and property as detailed in the Agreement (collectively, the "Purchased Assets").   Analysis of UCC lien filings shows that BofA is in first position, and senior to any other liens. BofA asserts that its security interest continues to attach to the Purchased Assets.  The Trustee does not contest that the Purchased Assets are included in the Collateral and subject to the perfected security interest of BofA, based on a review of relevant Loan Documents. BofA filed its financing statements in 2008, and has maintained them as current.[10]

29.     No other filed UCC financing statements appeared on the search regarding Entertainment; however, the search shows a lien filing by the State of California, Employment Development Department ("EDD"). The search regarding ACC shows that West Central Foods Inc. ("WCF") filed a financing statement form with the California Secretary of State on October 22, 2020, with a copy of an unsigned Credit Application and Agreement with an attachment purporting to grant a security interest in general intangibles, among other things. Not only is it not signed, the signature lines on the Credit Application and Agreement were crossed out. ACC's Schedules do not list WCF as a creditor. This evidences that WCF does not have a valid security interest or secured claim, and its security interest, if any, in the Purchased Assets is therefore disputed.

30.     As a part of the Agreement, BofA will consent to the Sale free and clear of its liens as Administrative Agent (provided that in the event of an overbid resulting in cash proceeds, the proceeds will be paid to Administrative Agent to be applied to the Current Loan Balance). DTP will be authorized to credit bid the Current Loan Balance or a portion thereof in

---

[10]    True and correct copies of UCC and lien searches with the California Secretary of State for Entertainment and ACC are attached hereto and made a part hereof as Exhibit H. As shown in the search results and attached filings, on or about September 8, 2022, unauthorized UCC 3 termination statements were mistakenly filed referencing the BofA financing statements for Entertainment and ACC. Corrective UCC 5 Information Statements were promptly filed the following day, advising that the UCC 3 termination statements were unauthorized. (Equivalent UCC 3 and UCC 5 filings were also made for the other Debtors.) BofA has separately confirmed that the UCC 3 filings were made without its knowledge and authorization.

16

payment of the Purchase Price (as defined in the Agreement) if it is the prevailing bidder.

31.    The Notice of the Compromise and Sale subject to higher and better qualified bids should ensure that no party is interested in paying a higher price for the Purchased Assets. The Trustee is advised that the Debtors retained a consulting firm qualified in intellectual property strategy and intangible asset sales and licensing, which spent four months trying to solicit offers for the Purchased Assets without success, despite extensive outreach. Neither the Trustee nor his counsel have received any offer to purchase the Purchased Assets or expression of interest, with the sole exception of a contact from a prior infringing user whose limited license for a Mark not operationally utilized by the Debtors was expiring. This contact was relayed to BofA. For the foregoing reasons it is the Trustee's business judgment that the proposed Sale is in the best interest of the Estates and creditors.

32.    The Trustee is informed there will not be any negative tax consequences for the Estates arising from the proposed sale of the Purchased Assets.

33.    If the Agreement and the Sale are approved and consummated, it is anticipated that the Estates will be able to retain at least $178,572.95 in proceeds that may otherwise be Collateral, will be spared from the cost and expense that could attend a dispute as to whether the Liquor License Proceeds and Trustee Commercial Claims are Collateral, and will be relieved from approximately $4.5 million in unsecured deficiency claims as well as claims by the DT Parties and their affiliates. If, however, the Trustee is not able to proceed with the proposed Agreement and Sale, it is unlikely that the Estates will be able to receive anything from the Purchased Assets, other than, possibly, a reduction in the secured claim equal to the nominal amount that the Administrative Agent may be able to obtain on a foreclosure sale.

34.    Additional evidence in support of this Motion is contained in the annexed Declaration of the Trustee.

**IV.**

**ARGUMENT**

A.  **The Court Should Approve The Agreement and Compromise Pursuant To Rule 9019.**

Bankruptcy Rule 9019(a) provides that:

> On motion by the [debtor in possession] and after notice and hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor and indenture trustees as provided in [Bankruptcy Rule] 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

The Court of Appeals for the Ninth Circuit has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988).  "The purpose of a compromise agreement is to allow the [debtor in possession] and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986), *cert. denied* 479 U.S. 854 (1986). Accordingly, in approving a settlement agreement, the Bankruptcy Court need not conduct an exhaustive investigation of the claims sought to be compromised.  *See United States v. Alaska National Bank (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982).  Rather, it is sufficient that the Bankruptcy Court find that the settlement was negotiated in good faith and is reasonable, fair, and equitable. *See In re A & C Properties*, 784 F.2d at 1381.

The Court of Appeals for the Ninth Circuit has identified the following factors for consideration in determining whether a proposed settlement agreement is reasonable, fair, and equitable:

(a)    the probability of success in the litigation;

(b)    the difficulties, if any, to be encountered in the matter of collection;

(c)    the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

(d)    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

1

2      *In re A & C Properties, supra*, 784 F.2d at 1381 (the "A & C Factors").

3              Consideration of these factors does not require the Bankruptcy Court to determine

4      whether a settlement presented is the best one that could possibly have been achieved.  Rather,

5      the Bankruptcy Court need only canvass the issues to determine whether the settlement falls

6      "below the lowest point in the zone of reasonableness." *Newman v. Stein*, 464 F.2d 689, 698 (2d

7      Cir. 1972) (emphasis added), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039 (1972);

8      *see also Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services, Inc.)*, 762 F.2d 185, 189

9      (2d Cir. 1985); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), *cert.*

10     *denied* 464 U.S. 822 (1983). It is well-established that, as a matter of public policy, settlements

11     are favored over continued litigation.  *See, e.g., In re A & C Properties; In re Blair*, 538 F.2d

12     849, 851 (9th Cir. 1976); *In re Heissenger Resources, Ltd.*, 67 B.R. 378, 382 (C.D. Ill. 1986).

13             The focus of inquiry in reviewing and approving compromises is whether the settlement

14     is reasonable under the particular circumstances of the case.  *See In re General Store of Beverly*

15     *Hills*, 11 B.R. 539 (9th Cir. BAP 1981).  Finally, although the Bankruptcy Court should give

16     deference to the reasonable views of creditors, "objections do not rule.  It is well established that

17     compromises are favored in bankruptcy."  *In re Lee Way Holding Co.*, 120 B.R. 881, 891

18     (Bankr. S.D. Ohio 1990).

19             Here, the A & C Factors are to be viewed in the circumstances of this case, in which the

20     Trustee is not seeking to settle pending litigation actions, nor has any litigation been threatened

21     by either BofA, the DT Parties or the Trustee.  Instead, the Agreement allows for the release of

22     claims which BofA may assert in the remaining assets of the Estates as its Collateral, and the

23     orderly disposition of the Purchased Assets.

24             Nevertheless, the application of the A & C Factors demonstrates that the compromises

25     pursuant to the Agreement are fair, equitable, in the interest of creditors, and should be approved.

26             1.      The Probability Of Success

27             As Administrative Agent, BofA may assert that its security interest continues to attach to

28     all of the remaining assets of the Estates.  As to certain assets, such as the Liquor License

Proceeds, the Trustee contends that it should be clear that the security interest does not attach, or is not perfected.   As to other assets, such as the Trustee Commercial Claims, the Trustee contends the security interest is not perfected, but the law is less clear on this issue. As to still other proceeds of collections by the Trustee, there may be a greater risk that such proceeds would be determined to constitute Collateral.

The Agreement benefits the Estates and creditors, by allowing the Estates to retain the proceeds of all of such assets, without the need for further proceedings.

The Trustee has not identified any potentially beneficial actions against BofA or the DT Parties or affiliated entities.  The release provisions of the Agreement contain provisions intended to preserve potential causes of action being pursued by special insurance counsel employed by the Trustee.

2.       Impediments to Collection

If the Agreement is approved, the Estates will retain the proceeds of remaining assets (other than the Purchased Assets) without the need for further actions.  Thus, this factor favors approval of the Agreement.

3.       Complexity of Issues, Expense, Inconvenience and Delay

As outlined above, the issues concerning whether remaining assets constitute Collateral vary in complexity by type of collateral. Some are potentially complex, while others may not be subject to reasonable dispute.  However, the Agreement allows the Estates to resolve all of these issues without the need for actions to avoid unperfected security interests, and related issues as to application and perfection.  As a result, the Agreement minimizes the "expense" and "delay" of potential litigation, and is one step towards moving these Cases to a timely and orderly conclusion.

4.       The Compromise Benefits The Estate's Creditors

This factor also weighs heavily in favor of approval of the Agreement.  As stated above, the Agreement allows for the Estates to resolve all issues related to the remaining assets.  It also allows the Estates to retain significant proceeds and to eliminate substantial deficiency claims as

1    well as scheduled claims by the DT Parties and their affiliates. Accordingly, the Court should

2    conclude that the Agreement benefits the Estates' creditors.

3        **B.        The Trustee Has Complied With All Applicable Notice Requirements For A**

4    **Sale.**

5        Section 363(b)(1) provides that the Trustee, "after notice and a hearing, may use, sell or

6    lease, other than in the ordinary course of business, property of the estate."  11 U.S.C.

7    § 363(b)(1).  Section 102(1) defines "after notice and a hearing" as after such notice as is

8    appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in

9    the particular circumstances.  11 U.S.C. § 102(1)(A).

10        Bankruptcy Rule 6004(a) provides, in pertinent part, that notice of a proposed sale not in

11   the ordinary course of business must be given pursuant to Bankruptcy Rules 2002(a)(2), (c)(1),

12   (i) and (k), and, if applicable, in accordance with section 363(b)(2) of the Bankruptcy Code.

13   Fed. R. Bankr. P. 6004(a).  Bankruptcy Rule 2002(a)(2) requires at least 21 days' notice by mail

14   of a proposed sale of property of the estate other than in the ordinary course of business, unless

15   the Court for cause shown shortens the time or directs another method of giving notice.  Fed. R.

16   Bankr. P. 2002(a)(2).  Bankruptcy Rule 2002(c)(1) requires that the notice of a proposed sale

17   include the date, time and place of any public sale, the terms and conditions of any private sale,

18   and the time fixed for filing objections.  It also provides that the notice of sale or property is

19   sufficient if it generally describes the property.  Fed. R. Bankr. P. 2002(c)(1).  Bankruptcy Rule

20   2002(k) requires that the notice be given to the United States Trustee.  Fed. R. Bankr. P.

21   2002(k).

22        In addition, Local Bankruptcy Rule 6004-1 requires that the notice contain the

23   information specified in Local Bankruptcy Rule 6004-1(c)(3) and that an additional copy of the

24   notice be submitted to the Clerk of the Bankruptcy Court together with a Form 6004-2 at the

25   time of filing for purposes of publication.  L.B.R. 6004-1(c)(3) and (f).

26        The Trustee has complied with all of the above provisions of the Bankruptcy Code, the

27   Bankruptcy Rules and the Local Bankruptcy Rules.  The Trustee has complied with Bankruptcy

28   Rules 6004(a) and 2002(a)(2), (c)(1), (i) and (k), as well as Local Bankruptcy Rule 6004-

1(c)(3), because the notice of the Motion that has been filed contemporaneously herewith (the "Notice") includes all of the required information, including, without limitation, the date, time and place of the Sale hearing, opportunity and procedures for submitting higher bids and the deadline for objecting to this Motion, and has been served on the Debtors and their counsel, all creditors, any party against whom direct relief is sought by this Motion, all parties requesting special notice, and the Office of the United States Trustee.  The Trustee has also complied with the requirements of Local Bankruptcy Rule 6004-1(f) because the Trustee has filed the Notice and Form 6004-2 with the Clerk of the Bankruptcy Court for purposes of publication.

**C.      The Sale Of The Purchased Assets Should Be Approved Because Good Business Reasons Exist, The Purchase Price As To Be Determined By Auction Is Fair And Reasonable, And The Proposed Sale Is In The Best Interests Of The Estates And Creditors.**

As a general matter, a Court considering a motion to approve a sale under Bankruptcy Code Section 363(b) should determine from the evidence presented before it that a "good business reason" exists to grant such a motion.  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  In addition, the Court must further find it is in the best interest of the estate.  To make this determination, a Court should consider whether:

(1)     the sale is fair and reasonable, *i.e.*, the price to be paid is adequate;

(2)     the property has been given adequate marketing;

(3)     the sale is in good faith, *i.e.*, there is an absence of any lucrative deals with insiders; and

(4)     adequate notice has been provided to creditors.

*In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); *In re Mama's Original Foods, Inc.,* 234 B.R. 500, 502-505 (C.D. Cal. 1999).  The Trustee submits that the proposed sale of the Purchased Assets, in accordance with the Agreement satisfies each of these requirements.

1.      Sound Business Purpose.

22

The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).  A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders.  *See*, *e.g., In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983).  *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (noting that in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand").  In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  The facts pertaining to the Sale at issue here amply substantiate the Trustee's business decision that the contemplated sale of the Purchased Assets, in accordance with the Agreement, serves the best interests of the Estates and merits the approval of this Court.

The Purchased Assets are presumptively included in the Collateral. Based on the prior experience of the Debtors and the Trustee, there is no reason a foreclosure sale by a secured creditor would produce any excess over the Current Loan Balance.  The Sale will enable the Estates to receive the benefits available under the Agreement.

Based on the foregoing, the Trustee submits that the proposed Sale of the Purchased Assets is in the best interests of the Estates and therefore represents a sound exercise of the Trustee's business judgment.

2.    <u>Fair and Reasonable Price.</u>

In order for a sale to be approved under Bankruptcy Code Section 363(b), the purchase price must be fair and reasonable.  *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).  The trustee is given substantial discretion in this regard.  *Id.*  In addition, Courts have broad discretion with respect to matters under section 363(b).  *See Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985).  In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold.  *Wilde Horse Enterprises, Inc.*, 136 B.R. at 841 (*citing In re Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985)),

1  *In re Alpha Industries, Inc.*, 84 B.R. 703, 705 (Bankr. Mont. 1988).

2       Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with

3  respect to the procedures to be employed by a trustee in conducting a public or private sale.

4  Nonetheless, as one Court has stated, "[i]t is a well-established principle of bankruptcy law that

5  the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the

6  highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging*

7  *Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).   Additionally, courts have long

8  recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding

9  yields higher offers and thus benefits the estate.   Therefore, the objective is 'to maximize

10  bidding, not restrict it.'" *Id.*

11       The notice of the Compromise and Sale subject to higher and better qualified bids, and

12  the possibility of higher and better qualified bids, should ensure that no party is interested in

13  paying a higher price for the Purchased Assets.

14       The Trustee is providing notice of the opportunity to submit higher and better qualified

15  bids in connection with the Notice of the Motion.   As provided in the Agreement, the Trustee

16  requests that this Bankruptcy Court determine that a bidder is qualified only so long as the

17  bidder provides the Trustee with: (x) a cash deposit of not less than $50,000 by no later than

18  three (3) business days prior to the hearing seeking approval of this Motion; and (y) proof of the

19  financial wherewithal to fund the Purchase Price (as defined in the Agreement) at an amount

20  equal to or greater than the Current Loan Balance.

21       3.   <u>Adequate Marketing.</u>

22       The Debtors retained a consulting firm qualified in intellectual property strategy and

23  intangible asset sales and licensing, which spent four months trying to solicit offers for the

24  Purchased Assets without success, despite extensive outreach.   Neither the Trustee nor his counsel

25  have received any offer to purchase the Purchased Assets or expression of interest, with the sole

26  exception of a contact from a prior infringing user (Arclight Films Pty. Ltd., Darclight Films Pty.

27  Ltd., Arclight Films International Pty. Ltd., and Arclight Films Canada, Inc. (collectively, the

28  "<u>Darclight Parties</u>") whose limited license for a trademark not operationally utilized by the

Debtors was expiring.  This contact was relayed to BofA. Exhibition was a well-known theater operator, under several of the names included in the Purchased Assets.  Not only did the Debtors use a qualified firm to do a targeted marketing effort for months, the existence of the Chapter 7 cases was widely publicized. Yet no party interested in purchasing all of the Marks has surfaced in the (more than a) year since the Petition Date. The Notice of the Sale, following the prior marketing, is sufficient in the circumstances.

      4.   Accurate and Reasonable Notice.

The purpose of the notice is to provide an opportunity for objections and hearing before the Court if there are objections.  *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988).  A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections.  *Id.*

Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a trustee elects to sell property of the estate under 11 U.S.C. § 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the trustee provide an itemized list of the property sold together with the prices received upon consummation of the sale. Fed. R. Bankr. P. 6004(f).

As set forth in detail in Section IV.B of this Motion, the Trustee has complied with all of the applicable notice provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.  Thus, the Trustee submits that the Notice of the Motion and proposed Sale should be deemed adequate, accurate and reasonable by the Court.

**D.    The Purchaser Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See Ewell v. Diebert (In re Ewell)*, 958 F. 2d 276, 281 (9th Cir. 1992); *see also In re Filtercorp, Inc. v. Gateway Venture Partners III, L.P.*, 163 F.3d 570, 577 (9th Cir. 1998).  To constitute lack of good faith, a party's conduct in connection with a sale must amount to "fraud, collusion between

the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *In re Suchy*, 786 F.2d 900, 902 (9th Cir. 1985). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the Sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (internal quotations omitted).

As required by section 363(m) of the Bankruptcy Code, the Agreement consummating the Sale was negotiated by the Trustee, BofA, and the DT Parties at arm's length and in good faith, each party represented by their own advisors. Should a successful qualified overbidder purchase the Purchased Assets, any such agreement consummating such sale will similarly be negotiated by such successful qualified overbidder and the Trustee at arm's length and in good faith, each party represented by their own advisors. Accordingly, the Trustee requests that the Order include a provision that the Purchaser of the Purchased Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.

**E.      The Court Should Approve The Sale Of The Purchased Assets Free And Clear Of Liens, Claims And Interests.**

The Bankruptcy Court has the power to authorize the sale of property free and clear of liens or interests. *See* 11 U.S.C. § 363(f); *In re Gerwer*, 898 F.2d 730, 733 (9th Cir. 1990).

Section 363(f) of the Bankruptcy Code permits a sale of property "free and clear of any interest in such property of an entity other than the estate" if <u>any one</u> of the following five conditions is met:

(1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such

1   interest.

2   11 U.S.C. § 363(f).

3   Section 363(f) is written in the disjunctive; thus, satisfaction of any one of the five

4   conditions is sufficient to sell property free and clear of liens.  *See e.g., Citicorp Homeowners*

5   *Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); *Mutual Life Ins.*

6   *Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 858 (Bankr.

7   W.D. Mo. 1984). The bankruptcy statute does not define "interest," but courts have interpreted

8   the term broadly. See *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 26

9   (9th Cir. B.A.P. 2008) ("*Clear Channel*") (liens); *In re Trans World Airlines, Inc.*, 322 F.3d 283,

10  293 (3d Cir. 2003) (claims based on successor liability theory); *Precision Indus., Inc. v.*

11  *Qualitech Steel SBQ, LLC,* 327 F.3d 537, 545-46 (7th Cir. 2003) (leasehold);   *Compak*

12  *Companies, LLC v. Johnson*, 415 B.R. 334, 339 (N.D.Ill. 2009) (license).

13  In connection with the instant Sale, the Trustee has provided the Notice to and has served

14  this Motion on all identified parties who may assert a lien (based on a search of public records),

15  claim or interest in the Purchased Assets.  All of such parties are identified in the fact section

16  above.

17  (1)    The Sale Should Be Approved Under 11 U.S.C. § 363 (f)(1) As To

18        Unsecured Claims.

19  The Purchased Assets may be sold free of unsecured claims under applicable law.

20  Claims which assert rights to payment on an unsecured basis (whether or not disputed) are

21  simply claims against the Debtors and do not legally attach to the Purchased Assets after the

22  Sale.  Given that such claims are claims for monetary relief which do not attach to the Purchased

23  Assets, the Purchased Assets may therefore be sold free and clear of such claims.

24  (2)    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(2).

25  Section 363(f)(2) of the Bankruptcy Code authorizes a sale to be free and clear of an

26  interest if the interest holder consents to the sale. Any existing or potential holder of a lien, claim

27  or interest who does not object should be deemed to have consented to the sale pursuant to Local

28  Bankruptcy Rule 9013-1(h). In addition, to the extent that the Trustee reaches agreement with a

party in interest prior to or at the Sale hearing on terms of consent to the Sale free and clear, the Trustee requests that the Court approve and incorporate such agreed terms of consent in the Sale order.

The proposed Sale is being conducted pursuant to the Agreement, with the consent of BofA. Accordingly, the Purchased Assets may be sold free and clear of BofA's lien pursuant to its consent so long as such sale is in accordance with the Agreement.

(3)    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(4).

To the extent that any creditors assert disputed secured claims and oppose the Sale free and clear of liens, the Motion should be granted based on the fact that such claims are in bona fide dispute. All asserted liens, claims and interests detailed above are disputed as discussed above.

The lien of WCF is disputed. WCF filed a copy of an unsigned (signature lines crossed out) Credit Application and Agreement, with an attachment purporting to grant a security interest, with the California Secretary of State. This filing demonstrates on its face that WCF did not obtain an "authenticated" grant of a security interest as required to support a valid security interest. See CA UCC § 9-203 (b)(3). Accordingly, any secured claim of West Central Foods Inc. is disputed.

The secured claims of WCF and the State of California, Employment Development Division are also disputed on the grounds that the senior security interest of BofA consumes all value of the Collateral and renders any junior lienholders unsecured.

(4)    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(5).

The Trustee submits the Court may also authorize the sale free and clear of such interests under § 363 (f)(5).

In *Clear Channel, supra,* the Bankruptcy Appellate Panel for the Ninth Circuit reversed the Bankruptcy Court's approval of a sale to a senior lender under § 363(f)(5). In reversing the Bankruptcy Court's decision, the Bankruptcy Appellate Panel found that § 363(f)(5) requires that "(1) a proceeding exists or could be brought, in which (2) the nondebtor could be compelled to accept a money satisfaction of (3) its interest." Id. at 41. Taking up these factors in reverse

28

1    order, the Bankruptcy Appellate Panel concluded that a lien constitutes an "interest" for purposes

2    of § 363(f)(5).  With respect to the second factor, the Bankruptcy Appellate Panel ruled that §

3    363(f)(5) refers to those proceedings in which the creditor "could be compelled to take less than

4    the value of the claim secured by the interest."  Id.  In order to approve a sale free and clear

5    under § 363(f)(5), the Court must "make a finding of the existence of … a mechanism [to

6    address extinguishing the lien or interest without paying such interest in full] and the [debtor in

7    possession] must demonstrate how satisfaction of the lien 'could be compelled.'"  Id. at 45.

8    Finally, the Bankruptcy Appellate Panel held that § 363(f)(5) requires that there be, "or that there

9    be the possibility of, some proceeding, either at law or at equity, in which the nondebtor could be

10   forced to accept money in satisfaction of its interest."  Id.

11        Here, all of the factors set forth in *Clear Channel* for a sale to DTP (or a successful

12   qualified overbidder) free and clear of junior lienholder interests are satisfied.  Specifically, any

13   party who asserts an "interest" in the Purchased Assets could be compelled, in a legal or

14   equitable proceeding, to accept a money satisfaction of its interest.  The Bankruptcy Court in *In*

15   *re Jolan, Inc.,* 2009 WL 1163928 (Bankr. W.D. Wash. 2009) provided an analysis of the

16   Bankruptcy Appellate Panel's decision in *Clear Channel* in addressing whether any non-

17   contractual mechanisms exist whereby a lienholder might get less than full payment and lose its

18   lien.  The Bankruptcy Court concluded that there are a number of legal and equitable

19   proceedings available in Washington in which a junior lienholder could be compelled to accept a

20   money satisfaction including, without limitation, "a senior secured party's disposition of

21   collateral under the default remedies provided in part VI of Article 9" of Washington's Uniform

22   Commercial Code (specifically, RCW 62A.9A-617), and the disposition of real property through

23   "judicial and nonjudicial foreclosures, which operate to clear junior lienholders' interests, with

24   their liens attaching to proceeds in excess of the costs of sale and the obligation or judgment

25   foreclosed." *Id.* at 3-4.

26        Here, the same legal and equitable proceedings are available in California as those

27   discussed by the Court in *Jolan*.  Specifically, a junior lienholder in California could be

28   compelled to accept a money satisfaction upon a senior secured party's disposition of collateral

1    under the default remedies provided in § 9617 of California's Uniform Commercial Code. The

2    holder of a junior lien would be compelled to accept any surplus funds as a satisfaction of its

3    interest, and other interests would be eliminated.

4         Based on the foregoing, the Trustee respectfully submits that the parties asserting liens,

5    claims and interests against the Purchased Assets could be compelled, in a legal or equitable

6    proceeding, to accept a money satisfaction of their interests. Under these circumstances, the Sale

7    should be approved under § 363(f)(5) of the Bankruptcy Code free and clear of liens, claims and

8    interests.

9         Based on the foregoing, the Sale of the Purchased Assets to DTP (or a successful

10   qualified overbidder) may be approved, free and clear of liens, claims and interests, pursuant to

11   11 U.S.C. § 363(f)(1), (2), (4) and (5).

12                                    **VI.**

13                              **<u>CONCLUSION</u>**

14        **WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

15        1.    finding that the notice given by the Trustee in connection with the Compromise,

16              the Sale and the hearing on the Motion is adequate, sufficient, proper and

17              complies with all applicable provisions of the Bankruptcy Code and Bankruptcy

18              Rules;

19        2.    granting the Motion in its entirety;

20        3.    approving the Compromise and the Agreement;

21        4.    approving the Sale of the Purchased Assets, including the assignment of the

22   Assigned License Agreements and related rights, to DTP, or a successful qualified overbidder,

23   and finding that the non-debtor counterparties thereto are deemed to have consented to such

24   assignment, in each case, free and clear of liens, claims and interests;

25        5.    authorizing the Trustee to execute and deliver any and all documents and take

26   such actions as may be reasonably necessary to consummate the Sale and the Compromise;

27

28

6.      in the event the Sale is completed to a successful qualified overbidder, authorizing the Trustee to effect distribution of Sale proceeds in accordance with the Agreement;

7.      finding that DTP (or a successful qualified overbidder) is a good faith buyer entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code;

8.      waiving the provisions of Bankruptcy Rule 6004 (h); and

9.      granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  October 21, 2022                EDWARD M. WOLKOWITZ,

                                        CHAPTER 7 TRUSTEE


                                        By:___/s/ Philip A. Gasteier_____
                                              PHILIP A. GASTEIER
                                              JEFFREY KWONG
                                              LEVENE, NEALE, BENDER, YOO
                                                  & GOLUBCHIK L L.L.P.
                                              Attorneys for Edward M. Wolkowitz,
                                              Chapter 7 Trustee

31

## DECLARATION OF EDWARD M. WOLKOWITZ

I, Edward M. Wolkowitz, hereby declare as follows:

1.    I am the duly appointed Chapter 7 Trustee of the bankruptcy estates (the "Estates") of Pacific Theatres Exhibition Corp. ("Exhibition"), Pacific Theatres Entertainment Corporation ("Entertainment"), ArcLight Cinema Company ("ACC"), Arclight Visions, Inc. ("AVI"), Glendale Americana Theatre, LLC ("GAT"), and Pacific Cinemas Corporation ("PCC"), the debtors in the chapter 7 cases (collectively, the "Debtors"). I have personal knowledge of the facts set forth below except where stated on information and belief and, if called to testify, I would and could competently testify thereto.  I submit this declaration in support of the foregoing *Motion for Order Approving (A) Compromise with Bank of America and the DT Parties; (B) Sale of Trademarks and Names and Related Intellectual Property Free and Clear of Liens, Claims and Interests, Subject to Higher and Better Bid, and Approval of Bid Requirements; and (C) Assignment of License Agreements* (the "Motion"), to which this declaration is attached.  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

2.    Pursuant to the Motion, I am seeking entry of an order approving (a) the compromise (the "Compromise") among the Trustee; BofA, N.A., as lender and administrative agent ("BofA" or "Administrative Agent"); DT Participant, LLC, a Delaware limited liability company ("DTP"); The Decurion Corporation, a California corporation,  Decurion Management Company ("DMC"), Dome Center, LLC ("DC"), and WinCal, LLC ("WinCal" and, together with DTP, DMC and DC, collectively, the "DT Parties"), as memorialized in the Sale, Purchase and Compromise Agreement, dated as of October 21, 2022 (the "Agreement"), a copy of which is attached hereto as Exhibit A**,** pursuant to Bankruptcy Rule 9019; (b) the sale of trademarks and names and related intellectual property as more specifically described in the Agreement (referred to herein and therein as, the "Intellectual Property"), free and clear of liens, claims and interests (together with the assignment of the Assigned License Agreements referred to below, the "Sale"), pursuant to 11 U.S.C. §§ 105(a), 363(b), (f) and (m), to DTP or to such party as presents

a higher and better qualified bid; and (c) the assignment of the license agreements identified on Exhibit 4 to the Agreement (the "Assigned License Agreements"), and related rights.

Case Background.

3.     On June 18, 2021 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 7 of the Bankruptcy Code.

4.     On or shortly after the Petition Date, I was duly appointed as the Trustee of the Debtors' Estates. The Debtors' Chapter 7 cases (each a "Case" and collectively, the "Cases") were ordered jointly administered under Lead Case No. 2:21-bk-15007-BB, by order entered July 7, 2021.

5.     I am informed that, prior to the Petition Date, Exhibition was the primary operating entity, and a 100% owned subsidiary of Entertainment, with PCC as the holding company of Entertainment. Exhibition held a 100% interest in GAT and in AVI, which was the holding company for ACC.  I am further advised that the Debtors utilized a common principal bank account, with funding pursuant to a secured credit line provided through BofA as Administrative Agent.

6.     Until it was forced to cease operations in March 2020 due to the Covid-19 Pandemic, Exhibition operated numerous motion picture theatres at leased premises (the "Leased Premises") in various locations throughout the United States. Based on my investigation, I am informed that, with very limited exceptions (including the Transactions discussed below), prior to the Petition Date, in one form or another, Exhibition surrendered possession of all of the Leased Premises to the respective landlords, as well as the tangible personal property of Exhibition remaining in the Leased Premises, subject, however, to rights of third parties including Administrative Agent and any equipment lessors.

7.     I am informed and believe that as of the Petition Date, the material assets of Exhibition included whatever remaining interest it retained in the tangible personal property, interests in liquor licenses, rights to refunds, and various potential causes of action. Entertainment and ACC held interests in trademarks, names and related intellectual property,

subject to license agreements to licensees and to applicable security interests. The remaining Debtors reported no assets beyond their interests as holding companies for other Debtors.

Secured Financing Arrangements.

8.      As of November 30, 2018, BofA, as administrative agent and lender, and Entertainment, as borrower, entered into that certain Second Amended and Restated Credit Agreement (as amended, the "Credit Agreement") for a loan to Entertainment (the "Loan"). Although BofA was the only lender under the Credit Agreement at that time, the Credit Agreement allowed for the addition of other lenders, with BofA to continue to serve as Administrative Agent for the Loan. Information regarding the Loan is stated herein on information and belief based on Proofs of Claim filed by BofA and additional documents received from BofA.

9.      Also as of November 30, 2018, (i) PCC, the immediate parent of Entertainment, executed an Amended and Restated Holdings Guaranty (the "Holdings Guaranty"); and Exhibition, AVI, ACC, and GAT (collectively, the "Subsidiary Guarantors") executed an Amended and Restated Subsidiary Guaranty (the "Subsidiary Guaranty", and collectively with the Holdings Guaranty, the "Guarantees"), in each case guaranteeing the Obligations (as defined in the Credit Agreement) of Entertainment under the Credit Agreement, and acknowledging that the Guarantied Obligations (as defined in the Guarantees) were being incurred for and would inure to their benefit and, in the case of the Subsidiary Guarantors, that a portion of the Loan proceeds may be advanced to them.

10.      Entertainment and the Subsidiary Guarantors (collectively the "Grantors"), also executed that certain Second Amended and Restated Master Security Agreement dated November 30, 2018 (as subsequently amended, the "Security Agreement") in favor of Administrative Agent.

11.      Pursuant to Section 1 of the Security Agreement, the Grantors granted to Administrative Agent a security interest in, among other things, substantially all assets of the Grantors, including but not limited to "all General Intangibles, including all intellectual property, … [and] all Goods, including Inventory, Equipment and Fixtures" (collectively, the

1  "Collateral"). *See* Security Agreement, ¶1(e) and (f).

2      12.    Administrative Agent perfected its lien and security interest in the Collateral by

3  filing UCC-1 financing statements with the State of California Secretary of State's Office on

4  February 25, 2008 as to each of ACC, Entertainment, Exhibition, PCC and AVI, and with the

5  Delaware Department of State's Office on June 27, 2013 as to GAT, and thereafter timely

6  filing applicable continuation statements (collectively, the "Financing Statements").[11]

7      13.    Also as of November 30, 2018, PCC and Entertainment each executed a Grant of

8  Trademark Security Interest in favor of Administrative Agent. Administrative Agent filed

9  various Trademark Assignments with the United States Patent and Trademark Office in regard to

10  its security interest in trademarks held by PCC and Entertainment.

11      14.    The Credit Agreement, the Security Agreement, the Grants of Trademark Security

12  Interest, the Financing Statements, the Guarantees, and all other agreements, documents, and

13  instruments evidencing, securing, or otherwise relating to the Loan, including but not limited to

14  the amendments are referred to herein as the "Loan Documents."

15      15.    As of November 9, 2020, BofA, as administrative agent and lender, Entertainment

16  (as borrower), PCC, and the Subsidiary Guarantors entered into a Waiver, Consent and

17  Amendment Number Three to Second Amended and Restated Credit Agreement (the "Third

18  Amendment"). The Third Amendment, among other things, (i) modified the existing credit

19  commitment; (ii) provided for a "Delayed Draw Term Loan Commitment" in the aggregate

20  original amount of $6,500,000 ("Delayed Draw Commitment"); (iii) provided for the consent by

21  BofA to the Transactions (as defined below); and provided for the consent by Entertainment (as

22  borrower) to the sale by the lenders to DTP of a 100% participation in the Delayed Draw

23  Commitment.

24

---

25  [11]  True and correct copies of UCC and lien searches with the California Secretary of State for Entertainment and
       ACC are attached hereto as Exhibit H. As shown in the search results and attached filings, on or about
26      September 8, 2022, unauthorized UCC 3 termination statements were mistakenly filed referencing the BofA
       financing statements for Entertainment and ACC. Corrective UCC 5 Information Statements were promptly
27      filed the following day, advising that the UCC 3 termination statements were unauthorized. (Equivalent UCC
       3 and UCC 5 filings were also made for the other Debtors.) BofA has separately confirmed that the UCC 3
28      filings were made without its knowledge and authorization.

16.     As of May 7, 2021, BofA, as administrative agent and lender, Entertainment (as borrower), PCC, and the Subsidiary Guarantors entered into an Amendment Number Four to Second Amended and Restated Credit Agreement (the "Fourth Amendment"). The Fourth Amendment, among other things, (i)   identified defaults and terminated the existing credit commitments, including but not limited to Delayed Draw Term Loan Commitment: (ii) provided for optional and discretionary funding of protective advances (the "Protective Advances") to Entertainment for the purpose of preserving and/or maximizing the value of the Collateral and continuing operations to the extent necessary in connection therewith; and (iii) acknowledged that an anticipated tax refund was a part of the Collateral, to be paid over to Administrative Agent.

17.     DTP and BofA, as administrative agent and as lender, entered into a Participation Agreement dated as of November 9, 2020, as amended by a First Amendment to Participation Agreement dated May 7, 2021, and a Second Amendment to Participation Agreement dated May 25, 2021  (as amended, the "Participation Agreement"), pursuant to which, among other things and as more specifically set forth in the Participation Agreement, BofA agreed to sell to DTP (i) an undivided, junior and subordinate 100% interest in the Protective Advances not to exceed $1,593,500 and (ii) an undivided last-out, junior and subordinate 100% interest in the Delayed Draw Term Loans (as defined in the Credit Agreement) outstanding at any time in a principal amount not to exceed $6,500,000 (the "Existing Term Loans"). True and correct copies of the Participation Agreement and amendments received from BofA are attached hereto as Exhibit I.

Related Party Transactions.

18.     As summarized in the Statements of Financial Affairs of ACC and Entertainment, on or about November 9, 2020 (the "Closing Date"), Exhibition, Entertainment (together with Exhibition, "Pacific Theatres"), ACC, DT Operator, LLC ("DT Operator"), DC, and WinCal entered into certain transactions collectively intended to, among other things, terminate a lease entered into by Exhibition and restructure certain lease obligations of another lease entered into by Exhibition (Exhibition was in default of both leases), provide Pacific Theatres with additional

36

liquidity, and grant certain intellectual property rights to DT Operator and WinCal. As a result of these transactions (the "Transactions"), Pacific Theatres received $17 million in new liquidity. The Transactions, each of which was contingent upon all of the others, and all of which closed contemporaneously, were described by the Debtors as follows:

    (a) Lease Termination and Forbearance with respect to the Arclight Lease (as such term is defined below): On or about the Closing Date, Exhibition, as tenant, and DC, as landlord of "Arclight Hollywood" (the "Arclight Premises"), entered into a lease termination and release agreement (the "Lease Termination Agreement") for the purpose of terminating that certain Theatre Lease for the Cinerama Dome, Los Angeles, California, dated May 5, 2000 (the "Arclight Lease"). Pursuant to the Lease Termination Agreement, the Arclight Lease was terminated and Exhibition vacated and surrendered possession of the Arclight Premises and all furniture, fixtures, equipment and other personal property located on or at the Arclight Premises. In consideration for the Lease Termination Agreement, DT Operator (on behalf of DC) paid Exhibition $10.5 million (the "Lease Termination Payment"). As further consideration for the lease termination, DC also agreed to forebear upon exercising or pursuing remedies against Exhibition on account of outstanding rent due and owing under the ArcLight Lease as of the Closing Date for an agreed period.

    (b) On or about the Closing Date, Exhibition applied $9 million of the Lease Termination Payment to pay down the outstanding principal balance under the Credit Agreement. The remaining $1.5 million of the Lease Termination Payment provided liquidity for Pacific Theatres for its needs.

    (c) DT Operator entered into a transition services agreement with Exhibition, under which DT Operator would reimburse Exhibition for expenses incurred as a result of any transition services rendered by Exhibition. DT Operator thereafter entered into a services agreement with Entertainment, under which DT Operator would reimburse Entertainment for expenses incurred as a result of any services rendered by Entertainment.

(d) Modification of Winnetka Lease:  On or about the Closing Date, WinCal, as landlord, and Exhibition, as tenant of "Pacific Theatres Winnetka" pursuant to that certain Lease, dated January 18, 1997 (as amended, the "Pacific Winnetka Lease"), entered into a lease modification and forbearance agreement providing for the payment of only "percentage rent" from the Closing Date through the remainder of the lease term.  WinCal also agreed to forbear for an agreed period from exercising or pursuing remedies against Exhibition on account of outstanding rent due and owing under the Pacific Winnetka Lease as of the Closing Date.

(e)  Intellectual Property Licenses and Exclusive Territory: On or about the Closing Date, Entertainment granted to WinCal certain intellectual property licenses. Also, on or about the Closing Date, ACC and Entertainment granted to DT Operator certain intellectual property licenses, and agreed not to operate under the names "Arclight" or "Pacific Theatres" in the general Hollywood vicinity (subject to permitted exceptions).

(f)  Financing Transaction: In connection with these Transactions, DTP purchased a $6.5 million participation in the Existing Term Loans.

19.        I am advised that The Decurion Corporation, DT Operator, DC, DTP and WinCal are affiliates of Pacific Theatres, ACC, and the other Debtors. I am further advised that all of the Transactions were approved solely by the independent directors of Pacific Theatres, and that prior to approving these Transactions, the independent directors of Pacific Theatres obtained a third-party valuation of the Arclight Lease and related property. I requested and received a copy of this third-party valuation, which has been reviewed by the retained by the Trustee.

Current Assets and Loan Status.

20.  In their filed Schedules of Assets, ACC and Entertainment, respectively, listed certain trademarks, word marks and design marks, which are more fully identified in Exhibit 1 to the Agreement (collectively, the "Marks"). Administrative Agent asserts that its security interest continues to attach to all of the Marks, as well as related Domain Names (as defined in the

Motion) and other Purchased Assets (as defined in the Motion).

21.     As of the Petition Date, Administrative Agent asserted that it was owed under the Loan Documents the outstanding principal amount of $6,355,500.00, plus accrued and unpaid interest and other costs and expenses. Administrative Agent reported that this principal amount consisted of $3,000,000.00 owing to BofA, as Lender, and $3,355,500.00 owing to DTP.

22.     Pursuant to that *Stipulation for Relief from Automatic Stay* between Exhibition, me, as Trustee, and Administrative Agent that was approved by Order entered December 3, 2021 [Docket # 138], the Trustee turned over to Administrative Agent a California tax refund to Exhibition in the amount of $1,301,347.81.

23.     Pursuant to that *Stipulation Regarding Disposition Of Theatres Tangible Personal Property* between me, as Trustee, and Administrative Agent that was approved by Order entered February 3, 2022 [Docket # 163], I sold certain tangible personal property ("FF&E") of Exhibition that had not been previously surrendered by Exhibition, and abandoned the remaining FF&E that had been surrendered to lessors.  I delivered to or on behalf of Administrative Agent $255,564.82 in proceeds of the sale of FF&E by me, as Trustee. Administrative Agent reported that it subsequently received $525,000.00 in gross proceeds from the disposition of its remaining FF&E collateral.

24.     As of the date of the Agreement, Administrative Agent asserts that it is owed under the Loan Documents the outstanding principal amount of $4,521,935.69, plus accrued and unpaid interest and other costs and expenses (collectively, the "Current Loan Balance"), consisting of principal of $1,166,436.69 owing to BofA, as lender, and principal of $3,355,500.00 owing to DTP as participant under the Existing Term Loans.

25.     In addition to proceeds of sale of liquor licenses (the "Liquor License Proceeds"), which I assert are not subject to a perfected security interest of Administrative Agent, as of September 30, 2022, I have collected approximately $178,572.95 from other sources, including but not limited to refunds, royalty payments, and account turnover (the "Existing Estate Collections"). A true and correct copy of the Form 2 maintained at my direction as Trustee, showing receipts and disbursements for Exhibition through September 27, 2022, is attached

hereto as Exhibit D.

26.    As Trustee, I am also pursuing certain recoveries from class actions and other actions that I believe are commercial tort claims (the "Trustee Commercial Claims"). Administrative Agent and I have not reached any agreement as to whether the Existing Estate Collections or the Trustee Commercial Claims are subject to a perfected security interest of Administrative Agent.

The Sale, Purchase and Compromise Agreement.

27.    The DT Parties and BofA, in its capacities as administrative agent and lender, have advised me that they have reached a separate agreement (attached as Exhibit 3 to the Agreement), which will, among other things, (a) allow DTP, through Administrative Agent, to credit bid the Current Loan Balance, or part thereof, in payment of the purchase price for the Purchased Assets, and (b) allow Administrative Agent to waive any remaining deficiency claim under the Credit Agreement, both on the terms set forth in the Agreement.

28.    The Agreement provides for the Sale of the Purchased Assets to DTP on a credit bid, subject however, to the possibility of higher and better qualified bids, and for the mutual release of claims between me, as Trustee, and the Estates, on the one hand, and BofA, the DT Parties and related entities, on the other hand. Pursuant to the Agreement, Administrative Agent (as well as BofA and DTP as lenders) will waive deficiency claims and release any security interest (other than as to any proceeds of a Sale to a higher and better qualified bidder), and the Estates will retain the Liquor License Proceeds, the Trustee Commercial Claims and the Existing Estate Collections, as well as any further collections from assets other than the Purchased Assets.

29.    As a result, the Estates will be relieved of any potential disputes regarding whether the Liquor License Proceeds and Trustee Commercial Claims are Collateral subject to a perfected security interest of Administrative Agent, which I dispute. The Estates will also be able to retain the Existing Estate Collections, which arguably fall within the Collateral.  The Estates will also be relieved of deficiency claims and claims by the DT Parties and their affiliates.

30.    The Agreement is made as a compromise of the parties' respective rights, defenses and claims, without any admission of liability or wrongdoing of any nature on the part

of any party. The Agreement includes other terms and provisions that I believe are customary in agreements of this kind.  All negotiations with BofA and the DT Parties were conducted at arms' length and in good faith.  The outcome of such negotiations is the Agreement and other supporting documents attached thereto.  I believe the consideration in connection with the Sale, including the credit bid by Administrative Agent, is fair.  There has been no fraud or collusion between any parties, including myself, BofA, the DT Parties, and any other party with respect to the Sale, including other possible bidders.

31.    The effectiveness of the Agreement and the Sale of the Purchased Assets are contingent in all respects upon and shall become binding only upon the date the order by the Bankruptcy Court approving the terms of the Agreement and the Sale of the Purchased Assets becomes final and no longer subject to appeal in the Cases.

F. <u>The Sale</u>.

32.    The Agreement provides for the Sale of the Purchased Assets free and clear of liens, claims and interests.  Analysis of UCC lien filings shows that BofA is in first position, and senior to any other liens. BofA asserts that its security interest continues to attach to the Purchased Assets.  I do not contest that the Purchased Assets are included in the Collateral, based on a review of relevant Loan Documents. BofA filed its applicable financing statements in 2008 and has maintained them as current.

33.    No other filed UCC financing statements appeared on the search regarding Entertainment; however, the search shows a lien filing by the State of California, Employment Development Department. The search regarding ACC shows that West Central Foods Inc. ("<u>WCF</u>") filed a financing statement form with the California Secretary of State on October 22, 2020, with a copy of an unsigned Credit Application and Agreement with an attachment purporting to grant a security interest in general intangibles, among other things. Not only is it not signed, the signature lines on the Credit Application and Agreement were crossed out. ACC's Schedules do not list WCF as a creditor. This evidences that WCF does not have a valid security interest or secured claim, and its security interest, if any, in the Purchased Assets is therefore disputed.

34.     As a part of the Agreement, BofA will consent to the Sale free and clear of its liens as Administrative Agent (provided that in the event of an overbid resulting in cash proceeds, the proceeds will be paid to Administrative Agent to be applied to the Current Loan Balance). DTP will be authorized to credit bid the Current Loan Balance or a portion thereof in payment of the Purchase Price (as defined in the Agreement) if it is the prevailing bidder.

35.     I believe that the proposed Notice of the Compromise and Sale subject to higher and better qualified bids will ensure that no party is interested in paying a higher price for the Purchased Assets.   I am advised that the Debtors retained a consulting firm qualified in intellectual property strategy and intangible asset sales and licensing, which spent four months trying to solicit offers for the Purchased Assets without success, despite extensive outreach. Neither I nor my counsel have received any offer to purchase the Purchased Assets or expression of interest, with the sole exception of a contact from a prior infringing user (the Darclight Parties (as defined below)) whose limited license for a Mark not operationally utilized by the Debtors was expiring.   This contact was relayed to BofA. For the foregoing reasons it is my business judgment that the proposed Sale is in the best interest of the Estates and creditors.

36.     I am informed that the Debtors are pass-through tax entities and that there will not be any negative tax consequences for the Estates arising from the proposed sale of the Purchased Assets.

Assigned License Agreements.

37.     Copies of the Trademark License Agreement (Pacific Winnetka Theatre), dated as of November 9, 2020, by and between Entertainment and WinCal, and the Trademark License Agreement (Arclight Hollywood), dated as of November 9, 2020, by and among ACC, Entertainment and DT Operator, LLC, produced by the Debtors are attached hereto as Exhibits B and C, respectively.

38.     A copy of the Settlement and License Agreement, effective as of March 17, 2011, by and among Arclight Films Pty. Ltd., Darclight Films Pty. Ltd., Arclight Films International Pty. Ltd., and Arclight Films Canada, Inc., (collectively, the "Darclight Parties") and ACC produced by counsel to licensee parties, is attached hereto as Exhibit E.

39.    Copies of the Assignment and License Agreement, dated as of October 8, 2003, by and between ACC and Arclight Creative Group, Inc., doing business as Arclight Productions, and the Assignment Agreement, dated as of December 19, 2001, by and between ACC, Arclight Inc., and Arclight AB, a Swedish company, produced by the Debtors are attached hereto as Exhibits F and G, respectively.

40.    The Assigned License Agreements are primarily licenses out and royalty free. The Assignment Agreement, dated as of December 19, 2001, by and between ACC, Arclight Inc., and Arclight AB, a Swedish company, also contains a limited license to ACC for use outside the United States.  DTP has requested that the Trustee seek approval to assign that agreement, along with the other Assigned License Agreements to DTP. The DT Parties have advised that to the best of their knowledge there has been no default by ACC under any of the Assigned License Agreements.

Compromise Considerations.

41.    If the Agreement and the Sale are approved and consummated, it is anticipated that the Estates will be able to retain at least $178,572.95 in proceeds that may otherwise be Collateral, will be spared from the cost and expense that could attend a dispute as to whether the Liquor License Proceeds and Trustee Commercial Claims are Collateral, and will be relieved from approximately $4.5 million in unsecured deficiency claims as well as scheduled claims by the DT Parties and their affiliates.  If, however, I am not able to proceed with the proposed Agreement and Sale, it is unlikely that the Estates will be able to receive anything from the Purchased Assets, other than, possibly, a reduction in the secured claim equal to the nominal amount that the Administrative Agent may be able to obtain on a foreclosure sale of the Purchased Assets.

42.    BofA has produced information showing the history of the Loan. The Debtors also produced information relating to the Transactions with the related parties in November 2021, as well as the participation in the Loan.  Relevant information has been reviewed by the forensic accountant I employed as well as by counsel. The circumstances have been reviewed under standards applicable to potential actions such as preferences, fraudulent transfers and

43

recharacterization of indebtedness. I have concluded that no potential actions have been identified that would warrant foregoing the benefits available under the Agreement.

43.    The Agreement was negotiated at arm's length between me, my counsel, counsel for BofA, and counsel for the DT Parties, BofA, and the DT Parties expressed their desire to achieve a consensual and complete resolution of any remaining issues involving the Debtors and the Estates, while providing the benefits to the Estates pursuant to the Agreement. BofA, and the DT Parties have been cooperative in providing information upon request. I accordingly believe that DTP is a good faith buyer entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code, and ask the Court to make a finding to that effect. In order to permit completion of the Settlement and Sale without further delay, I also request that the Court waive the provisions of Bankruptcy Rule 6004 (h).

For the foregoing reasons it is my business judgment that approval of the Agreement including the proposed Sale is in the best interest of the Estates and creditors.


I declare that the foregoing is true and correct under penalty of perjury of the laws of the United States of America.

Executed this 20th day of October, 2022 at Los Angeles County, California.



Edward M. Wolkowitz

EXHIBIT "A"

**Execution**

## SALE, PURCHASE AND COMPROMISE AGREEMENT

This Sale, Purchase and Compromise Agreement (this "Agreement") is made and entered into as of October 21, 2022 by and among (i) Edward M. Wolkowitz, solely in his capacity as chapter 7 trustee ("Trustee") for the bankruptcy estates (the "Estates") of Pacific Theatres Exhibition Corp. ("Exhibition"), Pacific Theatres Entertainment Corporation ("Entertainment"), ArcLight Cinema Company ("ACC"), Arclight Visions, Inc. ("AVI"), Glendale Americana Theatre, LLC ("GAT"), and Pacific Cinemas Corporation ("PCC" and, together with Exhibition, Entertainment, ACC, AVI and GAT, collectively, the "Debtors"), the debtors in the chapter 7 bankruptcy cases pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court"), jointly administered under Lead Case No. 2:21-bk-15007-BB (each a "Case" and collectively, the "Cases"); (ii) Bank of America, N.A., a national banking association, in its capacity as lender and administrative agent under the Credit Agreement (as such term is defined below) ("BofA"); (iii) DT Participant, LLC, a Delaware limited liability company ("DTP"); and (iv) solely for the purposes set forth in their signature blocks below, The Decurion Corporation, a California corporation ("TDC"), Decurion Management Company ("DMC"), Dome Center, LLC ("DC"), and WinCal, LLC ("WinCal" and, together with DTP, DMC and DC, collectively, the "DT Parties"). The Trustee, BofA, and the DT Parties are sometimes referred to herein each as a "Party" and collectively as the "Parties."

### RECITALS

A.    As of November 30, 2018, BofA, as administrative agent and lender, and Entertainment, as Borrower, entered into that certain Second Amended and Restated Credit Agreement (as amended, the "Credit Agreement"). Unless otherwise defined herein, all capitalized terms in this Agreement will be given the meaning ascribed to such terms in the Credit Agreement or applicable Loan Document (as such term is defined in the Credit Agreement). BofA is the holder of the Revolving Loans provided to Borrower under the Credit Agreement.

**Execution**

B.      On or around November 30, 2018, (i) PCC, the immediate parent of Entertainment, executed an Amended and Restated Holdings Guaranty (the "Holdings Guaranty"); and (ii) Exhibition, AVI, ACC, and GAT (collectively, the "Subsidiary Guarantors") executed an Amended and Restated Subsidiary Guaranty (the "Subsidiary Guaranty", and collectively with the Holdings Guaranty, the "Guarantees"), in each case guaranteeing the Obligations of Entertainment under the Credit Agreement, and acknowledging that the Guarantied Obligations were being incurred for and would inure to their benefit and, in the case of the Subsidiary Guarantors, that a portion of the Loan proceeds may be advanced to them.

C.      Entertainment and the Subsidiary Guarantors (collectively the "Grantors"), also executed that certain Second Amended and Restated Master Security Agreement dated November 30, 2018 (as subsequently amended, the "Security Agreement") in favor of BofA.

D.      Pursuant to Section 1 of the Security Agreement, the Grantors granted to BofA a security interest in, among other things, substantially all assets of the Grantors, including but not limited to "all General Intangibles, including all intellectual property, … [and] all Goods, including Inventory, Equipment and Fixtures" (collectively, the "Collateral").  See Security Agreement, ¶1(e) and (f).

E.      BofA perfected its lien and security interest in the Collateral by filing UCC-1 financing statements with the State of California Secretary of State's Office on February 25, 2008 as to each of ACC, Entertainment, Exhibition, PCC and AVI, and with the Delaware Department of State's Office on June 27, 2013 as to GAT, and thereafter timely filing applicable continuation statements (collectively, the "Financing Statements").

F.      On or around November 30, 2018, PCC and Entertainment each executed a Grant of Trademark Security Interest in favor of BofA (the "Trademark Security Assignment").  BofA filed various Trademark Assignments with the United States Patent and Trademark Office in regard to its security interest in trademarks held by PCC and Entertainment.

G.      On or around November 9, 2020, BofA, as administrative agent and lender,

**Execution**

Entertainment (as Borrower), PCC, and the Subsidiary Guarantors entered into a Waiver, Consent and Amendment Number Three to Second Amended and Restated Credit Agreement (the "Third Amendment"). The Third Amendment, among other things, (i) modified the existing credit commitment; (ii) provided for a "Delayed Draw Term Loan Commitment" in the aggregate original amount of $6,500,000 ("Delayed Draw Commitment"); (iii) provided for the consent by BofA to the Transactions (as such term is defined below); and (iv) provided for the consent by Borrower to the sale by the Lenders to DTP of a 100% participation in the Delayed Draw Commitment.

H.    On or around May 7, 2021, BofA, Entertainment (as Borrower), PCC, and the Subsidiary Guarantors entered into an Amendment Number Four to Second Amended and Restated Credit Agreement (the "Fourth Amendment"). The Fourth Amendment, among other things, (i) identified defaults and terminated the existing credit commitments, including but not limited to Delayed Draw Term Loan Commitment: (ii) provided for optional and discretionary funding of protective advances (the "Protective Advances") to Entertainment for the purpose of preserving and/or maximizing the value of the Collateral and continuing operations to the extent necessary in connection therewith; and (iii) acknowledged that an anticipated tax refund was a part of the Collateral, to be paid over to BofA.

I.    DTP and BofA entered into a Participation Agreement dated as of November 9, 2020 (as amended, the "Participation Agreement"), pursuant to which, among other things and as more specifically set forth in the Participation Agreement, BofA agreed to sell to DTP (i) an undivided, junior and subordinate 100% interest in the Protective Advances not to exceed $1,593,500 and (ii) an undivided last-out, junior and subordinate 100% interest in the Delayed Draw Term Loans outstanding at any time in a principal amount not to exceed $6,500,000 (the "Existing Term Loans").

J.    On or about November 9, 2020 (the "Closing Date"), Exhibition, Entertainment (together with Exhibition, "Pacific Theatres"), ACC, DT Operator, LLC ("DT Operator"), DC,

3

and WinCal entered into certain transactions collectively intended to, among other things, terminate a lease entered into by Exhibition and restructure certain lease obligations of another lease entered into by Exhibition (Exhibition was in default of both leases), provide Pacific Theatres with additional liquidity, and grant certain intellectual property rights to DT Operator and WinCal. As a result of these transactions (the "Transactions"), Pacific Theatres received $17 million in new liquidity. The Transactions, each of which was contingent upon all of the others, and all of which closed contemporaneously, can be summarized as follows:

(a) Lease Termination and Forbearance with respect to the Arclight Lease (as such term is defined below): On or about the Closing Date, Exhibition, as tenant, and DC, as landlord of "Arclight Hollywood" (the "Arclight Premises"), entered into a lease termination and release agreement (the "Lease Termination Agreement") for the purpose of terminating that certain Theatre Lease for the Cinerama Dome, Los Angeles, California, dated May 5, 2000 (the "Arclight Lease"). Pursuant to the Lease Termination Agreement, the Arclight Lease was terminated, and Exhibition vacated and surrendered possession of the Arclight Premises and all furniture, fixtures, equipment and other personal property located on or at the Arclight Premises. In consideration for the Lease Termination Agreement, DT Operator (on behalf of DC) paid Exhibition $10.5 million (the "Lease Termination Payment"). As further consideration for the lease termination, DC also agreed to forebear upon exercising or pursuing remedies against Exhibition on account of outstanding rent due and owing under the ArcLight Lease as of the Closing Date for an agreed period.

(b) On or about the Closing Date, Exhibition applied $9 million of the Lease Termination Payment to pay down the outstanding principal balance under the Credit Agreement. The remaining $1.5 million of the Lease Termination Payment provided liquidity for Pacific Theatres for its needs.

(c) DT Operator entered into a transition services agreement with Exhibition, under

**Execution**

which DT Operator would reimburse Exhibition for expenses incurred as a result of any transition services rendered by Exhibition.  DT Operator thereafter entered into a services agreement with Entertainment, under which DT Operator would reimburse Entertainment for expenses incurred as a result of any services rendered by Entertainment.

(d)  Modification of Winnetka Lease:  On or about the Closing Date, WinCal, as landlord, and Exhibition, as tenant of "Pacific Theatres Winnetka" pursuant to that certain Lease, dated January 18, 1997 (as amended, the "Pacific Winnetka Lease"), entered into a lease modification and forbearance agreement providing for the payment of only "percentage rent" from the Closing Date through the remainder of the lease term. WinCal also agreed to forbear for an agreed period from exercising or pursuing remedies against Exhibition on account of outstanding rent due and owing under the Pacific Winnetka Lease as of the Closing Date.

(e)  Intellectual Property Licenses and Exclusive Territory:  On or about the Closing Date, Entertainment granted to WinCal certain intellectual property licenses.  Also, on or about the Closing Date, ACC and Entertainment granted to DT Operator certain intellectual property licenses, and agreed not to operate under the names "Arclight" or "Pacific Theatres" in the general Hollywood vicinity (subject to permitted exceptions).

(f)  Financing Transaction:  In connection with these Transactions, DTP purchased a $6.5 million participation in the Existing Term Loans.

K.       DT Operator, DC, DTP and WinCal are affiliates of Pacific Theatres and ACC. All of the Transactions were approved solely by the independent directors of Pacific Theatres. Prior to approving these Transactions, the independent directors of Pacific Theatres obtained a third-party valuation of the Arclight Lease and related property.

L.       On June 18, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 7 of title 11 of the United States Code, thereby commencing the Cases.

5

**Execution**

M.      Until it was forced to cease operations in March 2020 due to the Covid-19
Pandemic, Exhibition operated numerous motion picture theatres at leased premises ("Leased
Premises") in various locations throughout the United States.  In addition to the Transactions
involving the Arclight Lease and Pacific Winnetka Lease (above), prior to the Petition Date, in
one form or another, Exhibition surrendered possession of various Leased Premises to its
respective landlords, as well as the tangible personal property of Exhibition remaining in the
Leased Premises, subject, however, to rights of third parties including BofA and any equipment
lessors.

N.      Shortly before the commencement of the Cases, the Debtors retained an outside
advisor to market and sell their intellectual property, but did not succeed in identifying a purchaser
for the intellectual property.

O.      In their filed Schedules of Assets, ACC and Entertainment, respectively, listed
certain trademarks, word marks and design marks, which are more fully identified in Exhibit 1
hereto (collectively, the "Marks").  BofA, as administrative agent and lender, asserts that it has a
valid, perfected and senior security interest on all of the Purchased Assets (as such term is defined
below), including, without limitation, the Marks and all other Intellectual Property (as such term
is defined below), and the Trustee does not contest that the Purchased Assets constitute BofA's,
as administrative agent and lender, Collateral.  "Intellectual Property" means any and all of the
Estates' right, title and interest in the following, in any jurisdiction throughout the universe
(whether or not registered): (i) trademarks, service marks, trade names, social media pages and
accounts, social media handles and user names, websites, brand names, logos, designs, trade dress
and other proprietary indicia of goods and services, including, without limitation, the Marks
identified on Exhibit 1 hereto, and the goodwill connected with the use of and symbolized by any
of the foregoing, (ii) copyrights and copyrightable material, including, without limitation, all rights
in and to all works based upon, derived from or incorporating the underlying work to the extent
owned by the Estates, (iii) internet domain names, domain names, URLs, whether or not

6

trademarks, including, without limitation, the domain names identified in Exhibit 2 hereto,  (iv) trade secrets, know-how, ideas, concepts and methods, (v) all applications, registrations, renewals, extensions and common-law rights associated in connection with any of the foregoing, (vi) any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing, excluding monies collected by the Estate prior to the Effective Date, and (vii) any and all claims and causes of action, with respect to any of the foregoing, whether accruing before, on and/or after the Effective Date, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present and future infringement, dilution, misappropriation, violation, misuse, breach or default.

P.      As of the Petition Date, BofA as administrative agent asserts that it was owed under the Loan Documents the outstanding principal amount of $6,355,500.00, plus accrued and unpaid interest and other costs and expenses.

Q.      Pursuant to that *Stipulation for Relief from Automatic Stay* between Exhibition, the Trustee, and BofA that was approved by Order entered December 3, 2021 [Docket # 138], the Trustee turned over to BofA a California tax refund to Exhibition in the amount of $1,301,347.81.

R.      Pursuant to that *Stipulation Regarding Disposition Of Theatres Tangible Personal Property* between the Trustee and BofA that was approved by Order entered February 3, 2022 [Docket # 163], the Trustee sold certain tangible personal property ("FF&E") of Exhibition that had not been previously surrendered by Exhibition, and abandoned remaining FF&E that had been surrendered to lessors.  BofA asserted and asserts that its security interest continues to attach to all of the FF&E that has not previously been released by BofA, and the Trustee does not contest that such FF&E constitutes BofA's Collateral.  The Trustee delivered to BofA $255,564.82 in proceeds of the sale of FF&E by the Trustee.  BofA reported that it subsequently received $525,000 in gross proceeds from disposition of its remaining FF&E collateral.

S.      As of the date of this Agreement, BofA asserts that it is owed under the Loan Documents the outstanding principal amount of $4,521,935.69, plus accrued and unpaid interest

**Execution**

and other costs and expenses (collectively, the "Current Loan Balance"), including principal of $1,166,436.69 owing to BofA, as lender under the Revolving Loans, and principal of $3,355,500.00 owing to DTP under the Existing Term Loans.

T.      In addition to proceeds of sale of liquor licenses ("Liquor License Proceeds"), which the Trustee asserts are not subject to a perfected security interest of BofA, as of September 30, 2022, the Trustee has collected approximately $178,572.95 from other sources, including but not limited to refunds, royalty payments, and account turnover ("Existing Estate Collections"). The Trustee also is pursuing certain recoveries from class actions and other actions that the Trustee believes are commercial tort claims ("Trustee Commercial Claims").  The Trustee and BofA have not reached any agreement as to whether the Existing Estate Collections or the Trustee Commercial Claims are subject to a perfected security interest of BofA as lender and administrative agent under the Credit Agreement.

U.      DTP has advised the Trustee that it wishes to purchase the Purchased Assets free and clear of liens, claims and interests on the terms set forth herein, and that DTP and BofA have reached an agreement which (among other things) will allow BofA as administrative agent to credit bid the Current Loan Balance, or part thereof, in payment of the purchase price for DTP's

acquisition of the Purchased Assets, a true and correct copy of which is attached hereto as Exhibit 3 (the "BofA/DTP Agreement").

V.      The Parties wish to avoid the risks and expenses attendant to further dealings, disputes, or litigation among them, without any Party admitting fault, liability or wrongdoing, and to settle claims the Parties may have against each other in accordance with the terms and conditions set in this Agreement.

NOW, THEREFORE, in consideration of the recitals above, which are incorporated herein by reference, and the covenants and agreements below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally

Execution

bound hereby, agree as follows:

## AGREEMENT

1.    <u>Court Approval.</u>  Promptly upon full execution of this Agreement, the Trustee shall file a motion in the Cases in form and substance reasonably satisfactory to BofA and DTP ("<u>Approval Motion</u>"), seeking Bankruptcy Court approval of this Agreement under Fed. R. Bk. Proc. 9019 and the sale of the Purchased Assets pursuant to 11 U.S.C. §363 free and clear of liens, claims and interests, on the terms set forth herein.  The Trustee shall use reasonable efforts to obtain such Bankruptcy Court approval, subject to the Trustee's right to consider higher or better competing bids with respect to the Purchased Assets as set forth herein.  BofA and the DTP shall reasonably cooperate in providing any information reasonably requested by the Trustee in connection with the Approval Motion.  If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any person or entity (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), the Trustee shall exercise reasonable diligence to defend against such appeal, petition or motion and shall use reasonable efforts to obtain an expedited resolution of any such appeal, petition or motions; provided, that the Trustee shall consult with BofA and the DT Parties regarding the status of any such actions.

2.    <u>Effective Date; Termination.</u>

(a)    The effectiveness of this Agreement and the sale of the Purchased Assets pursuant hereto are contingent in all respects upon and shall become binding only upon the date an order entered by the Bankruptcy Court in form and substance reasonably satisfactory to BofA and DTP approving the terms of this Agreement and the sale of the Purchased Assets becomes final and no longer subject to appeal in the Cases, within the time required by this Section 2 (a) (the "<u>Effective Date</u>").  This Agreement shall be null and void if: (i) the Bankruptcy Court denies the Approval Motion; or (ii) the Bankruptcy Court order approving the Approval Motion is not

**Execution**

final and non-appealable on or before the date that is 60 days after the date hereof, or such later date as agreed by the Parties in writing.

(b)      This Agreement may be terminated prior to the Effective Date as follows: (i) by the mutual written consent of each of the Parties; (ii) by BofA or DTP if the Trustee enters into any agreement in principle, letter of intent, memorandum of understanding, definitive agreement or other arrangement for the sale of any of the Purchased Assets to any person or entity other than DTP or a Successful Bidder as provided herein; or (iii) by any Party that is not in material breach of this Agreement if another Party shall have materially breached this Agreement and shall not have cured such material breach within 15 days of written notice thereof from the Party seeking termination.   If this Agreement is validly terminated in accordance with this paragraph, then this Agreement shall become null and void and of no further force or effect, and there shall be no liability hereunder on the part of any Party and DTP shall not be obligated to pay, satisfy or assume any portion of the Purchase Price, except that the provisions of this paragraph and Section 10, and any defined terms used therein, shall survive any termination of this Agreement.

3.      <u>Sale of Purchased Assets.</u>

(a)      The Trustee (referred to for purposes of this Section 3 as "<u>Seller</u>") agrees to sell, transfer, convey, assign and deliver to DTP, as the designee of BofA as administrative agent, and DTP agrees to purchase from the Trustee and the Estates, all of Seller's right, title and interest in and to (i) the Intellectual Property, (ii) the license agreements identified on <u>Exhibit 4</u> hereto (the "<u>Assigned License Agreements</u>") and (iii) all rights, claims, credits, settlement proceeds, causes of action or rights of set off against third parties relating to the Assigned License Agreements, excluding funds held by the Estates as of the Effective Date (clauses (i) through (iii), collectively, the "<u>Purchased Assets</u>"), free and clear of liens, claims and interests, on the terms set forth herein.

**Execution**

DTP agrees to be bound by the terms and obligations of the Assigned License Agreements arising solely after, and subject to the occurrence of, the Effective Date. The purchase price for the Purchased Assets shall be $50,000, or such higher amount as determined by DTP in its sole discretion through bidding as described herein (the "Purchase Price"). The Purchase Price for the purchase of the Purchased Assets by DTP shall be satisfied on the Effective Date through a credit against the Current Loan Balance, as adjusted (if applicable) through the Effective Date (the "Effective Date Loan Balance").  Notwithstanding anything to the contrary herein, under no circumstances shall any portion of the Purchase Price be converted into or otherwise require a cash payment by DTP or BofA.  The Trustee acknowledges and agrees that DTP is not hereby assuming any liabilities or other obligations of the Trustee or the Estates of any nature whatsoever, whether accrued or unaccrued, known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, liquidated or unliquidated, or due or to become due, except for liabilities and obligations under the Assigned License Agreements arising solely after, and subject to the occurrence of, the Effective Date.

(b)     BofA consents to the sale of the Purchased Assets to DTP, or any Successful Bidder (as such term is defined below), for an amount greater than the Purchase Price, free and clear of its liens and security interests under the Loan Documents, subject to the terms of this Agreement, and to DTP acting as its designee for purchase of the Purchased Assets by a credit against the Effective Date Loan Balance in accord with this Agreement.

(c)     The sale of the Purchased Assets (the "Sale") shall be consummated by delivery by Seller to DTP (or a Successful Bidder) on the Effective Date of (i) a duly executed Assignment and Assumption Agreement in the form attached hereto as Exhibit 5; (ii) a duly

11

**Execution**

executed Trademark Assignment substantially in the form attached hereto as <u>Exhibit 6</u>; and (iii) a duly executed Domain Name Assignment substantially in the form attached hereto as <u>Exhibit 7</u>.

(d)      The Trustee hereby represents, acknowledges and agrees for the Trustee and his successors in such capacity that (i) the Trustee is the duly appointed Chapter 7 trustee in the Cases as noticed in the Notice of Chapter 7 Bankruptcy Case filed in the Cases at Docket # 3 (Docket # 4 in the Entertainment Case) and (ii) subject to entry of an order of the Bankruptcy Court approving the Approval Motion, the Trustee has the authority to enter into this Agreement and to consummate the transactions contemplated hereby, including, without limitation, the Sale on the terms set forth herein.

(e)      DTP hereby represents, acknowledges and agrees for DTP and DTP's successors, heirs and assigns, that:

i.      The interests of the Estates, if any, in the Purchased Assets are being sold in "AS IS, WHERE IS, WITH ALL FAULTS" present condition, without representations or warranties of any kind or nature whatsoever whether express or implied, and subject to the Assigned License Agreements (for the avoidance of doubt, any license granting any rights to any of the Debtors in any of the Intellectual Property shall automatically terminate on the Effective Date).

ii.      The Seller is a bankruptcy trustee and any interest acquired by the Estates in the Purchased Assets was acquired for a short period of time due to the Cases.  Neither the Estates nor the Seller has acquired any interest in the Purchased Assets for the purpose of maintaining the Purchased Assets, but rather for the sole purpose of liquidating the Purchased Assets for the benefit of the creditors of the Estates.

iii.    Due to the unique nature of Cases, the Seller has not personally audited, investigated or inspected the Purchased Assets and has not personally used the Purchased Assets.  DTP and the Seller further agree that it is not economical or reasonable for the Seller to audit, investigate or inspect the Purchased Assets under these circumstances because neither the Estates nor the Seller acquired an interest in the Purchased Assets, if any, for the purpose of using the Purchased Assets.  DTP wishes to acquire the Purchased Assets for DTP's particular use.  DTP has greater assets and facilities than the Estates to make a diligent audit, investigation and inspection of the Purchased Assets.

iv.    DTP has been given an extensive opportunity to inspect and investigate the Purchased Assets, independently and through agents of DTP's choosing.  DTP shall continue to have the right to inspect the Purchased Assets.  DTP acknowledges that in purchasing the Purchased Assets, DTP is not relying in any manner on the Seller, the Seller's attorney or any other agents of the Seller or the Estates regarding the characteristics or condition of the Purchased Assets or any other aspect of the Purchased Assets.  DTP acknowledges that it is not relying in any manner upon any information regarding the Purchased Assets provided in any manner by (x) the Seller, the Seller's attorney or any other agent of the Seller; or (y) BofA, BofA's attorney or by any other agent of BofA.  DTP acknowledges that it is not relying on the Seller, the Seller's attorney or any other agents of the Seller or the Estates regarding whether the Purchased Assets comply with any statutes, codes, regulations, ordinances or other laws of any city, county, state, federal government or any other governmental agency.  DTP holds harmless the Seller, the Seller's

**Execution**

attorney, the Estates, the United States Bankruptcy Court and the Seller's agents as to suitability of the Purchased Assets for DTP's intended use.

v.  Although there could be defects in and on the Purchased Assets, including, but not limited to, title defects, DTP relieves the Seller, the Seller's attorneys and the Seller's agents of any and all obligations to inspect the Purchased Assets or investigate any matter involving the Purchased Assets, including, but not limited to, the history of the Purchased Assets, their condition, any Purchased Assets defects, its potential value to DTP or the public and any aspects of title to the Purchased Assets.

vi.  DTP represents and warrants that DTP is relying solely upon inspection(s) of the Purchased Assets by DTP and not upon any representation made by any person whomsoever, and that DTP is purchasing the Purchased Assets in the condition in which it now is, without any obligation on the part of the Seller to make any changes to the Purchased Assets or to maintain the Purchased Assets.  In summary, the sale is completely "AS IS, WHERE IS, WITH ALL FAULTS."  The consummation of this transaction shall constitute an acknowledgement by DTP that the Purchased Assets has been accepted without representation or warranty of any kind or nature and in its present "AS IS, WHERE IS, WITH ALL FAULTS" condition.

vii.  DTP shall be solely responsible for any broker's commission or finder's fee directly contracted by DTP and payable in connection with the Sale of the Purchased Assets (if any), as well as for any documentary transfer tax, recording fees or other similar charges (other than income, sales or similar taxes) payable to any governmental authority, if any, in connection with the Sale (if any).

14

**Execution**

(e)      DTP acknowledges and agrees that the Seller is acting in all respects in connection with this Agreement solely as a bankruptcy trustee, the representative of the Estates, and not in the Seller's personal or individual capacity.  DTP acknowledges and agrees that the Seller does not have and shall not have any personal liability of any kind under any provision of this Agreement.  With respect to any and all disputes arising from or in any manner connected with this Agreement, DTP hereby waives any and all rights to: (a) sue the Seller in his personal capacity; (b) to recover a judgment against the Seller personally; or (c) to obtain any other form of relief against the Seller in his personal capacity.  In the event of any breach of this Agreement by the Seller or the occurrence of any other dispute arising from or in any manner related to this Agreement such breach or dispute shall be asserted against the Estates only and not the Seller.

(f)      DTP acknowledges that the approval by the Bankruptcy Court of the sale contemplated in this Agreement shall be subject to overbidding in accordance with bankruptcy law and other applicable statutes, regulations and rules of the Bankruptcy Court.  DTP acknowledges that overbidders may be present at the hearing regarding the motion to approve the sale of the Purchased Assets and that the Seller has a duty to (a) attempt to obtain overbids and (b) to sell the Purchased Assets to the Qualified Bidder (as such term is defined below) who submits the highest or best bid.  DTP shall have the right to be present at the hearing regarding the motion to approve the sale to DTP and to participate in any bidding that may occur by credit bidding an amount up to the Current Loan Balance.  Seller shall inform DTP of the date, time, and location of the hearing regarding the motion to approve the sale to DTP.  DTP acknowledges and agrees, however, that the Bankruptcy Court will require the Seller to sell the Purchased Assets to the Qualified Bidder who submits the highest or best bid.  The Trustee agrees to request that the Bankruptcy Court determine that a bidder shall be a Qualified Bidder only so long as the bidder provided the Trustee

15

with: (x) a cash deposit of not less than $50,000 by no later than three (3) business days prior to the hearing seeking approval of the Approval Motion; and (y) proof of the financial wherewithal to fund the Purchase Price at an amount equal to or greater than the Current Loan Balance. Only a bidder satisfying (x) and (y) above or otherwise determined by the Bankruptcy Court to be qualified and entitled to bid (a "Qualified Bidder") may bid for the Purchased Assets at the hearing regarding the motion to approve the sale of the Purchased Assets.

(g)    Seller intends to offer the Purchased Assets for sale to potential overbidders free and clear of liens, claims and interests, on the same terms and conditions as provided here as to DTP, except (i) for the amount of the purchase price for the Purchased Assets and (ii) any overbidder's purchase price amount must be payable in cash at the closing of the sale. In the event that the Trustee determines, in the exercise of his reasonable business judgment, that the highest or best bid for the Purchased Assets has been submitted by a Qualified Bidder that submits an overbid, and closes a sale of the Purchased Assets to that Qualified Bidder (a "Successful Bidder"), the consideration from the Successful Bidder (the "Purchased Assets Proceeds") shall be paid directly by such Successful Bidder to BofA as administrative agent up to the amount of the Obligations owing under the Credit Agreement to be applied to thereto in accordance with the Loan Documents. If the Purchased Assets Proceeds are in excess of such amount to be paid to BofA, such excess shall be paid to Seller by the Successful Bidder.

(h)    During the period from the date hereof through the Effective Date (or the earlier termination hereof), the Trustee shall not (i) transfer, assign, abandon, dispose, permit to lapse or grant any license or sublicense of, or any rights to use, any rights under or with respect to any of the Purchased Assets; (ii) take any action or knowingly fail to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any

16

**Execution**

Purchased Assets; or (iii) enter into any settlement regarding breach or infringement of any Purchased Assets.

(i)    The Trustee agrees that after the Effective Date, the Trustee and the Estates shall not use and shall cease using, directly or indirectly, the Marks and any like names or combinations of words or derivations thereof or any names or marks confusingly similar thereto.

(j)    Subject to the terms and conditions of this Agreement, at and following the Effective Date, each of the parties shall execute, acknowledge and deliver all such further conveyances, assignments and notices and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to DTP and its successors and assigns, all of the Purchased Assets, and to otherwise make effective the transactions contemplated hereby.

4.    Retention of Proceeds by Estates.  From and after the Effective Date the Trustee and the Estates shall be entitled to retain all proceeds of any assets and property of the Debtors received by the Estates (other than Purchased Assets Proceeds, if any) and not previously remitted to BofA as administrative agent, including but not limited to Liquor License Proceeds, Existing Estate Collections, and Trustee Commercial Claims, whether or not such assets, property or proceeds constitute Collateral, free and clear of any claims or liens and security interests of BofA as administrative agent under the Loan Documents.

5.    UCC Terminations.  Promptly after the Purchased Assets are transferred to DTP or the Successful Bidder and, in the latter instance, after BofA as administrative agent is paid all of the Purchased Assets Proceeds up to the amount of the Obligations owing under the Credit Agreement, BofA as administrative agent shall file with the appropriate office (i) an effective UCC termination statement with respect to each financing statement supporting the liens and security

17

interests under the Loan Documents and (ii) intellectual property releases for any security assignments in favor of BofA with respect to the Purchased Assets, including, without limitation, the Trademark Security Assignment, which also shall be duly recorded in the United States Patent and Trademark Office and/or United States Copyright Office as to the Intellectual Property, as appropriate.

6.    Releases.

(a)    For and in consideration of the promises, commitments and undertakings set forth in this Agreement, receipt of which is hereby acknowledged, effective as of the Effective Date, the Trustee and the Estates, and each of them, on their own behalf and on behalf of their respective successors and assigns (collectively, the "Estate Releasing Parties"), forever and completely release, dismiss, acquit, and discharge (1) BofA (including in its capacity as administrative agent), (2) the DT Parties, (3) their respective affiliates (other than, in the case of the DT Parties, the Debtors, but including, without limitation, DT Operator, DC, and WinCal), (4) Life Insurance Company of North America, DC's mortgage lender, and (5) all of the past and present officers, directors, managers, control persons, equity holders, subsidiaries, members, employees, partners, attorneys, accountants, consultants and other professionals, agents, successors and assigns of each of the parties covered by (1), (2) and (3) above (collectively, the "Non-Estate Released Parties"), of and from all claims or causes of action of any nature whatsoever, known or unknown, discoverable or undiscoverable, direct or indirect, foreseen or unforeseen, or matured or un-matured, whether based in tort, contract, statutory law, equity or otherwise (collectively "Claims") arising by reason of any and all acts, omissions, events or facts occurring or existing prior to the date of this Agreement, including but not limited to the Loan Documents and the Collateral (collectively, the "Estate Released Claims"). Notwithstanding the foregoing, the Estate Released Claims shall not include (i) any obligations pursuant to this Agreement or Claims arising therefrom; or (ii) and rights and remedies available to the Trustee and the Estates to seek to obtain documents or information, including testimony, in aid of the

administration of the Estates or the pursuit of Claims against parties other than the Non-Estate Released Parties.

(b)    For and in consideration of the promises, commitments and undertakings set forth in this Agreement, receipt of which is hereby acknowledged, effective as of the Effective Date, BofA as lender and administrative agent, and the DT Parties, and each of them, on their own behalf and on behalf of their respective successors and assigns (collectively, the "Non-Estate Releasing Parties"), forever and completely release, dismiss, acquit, and discharge the Debtors, the Trustee, the Estates and all of their past and present officers, directors, employees, partners, attorneys, accountants, consultants and other professionals, agents, successors and assigns and each of them, in each case, in their respective capacity as such and in no other capacity (collectively, the "Estate Released Parties"), of and from all Claims arising by reason of any and all acts, omissions, events or facts occurring or existing prior to the date of this Agreement, including but not limited to the Loan Documents and the Collateral (collectively, the "Non-Estate Released Claims").  Notwithstanding the foregoing, the Non-Estate Released Claims shall not include any obligations pursuant to this Agreement, or any obligations of the Trustee or TDC pursuant to that certain Confidentiality Agreement, dated on or about the date hereof, by and between the Trustee and TDC.

(c)    Nothing in the foregoing releases shall be construed as a release of any claims, demands or causes of action by and/or on behalf of the Trustee and the Estates against parties other than the Non-Estate Released Parties arising out of or related to the DT Parties' procurement of any and all types of insurance coverage for the Debtors (hereinafter "Insurance Claims"). The Parties do not intend to prevent or limit the Trustee and the Estates from evaluating and/or pursuing claims, demands or causes of action against any of the following insurance producer and/or insurers (no matter how named and whether coverage extended by parent or subsidiary entities):

Arthur J Gallagher

**Execution**

Hartford
Hiscox USA
HDI
Arrowhead
CNA
Velocity
Brit
Lloyds
Sompo
Princeton/Munich re
Tokio
Chubb
Markel
Allied World
Ace American

TDC and DMC agree to reasonably cooperate with attorneys for the Trustee and the Estates regarding their availability for depositions, trial and/or hearing testimony and the prosecution of any such Insurance Claims.  In addition, the Trustee covenants not to pursue collection or recovery of any Insurance Claims directly against the Non-Estate Released Parties.

(d)      The Estate Releasing Parties and the Non-Estate Releasing Parties (collectively, the "Releasing Parties") hereby acknowledge that it is their intention that, subject to the provisions stated above, the releases contained herein shall be effective as full and final releases of and as a bar with prejudice to each and every Estate Released Claim and Non-Estate Released Claim (collectively the "Released Claims") as set forth therein; and that, by this Agreement, the Releasing Parties are forever waiving and relinquishing any and all rights and benefits which they may have by virtue of the laws of any jurisdiction that limits the extension of a general release to certain claims.  In connection with such waiver and relinquishment, the Releasing Parties acknowledge that they or their attorneys may hereafter discover facts different from or in addition to the facts that they now know or believe to be true with respect to the subject matter of this Agreement, but that it is their intention to hereby fully, finally, absolutely, and forever release any and all Released Claims, which now do exist, may exist or heretofore have existed between them, as provided herein, and that in furtherance of such intentions the release as given herein by the

20

Releasing Parties, shall be and remain in effect as a full and complete release of the Released Claims, notwithstanding the discovery of any such different or additional facts.

(e)  Notwithstanding the discovery of any such additional or different facts, the Releasing Parties certify that they have read Section 1542 of the California Civil Code set forth below:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

(f)  The Releasing Parties waive application of Section 1542 of the California Civil Code, to the extent applicable, and any other statutes, common law rights, rules or the like which may operate to limit the intent of this Agreement with respect to the Released Claims.  The Releasing Parties understand and acknowledge the significance and consequence of this waiver of Section 1542 of the California Civil Code is that even if the Releasing Parties should eventually suffer additional damages on account of the Released Claims, they will not be permitted to make any claim for such damages.

(g)  It is expressly understood and agreed by the Releasing Parties that the facts with respect to this Agreement may turn out to be different from the facts now known or believed by the Releasing Parties to be true.  Each of the Releasing Parties expressly assumes the risk of the facts turning out to be different and agrees that this Agreement will be in all respects effective and not subject to termination or rescission by reason of any such differences.

7.    Trustee as Representative of the Bankruptcy Estates.  The Parties acknowledge that the Trustee is a trustee appointed to administer bankruptcy estates.  The Parties acknowledge and agree that this Agreement is being made by the Trustee solely in his capacity as the chapter 7

trustee of the Debtors' Estates, and not in a personal capacity, and no liability or obligations shall accrue to the Trustee personally.

       8.    <u>No Admission of Liability</u>**.**  This Agreement is not intended and shall not in any way be construed as an admission by any Party of any liability, wrongdoing or acts of misconduct whatsoever against any other Party or any other person, and each Party specifically disclaims any liability to any other Party or any other person, except as otherwise stated herein.  The Parties specifically acknowledge and agree that this Agreement is made to compromise and settle the Parties' respective rights, defenses and claims and that neither this Agreement nor any action taken pursuant to this Agreement shall be offered or received in evidence in any action or proceeding as an admission of liability or wrongdoing of any nature on the part of any Party.

       9.    <u>Representations and Warranties</u>.  The Parties represent and warrant to the others, as an inducement for the others to enter into this Agreement, that:

       (a)    Such Party has read and understands all of the terms and conditions set forth in this Agreement;

       (b)    Such Party has had the benefit of legal counsel of its own choosing in deciding to execute this Agreement;

       (c)    Such Party, without promise of benefit other than as set forth herein, is voluntarily entering into this Agreement;

       (d)    There is good and valid consideration to support such Party's entering into this Agreement and to bind such Party by the terms and conditions of this Agreement;

       (e)    Such Party was not coerced, threatened or otherwise forced to sign this Agreement, and its signature appearing hereinafter is voluntary and genuine and was duly and validly authorized and given; and

**Execution**

(f)      BofA represents and warrants to the Trustee that it is the administrative agent and holder of all claims under the Loan Documents, and that it has not assigned its rights in any claims or causes of action released by it herein other than as provided herein.

10.    <u>Miscellaneous</u>.

(a)      <u>Notice</u>.    For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below in this Agreement, or to such other address as either Party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

| | |
|---|---|
| If to the Trustee: | Edward M. Wolkowitz, Chapter 7 Trustee<br>Levene, Neale, Bender Yoo & Golubchik L.L.P.<br>2818 La Cienega Avenue<br>Los Angeles, CA 90034 |
| with a copy (which shall not constitute notice) to: | Levene, Neale, Bender Yoo & Golubchik L.L.P.<br>Attention: Philip A. Gasteier, Esq.<br>2818 La Cienega Avenue<br>Los Angeles, CA 90034 |
| If to BofA: | G. Christopher Miller, Sr. Vice President<br>Bank of America, N.A.<br>100 Federal Street<br>MAS 100-09-012<br>Boston, MA 02110 |
| with a copy (which shall not constitute notice) to: | Robert J. Miller, Esq.<br>Buchalter<br>15279 N. Scottsdale Road, Suite 400<br>Scottsdale, AZ  85254 |
| If to the DT Parties: | c/o DT Participant, LLC<br>120 N. Robertson Blvd.<br>Los Angeles, CA 90048 |

**Execution**

Attention: Legal Department

with a copy via email (which shall not constitute
notice) to: LegalGroup@decurion.com

with a copy (which shall      KTBS Law LLP
not constitute notice) to:    1801 Century Park East, 26th Floor
                              Los Angeles, CA 90067-2328
                              Attn: Michael L. Tuchin

(b)    <u>Jurisdiction.</u>   The Parties agree that the Bankruptcy Court shall retain jurisdiction to hear and consider any dispute arising between the Parties under this Agreement. The Parties agree to meet and confer in good faith in an effort to resolve any dispute arising under this Agreement before commencing any legal action or proceeding with respect to such dispute.

(c)    <u>Counterparts</u>.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement, and the signature pages from any counterpart may be appended to any other counterpart to assemble fully-executed counterparts.   Counterparts of this Agreement also may be exchanged via electronic facsimile machines or computer, and any such electronic transmission of any Party's signature shall be deemed to be an original signature for all purposes.

(d)    <u>Amendment</u>.   The terms of this Agreement shall not be altered, amended, modified or otherwise changed in any respect except by a writing duly executed by all of the Parties hereto.

(e)    <u>Severability</u>.   Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.   If any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(f)    <u>Binding Agreement.</u>   This Agreement shall be binding upon the Parties, and their respective representatives, successors and assigns, and shall similarly inure to the benefit of

**Execution**

their respective representatives, successors and assigns, including any subsequently-appointed trustee in the Cases.  The Parties shall not assign or delegate their obligations under this Agreement to any other person or entity.

(g)     No Third-Party Beneficiaries.    Nothing in this Agreement, express or implied, is intended to, or shall be construed to, confer upon any person other than the Parties, the Estate Released Parties and the Non-Estate Released Parties any right, remedy or claim under or by reason of this Agreement, which is and shall be for the sole and exclusive benefit of the Parties, the Estate Released Parties and the Non-Estate Released Parties.

(h)     Attorney's Fees and Costs.    Each Party shall bear its own fees and expenses, including attorney and accounting fees, incurred in connection with the matters that are the subject of this Agreement.  In the event of a breach under the terms of the Agreement, the prevailing Party shall be entitled to recover its fees and costs, including attorney and accounting fees, incurred as a result of any such breach.

(i)     Construction; Certain Defined Terms.    The terms and conditions set forth in this Agreement are the product of joint draftsmanship by all Parties, each being represented by counsel, and any ambiguities in this Agreement or any documentation prepared pursuant to or in connection with this Agreement shall not be construed against any of the Parties because of draftsmanship.  As used herein, (i) the term "affiliates" means, as to any person or entity, each other person and entity that controls, is controlled by, or is under common control with, such person or entity, and (ii) the terms "control(s)" and "controlled" mean the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

(j)     Headings.    The headings of paragraphs in this Agreement are for convenience of reference only and shall not in any way affect the interpretation or construction of this Agreement.

**Execution**

(k)    <u>Governing Law</u>.  This Agreement shall be construed under and governed by the laws of the State of California, without regard to California's choice of law provisions.

(l)    <u>No Waiver</u>.  No failure of a Party to notify any other Party of any default shall prejudice any remedy for any subsequent defaults.  No failure of a Party to insist on strict compliance by any other Party with its obligations under this Agreement and no custom or practice of the Parties in variance with the terms of this Agreement shall constitute a waiver of the Party's right to demand exact compliance with this Agreement's terms.  Any waiver by a Party of a default shall be limited to the particular instance and shall not operate or be deemed to waive any further default.

(m)    <u>Authority</u>.  Each of the Parties, being an individual, trust, estate, limited liability company, partnership, statutorily-created committee, or corporate entity, represents and warrants to the other Parties that the representative who is signing this Agreement on its behalf in fact has the actual authority to enter into this Agreement on behalf of said Party, subject to Section 2 above, and to bind said Party to the terms and conditions set forth herein.  Each of the Parties further represents and warrants that it has the legal right to enter into and perform this Agreement in its entirety and that, in doing so, it will not be breaching any contractual or other duty or obligation to any third party and that it has not assigned any of its claims, rights or defenses subject to this Agreement to any other party.

(n)    <u>Further Assurances and Cooperation</u>.  Each Party agrees that it will take such action and execute such further documents as may be reasonably necessary or appropriate to fulfill the purposes expressed in this Agreement and to perform the terms and conditions of it. From and after the Effective Date, the Trustee shall make records relating to the Debtors available upon request of the DT Parties as may be reasonably required in connection with, among other things, tax returns, tax audits and other related filings or matters.

11.    <u>Entire Agreement</u>**.**  This Agreement sets forth all of the promises, covenants, agreements, conditions and understandings between the Parties with respect to the subject matter

**Execution**

hereof and supersedes all prior and contemporaneous agreements, understandings, inducements or conditions, express or implied.  The Parties specifically warrant that this Agreement is executed without reliance upon any statement or representation by any other Party, except as expressly stated herein.

[SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties have set their hands as of the Agreement Date.

**BANK OF AMERICA, N.A.**

By: _____
Name: _____
Title: _____

**DT PARTICIPANT, LLC**

By: _____
Name: _____
Title: _____

**EDWARD M. WOLKOWITZ, SOLELY IN
HIS CAPACITY AS CHAPTER 7 TRUSTEE
FOR THE NAMED DEBTORS**

[SIGNATURES CONTINUE NEXT PAGE]

[SIGNATURE PAGE TO SALE, PURCHASE AND COMPROMISE AGREEMENT]

IN WITNESS WHEREOF, the Parties have set their hands as of the Agreement Date.

**BANK OF AMERICA, N.A.**

By: _____
Name: _____
Title: _____

**DT PARTICIPANT, LLC**

By: DT Participant Holding, LLC
Its: Sole Member

By: _____
Name: JIM JAMILA
Title: SECRETARY

**EDWARD M. WOLKOWITZ, SOLELY IN
HIS CAPACITY AS CHAPTER 7 TRUSTEE
FOR THE NAMED DEBTORS**

_____

[SIGNATURES CONTINUE NEXT PAGE]

[SIGNATURE PAGE TO SALE, PURCHASE AND COMPROMISE AGREEMENT]

IN WITNESS WHEREOF, the Parties have set their hands as of the Agreement Date.

BANK OF AMERICA, N.A.

By: _____

Name: <u>G. Christopher Miller</u>

Title:  <u>Senior Vice President</u>

**DT PARTICIPANT, LLC**

By: _____
Name:_____
Title: _____

**EDWARD  M.  WOLKOWITZ,  SOLELY  IN
HIS CAPACITY AS CHAPTER 7 TRUSTEE
FOR THE NAMED DEBTORS**

_____

[SIGNATURES CONTINUE NEXT PAGE]

TDC and DMC join in this Agreement solely for the purposes of (i) effectuating the releases set forth in Section 6 of the Agreement and (ii) confirming their obligation to cooperate in accordance with the provisions of Section 6(c) of the Agreement.

**THE DECURION CORPORATION**

By: _____
Name: Adele Machtinger
Title: VP

**DECURION MANAGEMENT COMPANY**

By: _____
Name: Adele Machtinger
Title: VP

DC and WinCal join in this Agreement solely for the purposes of effectuating the releases set forth in Section 6 of the Agreement.

**DOME CENTER, LLC**

By: Dome Entertainment Center, Inc.
Its: Sole Member

By: _____
Name: Adele Machtinger
Title: VP

**WINCAL, LLC**

By: _____
Name: Adele Machtinger
Title: VP

[SIGNATURE PAGE TO SALE, PURCHASE AND COMPROMISE AGREEMENT]

**Exhibit 1**

**Marks**

| Mark | Jurisdiction | Owner | Serial No. | Filing Date | Reg. No. | Reg. Date |
|---|---|---|---|---|---|---|
| ARCLIGHT | European Union | Arclight Cinema Company | 002746410 | 06/17/2002 | 002746410 | 09/06/2004 |
| ARCLIGHT | United Kingdom | Arclight Cinema Company | 002746410 | 06/17/2002 | UK0092746410 | 09/06/2004 |
| ARCLIGHT | United States | Arclight Cinema Company | 75/751,235 | 06/30/1999 | 2,831,062 | 04/13/2004 |
| ARCLIGHT | United States | Arclight Cinema Company | 76/150,945 | 10/20/2000 | 2,870,777 | 08/10/2004 |
| ARCLIGHT CINEMAS | United States | Arclight Cinema Company | 76/143,967 | 10/09/2000 | 2,824,307 | 03/23/2004 |
| ARCLIGHT FILMS | United States | Arclight Cinema Company | 76/711,803 | 06/25/2012 | 4,545,541 | 06/10/2014 |
| DARCLIGHT | United States | Arclight Cinema Company | 76/711,804 | 06/25/2012 | 4,540,964 | 06/03/2014 |
| SOUND ADVICE | United States | Arclight Cinema Company | 88/752,169 | 01/09/2020 | 6,107,273 | 07/21/2020 |
| WHERE MOVIE LOVERS BELONG | United States | Arclight Cinema Company | 76/413,944 | 05/23/2002 | 2,704,374 | 04/08/2003 |
| YOUR MOVIE-TIME. UNINTERRUPTED. | United States | Arclight Cinema Company | 87/205,625 | 10/17/2016 | 5,213,116 | 05/30/2017 |
| MOVIE POUR | United States | Arclight Cinema Company | 88/841,504 | 03/20/2020 | N/A | N/A |
| PACIFIC THEATRES | California | Pacific Theatres Entertainment Corporation | 057332 | 02/24/2003 | 057332 | 02/24/2003 |
| PACIFIC THEATRES | United States | Pacific Theatres Entertainment Corporation | 74/340,640 | 12/16/1992 | 1,787,159 | 08/10/1993 |

| Mark | Jurisdiction | Owner | Serial No. | Filing Date | Reg. No. | Reg. Date |
|------|-------------|-------|-----------|------------|---------|-----------|
| PACIFIC THEATRES & DESIGN <br> PACIFIC THEATRES | United States | Pacific Theatres Entertainment Corporation | 75/761,158 | 07/23/1999 | 2,368,501 | 07/18/2000 |
| PACIFIC PERKS | United States | Pacific Theatres Entertainment Corporation | 88/771,696 | 01/24/2020 | N/A | N/A |

184841.21

**EXECUTION VERSION**

## Exhibit 2

**Domain Names**

| Domain Name | Owner |
| --- | --- |
| arclightboston.com | Pacific Theatres Exhibition Corp. |
| arclightcinemas.com | Pacific Theatres Exhibition Corp. |
| arclightcinemas.info | Pacific Theatres Exhibition Corp. |
| arclightcinemas.net | Pacific Theatres Exhibition Corp. |
| arclightcinemas.online | Pacific Theatres Exhibition Corp. |
| arclightcinemas.org | Pacific Theatres Exhibition Corp. |
| soundadvicebar.com | Pacific Theatres Exhibition Corp. |
| soundadvicebarboston.com | Pacific Theatres Exhibition Corp. |
| soundadvicebars.com | Pacific Theatres Exhibition Corp. |
| soundadviceboston.com | Pacific Theatres Exhibition Corp. |

## Exhibit 3

**BofA/DTP Agreement**

(see attached)

# INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "Agreement") is entered into as of this 21st day of October, 2022, between: (i) BANK OF AMERICA, N.A., a national banking association ("BofA"); and (ii) DT Participant, LLC, a Delaware limited liability company ("DTP"). BofA and DTP hereinafter may be referred to individually as a "Party" and collectively as the "Parties." Now, therefore, for good and valuable consideration, the Parties hereby agree as follows:

## RECITALS

A.     BofA and Pacific Theatres Exhibition Corp., a California Corporation ("Pacific Theatres"), are parties to that certain Second Amended and Restated Credit Agreement dated as of November 30, 2018 (as amended, the "Credit Agreement"). Unless otherwise defined herein, all capitalized terms herein will be given the same meaning as set forth in the Credit Agreement.

B.     Pursuant to the Existing Revolving Loans, Pacific Theatres is indebted to BofA in the principal amount of $1,166,435.69, plus accrued and accruing interest, and all costs and fees (including, without limitation, legal fees) incurred by BofA.

C.     Pursuant to that certain Participation Agreement dated as of November 9, 2020 (as amended, the "Participation Agreement"), BofA sold to DTP, an undivided last-out, junior and subordinate one hundred percent (100%) interest in certain loans in an amount not to exceed $6.5 million, which loans are defined in the Participation Agreement as the "Delayed Draw Term Loans."

D.     Under the Credit Agreement, BofA is the administrative agent with respect to the Existing Revolving Loans and the Delayed Draw Term Loans (collectively, the "Loans"). Pursuant to the Delayed Draw Term Loans, Pacific Theatres is indebted to BofA, as administrative agent, in the principal amount of $3,355,500.00, plus accrued and accruing interest, and all costs and fees (including, without limitation, legal fees) incurred by BofA.

E.     Pacific Theatres and five (5) affiliates thereof are debtors (collectively, "Debtors") in Chapter 7 cases (collectively, the "Cases") pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court"), jointly administered under Lead Case No. 2:21-bk-15007-BB. Edward M. Wolkowitz is the Chapter 7 trustee ("Trustee") in each of the Cases.

F.     Contemporaneously with the execution of this Agreement, the Trustee on behalf of the Debtors, BofA, as lender and administrative agent, The Decurion Corporation, a California corporation ("TDC"), Decurion Management Company ("DMC"), Dome Center, LLC ("DC"), and Wincal, LLC ("WinCal") and DTP have entered into that certain Sale, Purchase and Compromise Agreement dated as of the date hereof (the "Sale, Purchase and Compromise Agreement").

G.     Pursuant to the Sale, Purchase and Compromise Agreement, the Trustee is selling certain Purchased Assets (as defined in the Sale, Purchase and Compromise Agreement) free and clear of all liens, claims and interests to the highest or best bidder at a hearing to be scheduled by

the Bankruptcy Court (the "Sale Hearing").  The Parties agree it is in their own respective best interests to credit bid the debt outstanding on the Loans, up to and including the full amount of the Current Loan Amount (as defined in the Sale, Purchase and Compromise Agreement), so that DTP may obtain ownership of the Purchased Assets in accordance with the Sale, Purchase and Compromise Agreement.

H.     This Agreement is an amendment to the Participation Agreement.  Except as modified herein, the Participation Agreement, the Credit Agreement and other Loan Documents remain in full force and effect.  Any ambiguity between the Sale, Purchase and Compromise Agreement and this Agreement will be controlled by this Agreement.

## AGREEMENT

**1.     Recitals; Effective Date**. All of the foregoing recitals are hereby affirmed by the Parties and incorporated into this Agreement.  This Agreement shall be binding on the Parties and effective upon the full execution of this Agreement and the Sale, Purchase and Compromise Agreement.

**2.     Sale Hearing; Credit Bidding**.  BofA and DTP shall participate in the Sale Hearing and BofA shall credit bid at DTP's direction the amount of the debt outstanding on the Loans as is necessary to be determined the winning bidder at the Sale Hearing.  BofA hereby: (i) irrevocably designates DTP as its designee for the purchase of the Purchased Assets pursuant to the Sale, Purchase and Compromise Agreement; and (ii) acknowledges and agrees that, if BofA is the winning bidder and subject only to DTP's prompt payment of the sum set forth in Paragraph 3 hereof, BofA shall not have any right, title or interest in or to the Purchased Assets.

**3.     DTP Deficiency Payment**.  If BofA is the winning bidder for the Purchased Assets and the Purchased Assets are transferred by the Trustee to DTP, DTP shall pay BofA the sum equal to $600,000.00 promptly after the Purchased Assets are transferred by the Trustee to DTP.

**4.     Releases**.

(a)     Effective as of the Effective Date (as defined in the Sale, Purchase and Compromise Agreement), except  for their respective obligations under this Agreement and the Sale, Purchase and Compromise Agreement, BofA, on its own behalf and on behalf of any person acting by or through either or under its authority or on its behalf, including but not limited to each, every and all of its affiliates and each of its and its affiliates respective current and former agents, attorneys, employees, successors, assigns, partners, associates, managers, members, owners, privies, representatives, successors in interest, predecessors in interest, subsidiaries, divisions, parents, officers, directors, shareholders, indemnitors, indemnitees, insurers, and fiduciaries, as applicable (the "BofA Releasing Parties"), hereby fully release and forever discharge TDC and DTP, and each, every and all of their affiliates and their and their affiliates respective current and former agents, attorneys, employees, successors, assigns, partners, associates, managers, members, owners, privies, representatives, successors in interest, predecessors in interest, subsidiaries, divisions, parents, affiliates, officers, directors, shareholders, indemnitors, indemnitees, insurers, and fiduciaries (the "DTP Released Parties"), from any and all claims, losses, debts, charges,

damages, demands, obligations, causes of action, lawsuits, liabilities, breaches of duty, misfeasance, malfeasance, promises, controversies, contracts, judgments, awards, penalties, costs, attorney's fees and expenses of whatever nature, type, kind, description or character, whether based on statute, contract or common law, and whether known or unknown (collectively, "Claims"), existing at the time of this Agreement, and arising or related to the Participation Agreement, the Credit Agreement, the other Loan Documents, the Loans and/or the Cases.

(b)    Effective as of the Effective Date (as defined in the Sale, Purchase and Compromise Agreement), except  for their respective obligations under this Agreement and the Sale, Purchase and Compromise Agreement, DTP, on its own behalf and on behalf of any person acting by or through either or under its authority or on its behalf, including but not limited to each, every and all of its affiliates and each of its and its affiliates respective current and former agents, attorneys, employees, successors, assigns, partners, associates, managers, members, owners, privies, representatives, successors in interest, predecessors in interest, subsidiaries, divisions, parents, officers, directors, shareholders, indemnitors, indemnitees, insurers, and fiduciaries, as applicable (the "DRP Releasing Parties"), hereby fully release and forever discharge BofA, and each, every and all of its affiliates and its and its affiliates respective current and former agents, attorneys, employees, successors, assigns, partners, associates, managers, members, owners, privies, representatives, successors in interest, predecessors in interest, subsidiaries, divisions, parents, affiliates, officers, directors, shareholders, indemnitors, indemnites, insurers, and fiduciaries ("BofA Released Parties"), from any and all Claims, existing at the time of this Agreement, and arising or related to the Participation Agreement, the Credit Agreement, the other Loan Documents, the Loans and/or the Cases.

5.    **Waiver of California Civil Code Section 1542**. The Parties intend this to be a full and final settlement of all claims and other rights addressed in Paragraph 4 above, notwithstanding any potential later-discovered facts or information. Accordingly, with respect to the waivers and releases set forth in Paragraph 4, each Party assumes the risk of unknown and unanticipated facts and claims, and hereby specifically waives any and all protection of California Civil Code § 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each Party represents that it has consulted with counsel, is fully informed on the consequences of the full and final waiver encompassed herein, and knowingly waives any protections of California Civil Code § 1542, or any similar provision of common or statutory law. Each Party represents, warrants, and agrees that this waiver is a material term of this Agreement, without which it would not have entered into this Agreement.

6.    **Representations and Warranties**. Each Party represents and warrants to every other Party that (i) it has full ownership of the claims released in Paragraph 4 above, and that it has not sold, assigned, transferred, conveyed, hypothecated, encumbered, or otherwise

disposed of any claims relating to any subject matter covered by this Agreement; (ii) it has the full right, power and authority to enter into this Agreement and to fully perform its obligations under this Agreement; (iii) the execution, delivery and performance of this Agreement and the transactions contemplated in this Agreement have been duly and validly authorized by all necessary corporate, partnership or limited liability company action, as the case may be; (iv) the person executing this Agreement on behalf of the Party has full power and authority to do so; and (v) the entering into and performance of this Agreement by such Party does not violate, conflict with, or result in a material default under any other contract or agreement to which such Party is obligated, or by which it is bound.

7.    **Waiver of Presumptions**.  The Parties hereby waive the presumption that any ambiguities in a contract are read against the drafter of same.  The Parties further agree that this Agreement was negotiated by the Parties and that each of them is the drafter of every part of this Agreement.

8.    **Construction**.    Should any paragraph, clause, or provision of this Agreement be construed to be against public policy or determined by a court of competent jurisdiction to be void, invalid, or unenforceable, such construction and decision shall affect only those paragraphs, clauses, or provisions so construed or interpreted, and shall in no way affect the remaining paragraphs, clauses, or provisions of this Agreement, which shall remain in force.

9.    **Final and Complete Agreement and Merger Clause**.  This Agreement is the final and complete agreement of the Parties with respect to the subject matter hereof.  This Agreement supersedes, in their entirety, any and all proposals, negotiations, representations, agreements, promises, statements, and understandings that any of the Parties or their representatives or agents have made or had prior to the execution of this Agreement.  This Agreement may not be modified, interpreted, amended, waived, or revoked orally, but only by a separate written agreement signed by all Parties.

10.    **No Third-Party Beneficiaries**.    Nothing in this Agreement, express or implied, is intended to, or shall be construed to, confer upon any person other than the Parties, the DTP Released Parties and the BofA Released Parties any right, remedy or claim under or by reason of this Agreement, which is and shall be for the sole and exclusive benefit of the Parties, the DTP Released Parties and the BofA Released Parties.

11.    **No Reliance**.  The Parties acknowledge that they have not relied on any proposals, negotiations, representations, agreements, promises, statements or understandings of any kind other than what is expressly contained in this Agreement.

12.    **Governing Law**.  This Agreement shall be governed by the laws of the State of California without regard to its choice-of-law principles.  In the event of an action or other proceeding relating to the interpretation or the enforcement of this Agreement, the Parties agree that the court shall award reasonable attorneys' fees and costs to the prevailing party.

13.    **Counterparts; Electronic Signatures**.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which together shall constitute one and the same document.  The Parties may enter into this Agreement with electronic signatures

or with signatures signed by DocuSign or scanned to Portable Document Format ("PDF") and delivered via email and, if so, each Party hereby consents to the other Party entering into this Agreement with electronic signatures or with signatures signed, scanned to PDF and delivered via email.  Each Party hereby agrees that the electronic signature of the other Party to this Agreement or the signature signed, scanned to PDF and delivered via email shall be as valid as an original handwritten signature of such party to this Agreement and shall be effective to bind such party to this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

**DT PARTICIPANT, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**BANK OF AMERICA, N.A.**, a national banking association

By: _____
Name: Christopher Miller
Title: Senior Vice President

## Exhibit 4

### Assigned License Agreements

Settlement and License Agreement, effective as of March 17, 2011, by and among Arclight Cinema Company, Arclight Films Pty. Ltd., Darclight Films Pty. Ltd., Arclight Films International Pty. Ltd., and Arclight Films Canada, Inc.

Assignment and License Agreement, dated as of October 8, 2003, by and between Arclight Cinema Company and Arclight Creative Group, Inc., doing business as Arclight Productions

Assignment Agreement dated as of December 19, 2001, by and between Arclight Cinema Company, Arclight Inc., and Arclight AB, a Swedish company

Trademark License Agreement (Arclight Hollywood), dated as of November 9, 2020, by among Arclight Cinema Company, Pacific Theatres Entertainment Corporation and DT Operator, LLC

Trademark License Agreement (Pacific Winnetka Theatre), dated as of November 9, 2020, by and between Pacific Theatres Entertainment Corporation and WinCal, LLC

## <u>Exhibit 5</u>

**Assignment and Assumption Agreement**

(see attached)

## Assignment and Assumption Agreement

This Assignment and Assumption Assignment (this "**Assignment**") is made as of [November __], 2022, by and between Edward M. Wolkowitz, solely in his capacity as chapter 7 trustee for the bankruptcy estates of Pacific Theatres Exhibition Corp., Pacific Theatres Entertainment Corporation, ArcLight Cinema Company, Arclight Visions, Inc., Glendale Americana Theatre, LLC, and Pacific Cinemas Corporation (collectively, the "**Debtors**") (in such capacity, "**Assignor**"), and DT Participant, LLC, a Delaware limited liability company ("**Purchaser**"), with reference to that certain Sale, Purchase and Compromise Agreement dated as of October [__], 2022 (the "**Agreement**"). Capitalized terms used but not defined herein have the meaning given to them in the Agreement.

**WHEREAS**, on June 18, 2021, each of the Debtors commenced bankruptcy cases by filing voluntary petitions under chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**") and on or about the date thereof Assignor was duly appointed as the chapter 7 trustee for the Debtors' bankruptcy estates;

**WHEREAS**, subject to and in accordance with Section 363(b)(1) of the Bankruptcy Code, Assignor may sell assets of the Debtors estates and Assignor is informed that the Debtors own rights, title and interest in and to the Purchased Assets (as defined in the Agreement);

**WHEREAS**, pursuant to the Agreement, Assignor has agreed, inter alia, to sell, convey, assign, transfer and deliver to Purchaser any and all rights, title and interest Assignor may have in and to the Purchased Assets;

**WHEREAS**, Purchaser desires to acquire the entire right, title and interest in and to the Purchased Assets; and

**WHEREAS**, delivery of this Assignment on the Effective Date is required by Section 3(c) of the Agreement.

**NOW, THEREFORE**, pursuant to the terms and subject to the conditions set forth in the Agreement and for good and valuable consideration (including the consideration recited in the Agreement), the sufficiency of which is hereby acknowledged, Assignor makes the following assignment and agrees as follows:

1.    **TRANSFER OF PURCHASED ASSETS**. Subject to the terms of the Agreement, Assignor hereby irrevocably sells, conveys, assigns, transfers and delivers to Purchaser (and Purchaser's successors and assigns), and Purchaser hereby accepts, all of Assignor's entire right, title and interest in, to and under the Purchased Assets.

2.    **ASSIGNMENT AND ASSUMPTION**. Subject to the terms and conditions of the Agreement, Assignor does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby take assignment of, all of Assignor's direct or indirect right, title and interest in, to and under all of the Assigned License Agreements (as defined in the Agreement) as of the date hereof set forth on Exhibit 4 of the Agreement and Attachment A attached hereto. Subject to

the terms and conditions of the Agreement, Purchaser does hereby assume the liabilities and obligations under the Assigned License Agreements arising solely after, and subject to the occurrence of, the Effective Date.

3.    **COOPERATION**.    Assignor shall cooperate with Purchaser, at Purchaser's expense, as may be reasonably necessary or appropriate to assist or to enable Purchaser to effect the transactions contemplated hereby, including, but not limited to, the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney or other documents. If Assignor fails or refuses to execute such documents, within a reasonable time after receiving a request from Purchaser, or cannot be located in a reasonable time period despite Purchaser's reasonable efforts, Assignor hereby appoints Purchaser (and its successors, assigns and legal representatives) as Assignor's attorney-in-fact, with full power of substitution, having full right and authority in the name of Assignor to act on Assignor's behalf and to execute such documents. Assignor agrees that the foregoing stated powers are coupled with an interest and shall be irrevocable by Assignor.

4.    **REPRESENTATIONS**.    The Assignor hereby represents, acknowledges and agrees for the Assignor and his successors in such capacity that (i) the Assignor is the duly appointed Chapter 7 trustee in the Cases as noticed in the Notice of Chapter 7 Bankruptcy Case filed in the Cases at Docket # 3 (Docket # 4 in the Entertainment Case) and (ii) subject to the occurrence of the Effective Date, Assignor has the authority to execute and deliver this Assignment and consummate the transactions contemplated hereby.

5.    **MISCELLANEOUS**.    This Assignment will be fully binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns. This Assignment shall be governed by the governing law provision of the Agreement.  In the event of a conflict between the provisions herein and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern. Notwithstanding any other provision of this Assignment to the contrary, nothing contained in this Assignment shall in any way supersede, merge with, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions set forth in the Agreement nor shall this Assignment reduce, expand or enlarge any remedies under the Agreement. This Assignment may not be supplemented, altered or modified in any manner except by a writing signed by the parties hereto.  This Assignment may be executed in any number of counterparts by the parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts taken together constitute one and the same instrument.

[SIGNATURES FOLLOW ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have duly executed under seal and delivered this Assignment, as of the day and year first above written.

**ASSIGNOR:**

Edward M. Wolkowitz, solely in his capacity as chapter 7 trustee for the bankruptcy estates of Pacific Theatres Exhibition Corp., Pacific Theatres Entertainment Corporation, ArcLight Cinema Company, Arclight Visions, Inc., Glendale Americana Theatre, LLC, and Pacific Cinemas Corporation

_____

**PURCHASER:**

DT Participant, LLC, a Delaware limited liability company

By:_____
Name: _____
Title: _____

184841.21

## Attachment A

### Assigned License Agreements

Settlement and License Agreement, effective as of March 17, 2011, by and among Arclight Cinema Company, Arclight Films Pty. Ltd., Darclight Films Pty. Ltd., Arclight Films International Pty. Ltd., and Arclight Films Canada, Inc.

Assignment and License Agreement, dated as of October 8, 2003, by and between Arclight Cinema Company and Arclight Creative Group, Inc., doing business as Arclight Productions

Assignment Agreement dated as of December 19, 2001, by and between Arclight Cinema Company, Arclight Inc., and Arclight AB, a Swedish company

Trademark License Agreement (Arclight Hollywood), dated as of November 9, 2020, by among Arclight Cinema Company, Pacific Theatres Entertainment Corporation and DT Operator, LLC

Trademark License Agreement (Pacific Winnetka Theatre), dated as of November 9, 2020, by and between Pacific Theatres Entertainment Corporation and WinCal, LLC

## Exhibit 6

**Trademark Assignment**

(see attached)

### **Trademark Assignment**

This Trademark Assignment (this "**Assignment**") is made as of [November __], 2022, by and between Edward M. Wolkowitz, solely in his capacity as chapter 7 trustee for the bankruptcy estates of Pacific Theatres Entertainment Corporation ("**Entertainment**") and ArcLight Cinema Company (collectively with Entertainment, the "**Debtors**") (in such capacity, "**Assignor**"), and DT Participant, LLC, a Delaware limited liability company ("**Purchaser**"), with reference to that certain Sale, Purchase and Compromise Agreement dated as of October [__], 2022 (the "**Agreement**"). Capitalized terms used but not defined herein have the meaning given to them in the Agreement.

**WHEREAS**, on June 18, 2021, each of the Debtors commenced bankruptcy cases by filing voluntary petitions under chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**") and on or about the date thereof Assignor was duly appointed as the chapter 7 trustee for the Debtors' bankruptcy estates;

**WHEREAS**, subject to and in accordance with Section 363(b)(1) of the Bankruptcy Code, Assignor may sell assets of the Debtors estates and Assignor is informed that the Debtors own rights, title and interest in and to the trademarks listed in Attachment A hereto (together with all of the goodwill associated therewith, collectively, the "**Trademarks**");

**WHEREAS**, pursuant to the Agreement, Assignor has agreed, inter alia, to sell, convey, assign, transfer and deliver to Purchaser any and all rights, title and interest Assignor may have in the Trademarks;

**WHEREAS**, Purchaser desires to acquire the entire right, title and interest in and to the Trademarks; and

**WHEREAS**, delivery of this Assignment on the Effective Date is required by Section 3(c) of the Agreement.

**NOW, THEREFORE**, pursuant to the terms and subject to the conditions set forth in the Agreement and for good and valuable consideration (including the consideration recited in the Agreement), the sufficiency of which is hereby acknowledged, Assignor makes the following assignment and agrees as follows:

1.      **ASSIGNMENT**. Subject to the terms of the Agreement, Assignor hereby irrevocably sells, conveys, assigns, transfers and delivers to Purchaser (and Purchaser's successors and assigns), and Purchaser hereby accepts, all of Assignor's entire right, title and interest throughout the universe in, to and under the Trademarks including, but not limited to, any and all rights in and to the marks ARCLIGHT and/or PACIFIC THEATRES, to the extent owned by Assignor, respectively, which shall include, without limitation, all rights that may now or hereafter be vested in or controlled by Assignor together with the following to the extent they contain the terms ARCLIGHT and/or PACIFIC THEATRES and/or are directly related to the Trademarks:

184841.21

(a)     all trademarks, service marks, trade names, social media pages and accounts, social media handles and user names, brand names, logos, designs, trade dress and other proprietary indicia of goods and services, whether registered or unregistered, and all registrations and applications for registration of the foregoing, including expired/cancelled registrations and abandoned applications and intent-to-use applications (and marketing plans and business plans to which the foregoing pertain), any registrations that issue from the applications, renewals and extensions of such registrations and applications, and in the case of any applications based on an intent-to use, that portion of the business to which the Trademarks pertain, and the goodwill connected with the use of and symbolized by any of the foregoing to the extent owned by Assignor;

(b)     all rights, interests, licenses and agreements to utilize third party rights, title and/or interests;

(c)     all other corresponding rights whatsoever of Assignor accruing under any of the foregoing, that are or may be secured under the laws of the United States or any foreign country, by international treaties and conventions, and otherwise throughout the world now or hereafter in effect;

(d)     any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

(e)     any and all benefits, privileges, claims, rights to any actions, causes of action, and remedies with respect to any of the foregoing, whether accruing before, on and/or after the Effective Date, including, without limitation, the exclusive rights to apply for and maintain all such applications, registrations, renewals and/or extensions, all rights to recover damages, payments, restitution, and injunctive and other legal and equitable relief for past, present or future infringements, dilution, misappropriations, violations, misuse, breach or default thereof.

2.     **USPTO AUTHORIZATION**.  Assignor hereby authorizes and requests the United States Patent and Trademark Office (and any corresponding trademark office in any other country) to issue registrations in accordance with this Assignment.

3.     **COOPERATION**.  Assignor shall cooperate with Purchaser, at Purchaser's expense, as may be reasonably necessary or appropriate to assist or to enable Purchaser to record or perfect the above-described transfer of the Trademarks, or to secure registration before the United States Patent and Trademark Office (and any corresponding trademark office in any other country) including, but not limited to, the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney or other documents.  If Assignor fails or refuses to execute such documents, within a reasonable time after receiving a request from Purchaser, or cannot be located in a reasonable time period despite Purchaser's reasonable efforts, Assignor hereby appoints Purchaser (and its successors, assigns and legal representatives) as Assignor's attorney-in-fact, with full power of substitution, having full right and authority in the name of Assignor to act on Assignor's behalf and to execute such documents.  Assignor agrees that the foregoing stated powers are coupled with an interest and shall be irrevocable by Assignor.

4.  **REPRESENTATIONS**.  The Assignor hereby represents, acknowledges and agrees for the Assignor and his successors in such capacity that (i) the Assignor is the duly appointed Chapter 7 trustee in the Cases as noticed in the Notice of Chapter 7 Bankruptcy Case filed in the Cases at Docket # 3 (Docket # 4 in the Entertainment Case) and (ii) subject to the occurrence of the Effective Date, Assignor has the authority to execute and deliver this Assignment and consummate the transactions contemplated hereby.

5.  **MISCELLANEOUS**.  This Assignment will be fully binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns. This Assignment shall be governed by the governing law provision of the Agreement.  In the event of a conflict between the provisions herein and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern. Notwithstanding any other provision of this Assignment to the contrary, nothing contained in this Assignment shall in any way supersede, merge with, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions set forth in the Agreement nor shall this Assignment reduce, expand or enlarge any remedies under the Agreement. This Assignment may not be supplemented, altered or modified in any manner except by a writing signed by the parties hereto.  This Assignment may be executed in any number of counterparts by the parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts taken together constitute one and the same instrument.

[SIGNATURES FOLLOW ON NEXT PAGE]

184841.21

IN WITNESS WHEREOF, the parties hereto have duly executed under seal and delivered this Assignment, as of the day and year first above written.


**ASSIGNOR:**

Edward M. Wolkowitz, solely in his capacity as chapter 7 trustee for the bankruptcy estates of Pacific Theatres Entertainment Corporation and ArcLight Cinema Company


_____


**PURCHASER:**

DT Participant, LLC, a Delaware limited liability company


By:_____

Name: _____

Title: _____


184841.21

**Attachment A**

**Trademarks**

| Mark | Jurisdiction | Owner | Serial No. | Filing Date | Reg. No. | Reg. Date |
|---|---|---|---|---|---|---|
| ARCLIGHT | European Union | Arclight Cinema Company | 002746410 | 06/17/2002 | 002746410 | 09/06/2004 |
| ARCLIGHT | United Kingdom | Arclight Cinema Company | 002746410 | 06/17/2002 | UK0092746410 | 09/06/2004 |
| ARCLIGHT | United States | Arclight Cinema Company | 75/751,235 | 06/30/1999 | 2,831,062 | 04/13/2004 |
| ARCLIGHT | United States | Arclight Cinema Company | 76/150,945 | 10/20/2000 | 2,870,777 | 08/10/2004 |
| ARCLIGHT CINEMAS | United States | Arclight Cinema Company | 76/143,967 | 10/09/2000 | 2,824,307 | 03/23/2004 |
| ARCLIGHT FILMS | United States | Arclight Cinema Company | 76/711,803 | 06/25/2012 | 4,545,541 | 06/10/2014 |
| DARCLIGHT | United States | Arclight Cinema Company | 76/711,804 | 06/25/2012 | 4,540,964 | 06/03/2014 |
| SOUND ADVICE | United States | Arclight Cinema Company | 88/752,169 | 01/09/2020 | 6,107,273 | 07/21/2020 |
| WHERE MOVIE LOVERS BELONG | United States | Arclight Cinema Company | 76/413,944 | 05/23/2002 | 2,704,374 | 04/08/2003 |
| YOUR MOVIE-TIME. UNINTERRUPTED. | United States | Arclight Cinema Company | 87/205,625 | 10/17/2016 | 5,213,116 | 05/30/2017 |
| MOVIE POUR | United States | Arclight Cinema Company | 88/841,504 | 03/20/2020 | N/A | N/A |
| PACIFIC THEATRES | California | Pacific Theatres Entertainment Corporation | 057332 | 02/24/2003 | 057332 | 02/24/2003 |
| PACIFIC THEATRES | United States | Pacific Theatres Entertainment Corporation | 74/340,640 | 12/16/1992 | 1,787,159 | 08/10/1993 |
| PACIFIC THEATRES & DESIGN | United States | Pacific Theatres Entertainment Corporation | 75/761,158 | 07/23/1999 | 2,368,501 | 07/18/2000 |

18484121

| Mark | Jurisdiction | Owner | Serial No. | Filing Date | Reg. No. | Reg. Date |
|---|---|---|---|---|---|---|
| PACIFIC THEATRES | | | | | | |
| PACIFIC PERKS | United States | Pacific Theatres Entertainment Corporation | 88/771,696 | 01/24/2020 | N/A | N/A |

184841.21

## Exhibit 7

### Domain Name Assignment

(see attached)

## Domain Name Assignment

This Domain Name Assignment (this "**Assignment**") is made as of [November __], 2022, by and between Edward M. Wolkowitz, solely in his capacity as chapter 7 trustee for the bankruptcy estate of Pacific Theatres Exhibition Corp. (the "Debtor") (in such capacity, "**Assignor**"), and DT Participant, LLC, a Delaware limited liability company ("**Purchaser**"), with reference to that certain Sale, Purchase and Compromise Agreement dated as of October [__], 2022 (the "**Agreement**").  Capitalized terms used but not defined herein have the meaning given to them in the Agreement.

WHEREAS, on June 18, 2021, the Debtor commenced a bankruptcy case by filing a voluntary petition under chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**") and on or about the date thereof Assignor was duly appointed as the chapter 7 trustee for the Debtor's bankruptcy estate;

WHEREAS, subject to and in accordance with Section 363(b)(1) of the Bankruptcy Code, Assignor may sell assets of the Debtor's' estate and Assignor is informed that the Debtor owns rights, title and interest in and to the internet domain names, domain names and/or URLs listed in Attachment A hereto (collectively, the "**Domain Names**");

WHEREAS, pursuant to the Agreement, Assignor has agreed, inter alia, to sell, convey, assign, transfer and deliver to Purchaser any and all rights, title and interest Assignor may have in and to the Domain Names;

WHEREAS, Purchaser desires to acquire the entire right, title and interest in and to the Domain Names; and

WHEREAS, delivery of this Assignment on the Effective Date is required by Section 3(c) of the Agreement.

NOW, THEREFORE, pursuant to the terms and subject to the conditions set forth in the Agreement and for good and valuable consideration (including the consideration recited in the Agreement), the sufficiency of which is hereby acknowledged, Assignor makes the following assignment and agrees as follows:

1.      **ASSIGNMENT**. Subject to the terms of the Agreement, Assignor hereby irrevocably sells, conveys, assigns, transfers and delivers to Purchaser (and Purchaser's successors and assigns), and Purchaser hereby accepts, all of Assignor's entire right, title and interest of any kind in the Domain Names.

2.      **COOPERATION**.  Assignor shall cooperate with Purchaser, at Purchaser's expense, as may be reasonably necessary or appropriate to assist or to enable Purchaser to secure transfer of the Domain Name registrations before the registrars of the same and executing and delivering any affidavits, declarations, oaths, exhibits, assignments, powers of attorney or other documents reasonably necessary to secure such transfer.  If Assignor fails or refuses to execute such documents, within a reasonable time after receiving a request from Purchaser, or cannot be

located in a reasonable time period despite Purchaser's reasonable efforts, Assignor hereby appoints Purchaser (and its successors, assigns and legal representatives) as Assignor's attorney-in-fact, with full power of substitution, having full right and authority in the name of Assignor to act on Assignor's behalf and to execute such documents.  Assignor agrees that the foregoing stated powers are coupled with an interest and shall be irrevocable by Assignor.

       3.     **REPRESENTATIONS**.  The Assignor hereby represents, acknowledges and agrees for the Assignor and his successors in such capacity that (i) the Assignor is the duly appointed Chapter 7 trustee in the Cases as noticed in the Notice of Chapter 7 Bankruptcy Case filed in the Cases at Docket # 3 (Docket # 4 in the Entertainment Case) and (ii) subject to the occurrence of the Effective Date, Assignor has the authority to execute and deliver this Assignment and consummate the transactions contemplated hereby.

       4.     **MISCELLANEOUS**.  This Assignment will be fully binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns. This Assignment shall be governed by the governing law provision of the Agreement. In the event of a conflict between the provisions herein and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern. Notwithstanding any other provision of this Assignment to the contrary, nothing contained in this Assignment shall in any way supersede, merge with, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions set forth in the Agreement nor shall this Assignment reduce, expand or enlarge any remedies under the Agreement. This Assignment may not be supplemented, altered or modified in any manner except by a writing signed by the parties hereto.  This Assignment may be executed in any number of counterparts by the parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts taken together constitute one and the same instrument.

[SIGNATURES FOLLOW ON NEXT PAGE]

184841.21

IN WITNESS WHEREOF, the parties hereto have duly executed under seal and delivered this Assignment, as of the day and year first above written.


**ASSIGNOR:**

Edward M. Wolkowitz, solely in his capacity as chapter 7 trustee for the bankruptcy estate of Pacific Theatres Exhibition Corp.


_____


**PURCHASER:**

DT Participant, LLC, a Delaware limited liability company


By:_____
Name: _____
Title:    _____

184841.21

## Attachment A

### Domain Names

| Domain Name | Owner |
|---|---|
| arclightboston.com | Pacific Theatres Exhibition Corp. |
| arclightcinemas.com | Pacific Theatres Exhibition Corp. |
| arclightcinemas.info | Pacific Theatres Exhibition Corp. |
| arclightcinemas.net | Pacific Theatres Exhibition Corp. |
| arclightcinemas.online | Pacific Theatres Exhibition Corp. |
| arclightcinemas.org | Pacific Theatres Exhibition Corp. |
| soundadvicebar.com | Pacific Theatres Exhibition Corp. |
| soundadvicebarboston.com | Pacific Theatres Exhibition Corp. |
| soundadvicebars.com | Pacific Theatres Exhibition Corp. |
| soundadviceboston.com | Pacific Theatres Exhibition Corp. |

# EXHIBIT "B"

## TRADEMARK LICENSE AGREEMENT
### (Pacific Winnetka Theatre)

This License Agreement (the "Agreement"), is made and entered into on this 9th day of November, 2020 ("Effective Date"), by and between Pacific Theatres Entertainment Corporation, a California corporation ("Licensor") and WinCal, LLC, a California limited liability company ("Licensee").

WHEREAS, Licensor owns the trademarks, service marks and logos set forth in the attached Exhibit A, together with goodwill symbolized thereby (collectively the "Marks"); and

WHEREAS, Licensee owns a theatre location in Chatsworth, California located at 9201 Winnetka Ave, Chatsworth, CA 91311 (referred to herein as the "Winnetka Premises") and leases the Winnetka Premises to Pacific Theatres Exhibition Corp., an affiliate of Licensor ("Tenant") for operation by Tenant of a multi-screen theatre business;

WHEREAS, Licensor is a guarantor of that certain loan evidenced by the Second Amended and Restated Credit Agreement dated as of November 30, 2018 (the "Original Credit Agreement"), as amended by that certain Amendment Number One to Second Amended and Restated Credit Agreement dated July 23, 2019 (the "First Amendment to Credit Agreement"), that certain Waiver and Amendment Number Two to Second Amended and Restated Credit Agreement dated September 16, 2020 (the "Second Amendment to Credit Agreement"), and that certain Waiver, Consent and Amendment Number Three to Second Amended and Restated Credit Agreement dated on or about the date hereof (the "Third Amendment to Credit Agreement" and, together with the Original Credit Agreement, the First Amendment to Credit Agreement and the Second Amendment to Credit Agreement, collectively, the "B of A Loan Agreement") by and among Pacific Theatres Entertainment Corporation, a California corporation ("PTEC"), the lenders from time to time party thereto, and Bank of America, N.A.;

WHEREAS, Licensee desires to obtain from Licensor, and Licensor desires to grant to Licensee, a license to use the Marks in connection with Licensee's future operation and use of the Winnetka Premises as set forth in this Agreement and pursuant to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Grant of Rights**.

(a) License Rights. Subject to the rights reserved by Licensor set forth in Section 2 below, Licensor grants to Licensee during the Term a non-exclusive, royalty-free, non-transferable (except as provided under Section 10 below) right and license to use the Marks solely in connection with the operation and marketing use by Licensee of the Winnetka Premises (the "Business Purpose") with the right to negotiate and execute sublicenses of the Marks (subject to the terms and conditions of this Agreement) solely for the Business Purpose, subject to the applicable quality control provisions of this Agreement. The parties acknowledge and agree that (i) the license grant to Licensee shall not go into effect until such time as Tenant no longer leases the Winnetka Premises for operation of the

- 1 -

theatre business and (ii) Licensee has the right to sublicense its rights hereunder to its designees and future tenants at the Winnetka Premises.

2.      **Rights Reserved by Licensor.**  Licensee acknowledges Licensor's ownership of the Marks and all goodwill associated with the Marks, and agrees that its use of the Marks and goodwill related thereto shall inure to Licensor's sole benefit.  Licensee agrees that Licensee will not at any time during the Term do or permit to be done any act that will impair the rights of the Licensor in and to the Marks or otherwise challenge the validity of the Marks. Licensor reserves (a) the right to assign or otherwise dispose of its Marks subject to the specific rights granted by Licensor to Licensee herein and subject to the terms and conditions of this Agreement, and (b) all other rights Licensor has in the Marks that are not expressly granted by this Agreement, including without limitation each Licensor's exclusive ownership of its Marks.

3.  **Quality Control and Approval.**

   (a)  In connection with the Business Purpose, Licensee shall, and any sublicensee shall be required to, maintain standards of quality that conform to those high-quality standards at least equal to those presently used by Licensor or consistent with any future usage by Licensor.  Licensee understands and agrees that any and all uses of the Marks by Licensee in connection with the Business Purpose shall be subject to the reasonable approval and quality control of Licensor.  Upon the reasonable request of Licensor, not more than once per year, Licensee shall provide Licensor with notice detailing Licensee's use of the Marks, and provide Licensor a reasonable opportunity to review and approve the use of the Marks; provided, however, that Licensee shall at all times, upon reasonable request of Licensor, provide Licensor an opportunity to review and inspect the use of the Marks.  Notwithstanding anything to the contrary in this Section 3(a), Licensor agrees that any use conforming to the high-quality standards presently used, and consistent with the current use by Licensor, or any use by Licensee previously approved by Licensor, is deemed to satisfy the quality control provisions of this Section 3(a).   For purposes of clarification, after a use of the Marks is approved (or deemed approved) by Licensor pursuant to this Section, Licensee may continue to use the Marks in a manner consistent with such use without further approval by Licensor.  In the event either party becomes aware of, or is informed of, consumer confusion arising from Licensee's use of the Marks in connection with the Business Purpose, the parties will work in good faith to develop appropriate steps to minimize such confusion to the extent possible. It is understood that the rights of Licensor under this Section are granted only to the extent necessary to preserve the respective goodwill in and to protect the validity of the Marks and does not grant rights to Licensor beyond such extent.

   (b)  For use of the Marks by a sublicensee, Licensor hereby appoints Licensee as its non-exclusive designee to oversee and manage the quality control of (i) the use by the sublicensee of the Marks in accordance with the terms of this Agreement and the applicable sublicense, and (ii) the nature and quality of the services offered by the sublicensee, all in accordance with the terms and conditions of this Agreement.  Licensee accepts such appointment and agrees to perform such services in accordance with the terms of this Agreement.  For purposes of clarity, this provision only provides for the delegation of quality control services to be provided by Licensee on behalf of Licensor with respect to licensed use of the Marks by sublicensees, and Licensor retains all right, title and interest in and to its Marks and all goodwill arising from the use of the Marks.

(c)  The effectiveness of this Agreement is contingent upon the concurrent mutual execution and delivery of the following (collectively, the "Concurrent Agreements"):  (i) the Third Amendment to Credit Agreement, whereby Operator (as defined below) will purchase a junior participation in the loans provided under B of A Loan Agreement so as to provide PTEC, Licensor's parent company, with additional liquidity; (ii) that certain Lease Termination and Release Agreement of even date herewith between Dome Center, LLC., as landlord of the of the "ArcLight Hollywood", and Licensor, as tenant, terminating that certain Theatre Lease dated May 5, 2000, as amended, with respect to the ArcLight Hollywood premises (the "Termination Agreement"); (iii) that certain Transition Services Agreement of even date herewith between DT Operator, LLC, a Delaware limited liability company ("Operator"), and Licensor with respect to the ArcLight Hollywood premises, (iv) that certain Sixth Amendment to Lease and Forbearance Agreement of even date herewith between Licensee, as landlord, and Licensor, as tenant, with respect to the lease of the Winnetka Premises more particularly described therein; and (v) that certain Trademark License Agreement of even date herewith between Licensor and ArcLight Cinema Company, a California corporation, as licensors, and Operator, as licensee.  The parties acknowledge and agree that the execution, delivery and performance of the Concurrent Agreements, including, without limitation, the payments made pursuant to the Termination Agreement, are additional consideration for the execution, delivery and performance of this Agreement.

4.      **Ownership and Maintenance of Marks**.  Licensee hereby acknowledges that (a) Licensor is the owner all right, title and interest in and to the Marks and any goodwill related thereto; and (b) Licensee, by reason of this Agreement, does not acquire any right, title, interest or other claim of ownership to the Marks, other than the license granted under this Agreement.  During the Term of this Agreement, Licensor will prosecute and maintain the registrations and pending applications for the Marks in full force and effect and shall pay all applicable fees (including, without limitation, all taxes and maintenance fees) and take such other actions to maintain the Marks (and all registrations and pending applications therefor). Licensor will inform Licensee of any voluntary decision by Licensor to abandon or cancel any registration or application for any of the Marks prior to taking any such action.  Upon such event, Licensor will, upon Licensee's request, assign, transfer and convey all of its rights, title, and interest in application or registration for such Mark(s) to Licensee, as so requested, at no cost to Licensee, and the license grant to Licensee pursuant to this Agreement will terminate for such Marks upon the effective date of such assignment.  Licensor acknowledges and agrees that an essential condition of this Agreement is the protection of the high reputation and quality associated with the Marks, and Licensor agrees that it will not engage in any conduct inconsistent with that high reputation and quality.

5.      **Term and Termination.**

(a)      **Term**.  This Agreement shall be effective as of the Effective Date and continue in full force and effect until otherwise terminated as provided under Section 5(b) (the "Term").

(b)      **Termination**.  The parties may terminate this Agreement in whole or in part at any time upon mutual written consent of the parties.  If, during the Term,  any of the Marks is invalidated by a third party action or use of the Marks is enjoined by court or regulatory proceeding, the Licensor of the affected Mark will use commercially reasonable efforts to procure the right for Licensee to continue using the affected Mark in accordance with the terms of this Agreement, and if the foregoing is not reasonably possible, this Agreement will be deemed terminated with respect to the affected Mark.

(c)    **Effect of Termination**.  Upon the termination of this Agreement in its entirety, (i) all rights in the Marks granted to Licensee hereunder shall automatically revert to Licensor, and Licensee shall have no further rights in or to the Marks and (ii) Licensee and all of its sublicensees shall discontinue all use of the Marks and return to Licensor any and all materials provided to Licensee or its sublicensees by Licensor under this Agreement within a reasonable period of time as necessary taking into consideration the nature and use of the Marks, and in any event within twelve months.  In the event of a partial termination of this Agreement with respect to certain Marks, (i) the rights granted to Licensee hereunder with respect to the terminated Marks shall automatically revert to Licensor, and Licensee shall have no further rights in or to those applicable Marks and (ii) Licensee and all of its sublicensees shall discontinue all use of those applicable Marks and return to Licensor any and all materials provided to Licensee or its sublicensees by Licensor under this Agreement  with respect to those applicable Marks within a reasonable period of time as necessary taking into consideration the nature and use of the Marks, and in any event within twelve months.  Notwithstanding the foregoing, Licensee has no obligation to recall materials (e.g. premiums or related materials) that are (i) not within Licensee's control or (ii) have been distributed or otherwise placed into the stream of commerce and are outside the control of Licensee.

6.      **Legends.**  Licensee agrees to affix to any materials bearing any of the Marks (including labels, packaging, advertising and promotional materials) any statutory notices or legends reasonably requested by Licensor or otherwise required by applicable law.

7.      **Legal Proceedings.**  Unless otherwise determined by the parties in writing, Licensor (or its designee) shall have the sole right to determine and carry out, in its discretion, the course of action, if any, that may be appropriate for responding to instances of infringement or other misuse of the Marks, and Licensee shall, at Licensor's request, cooperate fully with Licensor in any action, claim or proceedings brought or threatened in respect of the Marks.

8.      **Indemnification.**  Except as expressly provided in this Section 8, Licensor does not assume any liability to Licensee, or third parties, for use of the Marks in connection with Licensee's or any of its sublicensee's goods or services.  Licensee shall defend, indemnify and hold harmless Licensor and its affiliates, successors and assigns, and their respective officers, directors, employees, agents, attorneys and representatives, from and against any and all claims, causes of action, suits, damages, losses, liabilities, costs and expenses (including, but not limited to, reasonable attorney's fees and expenses), which may be sustained or suffered as a result of (i) the operation or marketing by Licensee of the Winnetka Premises or otherwise in connection with the Business Purpose; or (ii) any breach of this Agreement by Licensee or any sublicensee, including without limitation, any act or omission, which causes or is alleged to cause harm or a violation of any of the rights of any third party or the Marks. Licensor shall defend, indemnify and hold harmless Licensee and its affiliates, successors and assigns, and their respective officers, directors, employees, agents, attorneys and representatives, from and against any and all claims, causes of action, suits, damages, losses, liabilities, costs and expenses (including but not limited to, reasonable attorney's fees and expenses), which may be sustained or suffered as a result of any claim that the use of the Marks as authorized under this Agreement infringes or misappropriates the copyright, trademark, or other intellectual property or proprietary rights of a third party.

- 4 -

9.      **Relationship of the Parties.**  Nothing contained herein shall be construed to create or constitute any employment, agency, partnership or joint venture arrangement by and between the parties.  Furthermore, it is understood that neither party has the power or authority, express or implied, to obligate or bind the other party in any manner or thing whatsoever.

10.      **Assignment**.  Except in the event of a change of control, assignment by operation of law, or in connection with a sale of the Winnetka Premises or other facility owned or operated by Licensee for which the Marks are used pursuant to this Agreement (for which Licensee may freely assign this Agreement), Licensee may not assign or transfer this Agreement in its entirety, without the prior written consent of the Licensor, not to be unreasonably withheld, conditioned or delayed.  Notwithstanding anything to the contrary in this Section 10, this <u>Section 10</u> shall not prohibit or restrict Licensee from (i) permitting its affiliated designees or sublicensees (including future tenants) from using the Marks solely for the Business Purpose as provided under this Agreement or (ii) freely assigning or sublicensing its right hereunder, without additional payment or further obligation to Licensor,  in connection with any lease, conveyance, transfer, sale or assignment of the Winnetka Premises.

11.      **Headings.**  The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

12.      **Notices.**  All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be deemed to have been duly given:  (a) if sent by first-class registered, certified or recorded delivery mail, return receipt requested, postage prepaid, no later than the fifth (5th) day following the date of deposit in the mail; (b) if delivered personally, when received; (c) if sent by a generally recognized overnight courier service, when received; or (d) if transmitted by facsimile or other telegraphic communications equipment, when confirmed, in each case addressed as follows:

|  |  |
|---|---|
| If to Licensor, to: | Pacific Theatres Entertainment Corporation |
|  | 120 N. Robertson Blvd. |
|  | Los Angeles, CA 90048 |
|  | Attn: Legal Department |
|  |  |
|  | Hogan Lovells US LLP |
|  | 1999 Avenue of the Stars, Suite 1400 |
|  | Los Angeles, CA 90067 |
|  | Attn: Richard Wynne & Erin Brady |
|  |  |
| If to Licensee to: | WinCal, LLC |
|  | 120 N. Robertson Blvd. |
|  | Los Angeles, CA 90048 |
|  | Attn: Legal Department |

13**.**      **Entire Agreement.**  This Agreement constitutes the entire agreement between Licensor and Licensee with respect to the subject matter hereof and supersedes all prior agreements and understandings between Licensor and Licensee.  Except as provided to the contrary herein, all of the provisions of this Agreement shall bind and inure to the benefit of the parties and their successors and permitted assigns.

14**.    No Waiver.** Any waiver by Licensor of any breach of or failure to comply with any provision of this Agreement shall be in writing and shall not be construed as, or constitute, a continuing waiver of such provision or a waiver of any breach of, or failure to comply with, any other provision of this Agreement.  No change or modification of this Agreement shall be valid or binding on the parties hereto unless such change or modification shall be in writing and signed by the parties hereto.

15.    **Severability**.  If at any time, any provision of this Agreement is or becomes illegal, invalid, or unenforceable, under applicable law, the legality, validity, or enforceability of the remaining provisions shall in no way be affected or impaired.

16.    **Survival**.  Except as otherwise provided in this Agreement, the covenants, representations, warranties and indemnities contained in this Agreement which by their nature, sense and context survive or are expressly intended to survive the expiration or termination of this Agreement will so survive and continue in full force and effect until they are satisfied or by their nature expire, including, without limitation, Sections 2, 4, 5(c), 7, 8, 9, 12 through 18 (inclusive).

17.    **Compliance With Laws**.  Licensee agrees to comply with all applicable laws, regulations, and standards relating or pertaining to Licensee's business operations and the use and sublicense of the Marks in accordance with the terms and conditions of this Agreement.

18.    **Governing Law**.  This Agreement shall be governed and construed in accordance with the laws of the State of California, United States of America, excluding its conflict of law principles and the United Nations Convention on Contracts for the International Sale of Goods.  To the full extent permitted by law, the exclusive jurisdiction for any action relating to this Agreement shall be a federal or state court located in County of Los Angeles, California, and the parties consent to such jurisdiction and waive and agree not to plead or claim that any such action or proceeding has been brought in an inconvenient forum.

[No further text on this page.]

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**Licensor:**                                                    **Licensee:**

**PACIFIC THEATRES ENTERTAINMENT**   **WINCAL, LLC,**
**CORPORATION,**                                         a California limited liability company
a California Corporation

By: _____                          By:      California Drive-In Theatres, Inc.,
Name: Robert A. Kors                                            a California corporation, its sole member
Title: Independent Director

                                                                          By: _____
                                                                          Name: Jill Saperstein
By: _____                          Title:  Secretary
Name: M. Freddie Reiss
Title: Independent Director

- 7 -

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

Licensor:                                        Licensee:

**PACIFIC THEATRES**                              **WINCAL, LLC,**
**ENTERTAINMENT CORPORATION,**                    a California limited liability company
a California Corporation

                                                 By:     California Drive-In Theatres, Inc.,
                                                         a California corporation, its sole member

By: _____
Name: Robert A. Kors                                     By: _____
Title: Independent Director                              Name: Jill Saperstein
                                                         Title:  Secretary

By: _____
Name: M. Freddie Reiss
Title: Independent Director

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

Licensor:

**PACIFIC THEATRES ENTERTAINMENT CORPORATION,**
a California Corporation


By: _____
Name: Robert A. Kors
Title: Independent Director


By: _____
Name: M. Freddie Reiss
Title: Independent Director

Licensee:

**WINCAL, LLC,**
a California limited liability company

By:     California Drive-In Theatres, Inc.,
        a California corporation, its sole member

        By: _____
        Name: Jill Saperstein
        Title:  Secretary

- 7 -

# EXHIBIT A

## MARKS

| Trademark Name/Description | Registration No. | Current Owner | Class & Services | Jurisdiction |
|---|---|---|---|---|
| "PACIFIC THEATRES" (word mark) | 057332 | Pacific Theatres Entertainment Corporation | Class 41 Movie Theater services | California |
| "PACIFIC THEATRES" (word mark) | Reg. No. 1,787,159<br><br>Serial No. 74-340640 | Pacific Theatres Entertainment Corporation | Class 41 Movie Theater services | U.S. Federal Trademark |
| "PACIFC THEATRES AND DESIGN" (service mark with stylized movie projector design logo)<br><br> | Reg. No. 2,368,501<br><br>(2368501)<br><br>Serial No. 75-761158<br><br>(75761158) | Pacific Theatres Entertainment Corporation | Class 41 Movie Theater services | U.S. Federal Trademark |

# EXHIBIT "C"

## TRADEMARK LICENSE AGREEMENT
### (ArcLight Hollywood)

This License Agreement (the "Agreement"), is made and entered into on this 9th day of November, 2020 ("Effective Date"), by and between ArcLight Cinema Company, a California corporation ("ArcLight Licensor"), Pacific Theatres Entertainment Corporation, a California corporation ("Pacific Licensor")(ArcLight Licensor and Pacific Licensor each a "Licensor" and together "Licensors"), and DT Operator, LLC ("Licensee").

WHEREAS, ArcLight Licensor owns the trademarks, service marks and logos set forth in the attached Exhibit A, together with goodwill symbolized thereby (collectively the "ArcLight Marks"); and

WHEREAS, Pacific Licensor owns the trademarks, service marks and logos set forth in the attached Exhibit A, together with goodwill symbolized thereby (collectively the "Pacific Marks"; together with the ArcLight Marks, the "Marks");

WHEREAS, Licensors are guarantors of that certain loan evidenced by the Second Amended and Restated Credit Agreement dated as of November 30, 2018 (the "Original Credit Agreement"), as amended by that certain Amendment Number One to Second Amended and Restated Credit Agreement dated July 23, 2019 (the "First Amendment to Credit Agreement"), that certain Waiver and Amendment Number Two to Second Amended and Restated Credit Agreement dated September 16, 2020 (the "Second Amendment to Credit Agreement"), and that certain Waiver, Consent and Amendment Number Three to Second Amended and Restated Credit Agreement dated on or about the date hereof (the "Third Amendment to Credit Agreement" and, together with the Original Credit Agreement, the First Amendment to Credit Agreement and the Second Amendment to Credit Agreement, collectively, the "B of A Loan Agreement") by and among Pacific Theatres Entertainment Corporation, a California corporation ("PTEC"), the lenders from time to time party thereto, and Bank of America, N.A.; and

WHEREAS, Licensee operates a theatre location in the neighborhood of Hollywood, California at 6360 Sunset Boulevard, Los Angeles, CA 90028 (referred to herein as the "ArcLight Premises") and desires to obtain from Licensors, and Licensors desire to grant to Licensee, a license to use the Marks in connection with the operation by Licensee of the ArcLight Premises and the Business Purpose (as defined below) all as set forth in this Agreement and pursuant to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Grant of Rights**.

   (a) License Rights.  Subject to the rights reserved by Licensor set forth in Section 2 below, each Licensor grants to Licensee during the Term a royalty-free, non-transferable (except as provided under Section 10 below) right and license to use its respective Marks solely in connection with the operation and marketing by Licensee of the ArcLight Premises and of any other facility owned or operated by Licensee (or its affiliated designee or assignee) in the Exclusive Territory (defined

below) (collectively, the "Business Purpose") with the right to negotiate and execute sublicenses of the Marks (subject to the terms and conditions of this Agreement) solely for the Business Purpose, subject to the applicable quality control provisions of this Agreement.

(b) Exclusivity.  Subject to the rights reserved to Licensors, Licensee has (i) the exclusive right to use the ArcLight Marks for the Business Purpose, including the ArcLight Premises and any other facility owned or operated by Licensee (or its affiliated designee or assignee) within  the area of Hollywood, California ("Exclusive Territory") (ii) the non-exclusive right to use the Marks worldwide in connection with the marketing and promotion of the ArcLight Premises and the Business Purpose.  Other than with respect to the locations listed on **Exhibit B**, each Licensor agrees during the Term not to open or operate, or authorize or license a third party to open or operate, a theater or any other facility under the "ArcLight Cinemas" or "Pacific Theatres" names or to market or advertise (itself or through a third party) any theater or any other facility under the "ArcLight Cinemas" or "Pacific Theatres" names (other than the locations listed on **Exhibit B**) within a five (5) mile radius of the Arclight Premises. Notwithstanding the foregoing, the parties acknowledge and agree that general online or digital marketing by Licensors outside the Exclusive Territory that may inadvertently spill-over into the Exclusive Territory shall not be considered a breach of this Section 1(b).

2.        **Rights Reserved by Licensor.**  Licensee acknowledges each Licensor's ownership of the Marks and all goodwill associated with the Marks, and agrees that its use of the Marks and goodwill related thereto shall inure to that Licensor's sole benefit.  Licensee agrees that Licensee will not at any time during the Term do or permit to be done any act that will impair the rights of the Licensor in and to the Marks or otherwise challenge the validity of the Marks. Each Licensor reserves (a) the right to assign or otherwise dispose of its Marks subject to the specific rights granted by that Licensor to Licensee herein and subject to the terms and conditions of this Agreement, and (b) all other rights that Licensor has in its Marks that are not expressly granted by this Agreement, including without limitation each Licensor's exclusive ownership of its Marks.

3.    **Quality Control and Approval.**

(a)  In connection with the Business Purpose, Licensee shall, and any sublicensee shall be required to, maintain standards of quality that conform to those high-quality standards at least equal to those presently used by Licensors or consistent with any future usage by Licensors.  Licensee understands and agrees that any and all uses of the Marks by Licensee in connection with the Business Purpose shall be subject to the reasonable approval and quality control of Licensors.  Upon the reasonable request of a Licensor, not more than once per year, Licensee shall provide that Licensor with notice detailing Licensee's use of the Marks, and provide Licensor a reasonable opportunity to approve the use of the Marks; provided, however, that Licensee shall at all times, upon the reasonable request of Licensor, provide Licensor an opportunity to review and inspect the use of the Marks.   Notwithstanding anything to the contrary in this Section 3(a), Licensors agree that any use conforming to the high-quality standards presently used, and consistent with the current use by Licensors, or any use by Licensee previously approved by Licensor is deemed to satisfy the quality control provisions of this Section 3(a).   For purposes of clarification, after a use of the Marks is approved (or deemed approved) by Licensor pursuant to this Section, Licensee may continue to use the Marks in a manner consistent with such use without further approval by Licensor.  In the event either party becomes aware of, or is informed of, consumer confusion arising from Licensee's use of the Marks in connection with the Business Purpose, the parties will work in

good faith to develop appropriate steps to minimize such confusion to the extent possible. It is understood that the rights of Licensors under this Section are granted only to the extent necessary to preserve the respective goodwill in and to protect the validity of the Marks and does not grant rights to Licensors beyond such extent.

(b)  For use of the Marks by a sublicensee, each Licensor hereby appoints Licensee as its non-exclusive designee to oversee and manage the quality control of (i) the use by the sublicensee of the Marks in accordance with the terms of this Agreement and the applicable sublicense, and (ii) the nature and quality of the services offered by the sublicensee, all in accordance with the terms and conditions of this Agreement.  Licensee accepts such appointment and agrees to perform such services in accordance with the terms of this Agreement.  For purposes of clarity, this provision only provides for the delegation of quality control services to be provided by Licensee on behalf of that Licensor with respect to licensed use of the Marks by sublicensees, and each Licensor retains all right, title and interest in and to its Marks and all goodwill arising from the use of the Marks.

(c)  The effectiveness of this Agreement is contingent upon the concurrent mutual execution and delivery of the following (collectively, the "Concurrent Agreements"):  (i) the Third Amendment to Credit Agreement, whereby Licensee will purchase a junior participation in the loans provided under B of A Loan Agreement so as to provide PTEC, Licensors' parent company, with additional liquidity; (ii) that certain Lease Termination and Release Agreement of even date herewith between Dome Center, LLC., as landlord of the ArcLight Premises, and Pacific Licensor, as tenant, terminating that certain Theatre Lease dated May 5, 2000, as amended, with respect to the ArcLight Premises (the "Termination Agreement"); (iii) that certain Transition Services Agreement of even date herewith between Licensee and Pacific Licensor with respect to the ArcLight Premises, (iv) that certain Sixth Amendment to Lease and Forbearance Agreement of even date herewith between WINCAL, LLC, a California limited liability company ("Wincal"), as landlord, and Pacific Licensor, as tenant, with respect to the lease of the "Pacific Winnetka" theater premises more particularly described therein; and (v) that certain Trademark License Agreement of even date herewith between Pacific Licensor, as licensor, and Wincal, as licensee.  The parties acknowledge and agree that the execution, delivery and performance of the Concurrent Agreements, including, without limitation, the payments made pursuant to the Termination Agreement, are additional consideration for the execution, delivery and performance of this Agreement.

4.      **Ownership and Maintenance of Marks**.  Licensee hereby acknowledges that (a) each Licensor is the owner of all right, title and interest in and to its Marks and any goodwill related thereto; and (b) Licensee, by reason of this Agreement, does not acquire any right, title, interest or other claim of ownership to the Marks, other than the license granted under this Agreement. During the Term of this Agreement, each Licensor will prosecute and maintain the registrations and pending applications for the Marks in full force and effect and shall pay all applicable fees (including, without limitation, all taxes and maintenance fees) and take such other actions to maintain the Marks (and all registrations and pending applications therefor). Each Licensor will inform Licensee of any voluntary decision by that Licensor to abandon or cancel any registration or application for any of the Marks prior to taking any such action.  Upon such event, that Licensor will, upon Licensee's request, assign, transfer and convey all of its rights, title, and interest in the application or registration for such Mark(s) to Licensee, as so requested, at no cost to Licensee, and the license grant to Licensee pursuant to this Agreement will terminate for such Mark(s) upon the effective date of such assignment.  Licensors acknowledge and agree that an essential condition of this Agreement

is the protection of the high reputation and quality associated with the Marks, and each Licensor agrees that it will not engage in any conduct inconsistent that high reputation and quality.

5.      **Term and Termination.**

(a)      **Term**.  This Agreement shall be effective as of the Effective Date and continue in full force and effect until otherwise terminated as provided under Section 5(b) ("Term").

(b)      **Termination**.  The parties may terminate this Agreement in whole or in part at any time upon mutual written consent of the parties.   If, during the Term,  any of the Marks is invalidated by a third party action or use of the Marks is enjoined by court or regulatory proceeding, the Licensor of the affected Mark will use commercially reasonable efforts to procure the right for Licensee to continue using the affected Mark in accordance with the terms of this Agreement, and if the foregoing is not reasonably possible, this Agreement will be deemed terminated with respect to the affected Mark.

(c)      **Effect of Termination**.  Upon the termination of this Agreement in its entirety, (i) all rights in the Marks granted to Licensee hereunder shall automatically revert to Licensors, and Licensee shall have no further rights in or to the Marks and (ii) Licensee and all of its sublicensees shall discontinue all use of the Marks and return to Licensors any and all materials provided to Licensee or its sublicensees by Licensors under this Agreement within a reasonable period of time as necessary taking into consideration the nature and use of the Marks, and in any event within twelve months.  In the event of a partial termination of this Agreement with respect to certain Marks, (i) the rights granted to Licensee hereunder with respect to the terminated Marks shall automatically revert to Licensors, and Licensee shall have no further rights in or to those applicable Marks and (ii) Licensee and all of its sublicensees shall discontinue all use of those applicable Marks and return to Licensors any and all materials provided to Licensee or its sublicensees by Licensors under this Agreement  with respect to those applicable Marks within a reasonable period of time as necessary taking into consideration the nature and use of the Marks, and in any event within twelve months.  Notwithstanding the foregoing, (i) Licensee has no obligation to recall materials (e.g. premiums or related materials) that are not within Licensee's control or have been distributed or otherwise placed into the stream of commerce and are outside the control of Licensee and (ii) Licensee shall have no obligation to remove the Pacific Marks from the historic signage at the "Pacific's Cinerama Dome" located at the ArcLight Premises or from the historic signage at the "Hollywood Pacific" theater building located at 6423-45 Hollywood Blvd, Los Angeles, CA 90028.

6.      **Legends.**  Licensee agrees to affix to any materials bearing any of the Marks (including labels, packaging, advertising and promotional materials) any statutory notices or legends reasonably requested by Licensors or otherwise required by applicable law.

7.      **Legal Proceedings.**  Unless otherwise determined by the parties in writing, each Licensor (or its designee) shall have the sole right to determine and carry out, in its discretion, the course of action, if any, that may be appropriate for responding to instances of infringement or other misuse of its Marks, and Licensee shall, at that Licensor's request, cooperate fully with that Licensor in any action, claim or proceedings brought or threatened in respect of the Marks.

8.      **Indemnification.**  Except as expressly provided in this Section 8, Licensors do not assume any liability to Licensee, or third parties, for use of the Marks in connection with Licensee's or any of its sublicensee's goods or services.  Licensee shall defend, indemnify and hold harmless Licensors and their affiliates, successors and assigns, and their respective officers, directors, employees, agents, attorneys and representatives, from and against any and all claims, causes of action, suits, damages, losses, liabilities, costs and expenses (including, but not limited to, reasonable attorney's fees and expenses), which may be sustained or suffered as a result of (i) the operation or marketing by Licensee of the ArcLight Premises or otherwise in connection with the Business Purpose; or (ii) any breach of this Agreement by the Licensee or any sublicensee, including without limitation, any act or omission, which causes or is alleged to cause harm or a violation of any of the rights of any third party or the Marks.  Each Licensor shall defend, indemnify and hold harmless Licensee and its affiliates, successors and assigns, and their respective officers, directors, employees, agents, attorneys and representatives, from and against any and all claims, causes of action, suits, damages, losses, liabilities, costs and expenses (including, but not limited to, reasonable attorney's fees and expenses), which may be sustained or suffered as a result of any claim that the use of its Marks as authorized under this Agreement infringes or misappropriates the copyright, trademark, or other intellectual property or proprietary rights of a third party.

9.      **Relationship of the Parties.**  Nothing contained herein shall be construed to create or constitute any employment, agency, partnership or joint venture arrangement by and between the parties.  Furthermore, it is understood that neither party has the power or authority, express or implied, to obligate or bind the other party in any manner or thing whatsoever.

10.      **Assignment**.  Except in the event of a change of control, assignment by operation of law, or in connection with a sale of the ArcLight Premises or other facility owned or operated by Licensee for which the Marks are used pursuant to this Agreement (for which Licensee may freely assign this Agreement), Licensee may not assign or transfer this Agreement in part or in its entirety, without the prior written consent of the Licensors, not to be unreasonably withheld, conditioned or delayed.  Notwithstanding anything to the contrary in this Section 10, this Section 10 shall not prohibit or restrict Licensee from (i) permitting its affiliated designees or sublicensees from using the Marks solely for the Business Purpose as provided under this Agreement or (ii) freely assigning or sublicensing its rights hereunder without additional payment or obligation to Licensors in connection with any conveyance, transfer, sale or assignment of the ArcLight Premises or any other facility owned or operated by Licensee (or its affiliated designee) in the neighborhood of Hollywood, California, provided that Licensee shall provide Licensors prompt written notice of any such assignment or sublicense.

11.      **Headings.**  The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

12.      **Notices.**  All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be deemed to have been duly given:  (a) if sent by first-class registered, certified or recorded delivery mail, return receipt requested, postage prepaid, no later than the fifth (5th) day following the date of deposit in the mail; (b) if delivered personally, when received; (c) if sent by a generally recognized overnight courier service, when received; or (d) if transmitted by facsimile or other telegraphic communications equipment, when confirmed, in each case addressed as follows:

If to Arclight Licensor, to:      ArcLight Cinema Company
120 N. Robertson Blvd.
Los Angeles, CA 90048
Attn: Legal Department

Hogan Lovells US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Attn: Richard Wynne & Erin Brady

If to Pacific Licensor, to:      Pacific Theatres Entertainment Corporation
120 N. Robertson Blvd.
Los Angeles, CA 90048
Attn: Legal Department

Hogan Lovells US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Attn: Richard Wynne & Erin Brady

If to Licensee to:      DT Operator, LLC
120 N. Robertson Blvd.
Los Angeles, CA 90048
Attn: Legal Department

13.    **Entire Agreement.**  This Agreement constitutes the entire agreement between Licensors and Licensee with respect to the subject matter hereof and supersedes all prior agreements and understandings between Licensors and Licensee.  Except as provided to the contrary herein, all of the provisions of this Agreement shall bind and inure to the benefit of the parties and their successors and permitted assigns.

14.    **No Waiver.** Any waiver by Licensors of any breach of or failure to comply with any provision of this Agreement shall be in writing and shall not be construed as, or constitute, a continuing waiver of such provision or a waiver of any breach of, or failure to comply with, any other provision of this Agreement.  No change or modification of this Agreement shall be valid or binding on the parties hereto unless such change or modification shall be in writing and signed by the parties hereto.

15.    **Severability**.  If at any time, any provision of this Agreement is or becomes illegal, invalid, or unenforceable, under applicable law, the legality, validity, or enforceability of the remaining provisions shall in no way be affected or impaired.

16.    **Survival**.  Except as otherwise provided in this Agreement, the covenants, representations, warranties and indemnities contained in this Agreement which by their nature, sense and context survive or are expressly intended to survive the expiration or termination of this Agreement will so survive and continue in full force and effect until they are satisfied or by their nature expire, including, without limitation, Sections 2, 4, 5(c), 7, 8, 9, 12 through 18 (inclusive).

17.      **Compliance With Laws**.  Licensee agrees to comply with all applicable laws, regulations, and standards relating or pertaining to Licensee's business operations and the use and sublicense of the Marks in accordance with the terms and conditions of this Agreement.

18.      **Governing Law**.  This Agreement shall be governed and construed in accordance with the laws of the State of California, United States of America, excluding its conflict of law principles and the United Nations Convention on Contracts for the International Sale of Goods.  To the full extent permitted by law, the exclusive jurisdiction for any action relating to this Agreement shall be a federal or state court located in County of Los Angeles, California, and the parties consent to such jurisdiction and waive and agree not to plead or claim that any such action or proceeding has been brought in an inconvenient forum.

[No further text on this page.]

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**ArcLight Licensor:**

**ARCLIGHT CINEMA COMPANY,**
a California Corporation

By: _____
Name: Jeff Koblentz
Title: Chief Financial Officer

**Pacific Licensor:**

**PACIFIC THEATRES ENTERTAINMENT CORPORATION,**
a California Corporation

By: _____
Name:  Robert A. Kors
Title: Independent Director


By: _____
Name:  M. Freddie Reiss
Title: Independent Director

**Licensee:**

**DT OPERATOR, LLC,**
a Delaware limited liability company

By:      DT Operator Holding, LLC
         a Delaware limited liability
         company, its sole member

By: _____
Name: Jasmine Upperman
Title: Secretary

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**ArcLight Licensor:**

**ARCLIGHT CINEMA COMPANY,**
a California Corporation

By: _____
Name: Jeff Koblentz
Title: Chief Financial Officer

**Licensee:**

**DT OPERATOR, LLC,**
a Delaware limited liability company

By:    DT Operator Holding, LLC
       a Delaware limited liability
       company, its sole member

       By: _____
       Name: Jasmine Upperman
       Title: Secretary

**Pacific Licensor:**

**PACIFIC THEATRES ENTERTAINMENT CORPORATION,**
a California Corporation

By: _____
Name:  Robert A. Kors
Title: Independent Director

By: _____
Name:  M. Freddie Reiss
Title: Independent Director

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**ArcLight Licensor:**

**ARCLIGHT CINEMA COMPANY,**
a California Corporation

By: _____
Name: Jeff Koblentz
Title: Chief Financial Officer

**Licensee:**

**DT OPERATOR, LLC,**
a Delaware limited liability company

By:    DT Operator Holding, LLC
         a Delaware limited liability
         company, its sole member

B                    y                    :
_____
Name: Jasmine Upperman
Title: Secretary

**Pacific Licensor:**

**PACIFIC THEATRES
ENTERTAINMENT CORPORATION,**
a California Corporation

By: _____
Name: Robert A. Kors
Title: Independent Director

By: _____
Name: M. Freddie Reiss
Title: Independent Director

## EXHIBIT A

### ARCLIGHT MARKS

| Mark | Jurisdiction | Owner | App. No/ Reg. No. |
|---|---|---|---|
| ARCLIGHT | United States | Arclight Cinema Company | 2,870,777 |
| ARCLIGHT CINEMAS | United States | Arclight Cinema Company | 2,824,307 |
| ARCLIGHT FILMS | United States | Arclight Cinema Company | 4,545,541 |
| MOVIE POUR | United States | Arclight Cinema Company | 88/841,504 |
| SOUND ADVICE | United States | Arclight Cinema Company | 6,107,273 |
| WHERE MOVIE LOVERS BELONG | United States | Arclight Cinema Company | 2,704,374 |
| YOUR MOVIE-TIME. UNINTERRUPTED. | United States | Arclight Cinema Company | 5,213,116 |

### PACIFIC MARKS

| Mark | Jurisdiction | Owner | App. No/ Reg. No. |
|---|---|---|---|
| "PACIFIC THEATRES" (word mark) | California | Pacific Theatres Entertainment Corporation | 057332 |
| PACIFIC THEATRES | United States | Pacific Theatres Entertainment Corporation | 1,787,159 |
| "PACIFIC THEATRES AND DESIGN" (service mark with stylized movie projector design logo)  | United States | Pacific Theatres Entertainment Corporation | Serial No. 75-761158 |

## EXHIBIT B

## EXISTING FACILITIES

Pacific Theatres at the Grove, 189 The Grove Drive, Los Angeles, CA 90036

Pacific Theatres, Glendale, 322 Americana Way, Glendale, CA 91210

"Pacific Theatres" building (aka Robertson Plaza), 116-120 North Robertson Blvd., Los Angeles, CA 90048

# EXHIBIT "D"

**Form 2**
**Cash Receipts and Disbursements Record**

| Case Number: | 21-15007 BB | Trustee: | EDWARD M. WOLKOWITZ |
|---|---|---|---|
| Case Name: | Pacific Theatres Exhibition Corp | Bank Name: | Signature Bank |
| | | Account: | ******4570 - Checking |
| Taxpayer ID#: | **-***3191 | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 07/13/21 | Asset #13 | BANK OF AMERICA (CASHIERS CHECK) | DEPOSIT FOR SALE ALCOHOLIC BEVERAGE LICENSE | 1129-000 | 9,000.00 | | 9,000.00 |
| 07/13/21 | Asset #1 | BANK OF AMERICA (CASHIERS CHECK) | CLOSE OF BANK ACCOUNT | 1129-000 | 13,017.70 | | 22,017.70 |
| 07/30/21 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 18.82 | 21,998.88 |
| 08/06/21 | Asset #17 | STATE OF ILLINOIS | EMPLOYER REFUND UNEMPLOYMENT INS | 1129-000 | 37.79 | | 22,036.67 |
| 08/06/21 | Asset #17 | BOSTON GLOBE MEDIA PARTNERS LLC | REFUND - OVER PAYMENT OF INVOICES PRE-PAID ADVERTISING | 1129-000 | 10,000.00 | | 32,036.67 |
| 08/06/21 | Asset #17 | STATE OF ILLINOIS | EMPLOYER REFUND - UNEMPLOYMENT INS | 1129-000 | 32.73 | | 32,069.40 |
| 08/06/21 | Asset #13 | AMERICAN MULTI-CINEMA INC | DEPOSIT - LICENSE GROVE CINEMAS LLC # 14 | 1129-000 | 8,500.00 | | 40,569.40 |
| 08/06/21 | Asset #13 | AMERICAN MULTI-CINEMA INC | DEPOSIT - SALE ALCOHOLIC BEVERAGE LICENSE AAB CINEMAS LLC AMERICAN # 18 | 1129-000 | 8,500.00 | | 49,069.40 |
| 08/09/21 | | To Account# XXXXXX6387 | DEPOSIT FROM REGAL CINEMAS INC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE | 9999-000 | | 9,000.00 | 40,069.40 |
| 08/09/21 | | To Account# XXXXXX6387 | DEPOSIT FROM GROVE CINEMAS LLC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE #14 | 9999-000 | | 8,500.00 | 31,569.40 |
| 08/09/21 | | To Account# XXXXXX6387 | DEPOSIT FROM AAB CINEMAS LLC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE AMERICANA # 18 | 9999-000 | | 8,500.00 | 23,069.40 |

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 21-15007 BB | | Trustee: | EDWARD M. WOLKOWITZ |
| Case Name: | Pacific Theatres Exhibition Corp | | Bank Name: | Signature Bank |
| | | | Account: | ******4570 - Checking |
| Taxpayer ID#: | **-***3191 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | | Separate Bond: | N/A |

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Trans. Date | Check or Ref. # | Paid To / Received From | Description of Transaction | Uniform Tran. Code | Receipts $ | Disbursements $ | Checking Account Balance |
| 08/12/21 | Asset #14 | STATE OF CALIFORNIA | SALES TAX REFUND (NOT ESTATE FUNDS) | 1129-000 | 1,301,347.81 | | 1,324,417.21 |
| 08/18/21 | | To Account# XXXXXX6603 | CA STATE SALES TAX REFUND (NOT ESTATE FUNDS) | 9999-000 | | 1,301,347.81 | 23,069.40 |
| 08/31/21 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 461.26 | 22,608.14 |
| 09/09/21 | Asset #17 | NICOR GAS | REFUND | 1129-000 | 1,176.64 | | 23,784.78 |
| 09/14/21 | Asset #13 | PIZZANA LLC | DEPOSIT FOR SALE OF  ALCOHOLIC BEVERAGE LICENSE | 1129-000 | 8,500.00 | | 32,284.78 |
| 09/14/21 | | To Account# XXXXXX6387 | DEPOSIT FOR SALE OF  ALCOHOLIC BEVERAGE LICENSE - PIZZANA | 9999-000 | | 8,500.00 | 23,784.78 |
| 09/21/21 | Asset #1 | BANK OF HAWAII | CLOSE OF BANK ACCOUNTS | 1129-000 | 569.28 | | 24,354.06 |
| 09/28/21 | Asset #3 | ALSTON & BIRD LLP | ROYALTY PAYMENT JULY 2021 $3939.32 ROYALTY PAYMENT AUGUST 2021 $3939.32 | 1129-000 | 7,878.64 | | 32,232.70 |
| 09/30/21 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 38.67 | 32,194.03 |
| 10/15/21 | Asset #3 | ALSTON & BIRD LLP | SEPTEMBER 2021 ROYALTY PAYMENT | 1129-000 | 3,939.32 | | 36,133.35 |
| 10/29/21 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 52.83 | 36,080.52 |
| 11/05/21 | Asset #13 | ATLA VENICE LLC | DEPOSIT FOR SALE OF LIQUOR LICENSE SUNSET HOLLYWOOD | 1129-000 | 8,500.00 | | 44,580.52 |

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 21-15007 BB | | Trustee: | EDWARD M. WOLKOWITZ |
| --- | --- | --- | --- | --- |
| Case Name: | Pacific Theatres Exhibition Corp | | Bank Name: | Signature Bank |
| | | | Account: | ******4570 - Checking |
| Taxpayer ID#: | **-***3191 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 11/08/21 | | To Account# XXXXXX6387 | ATLAN VENICE LLC DEPOSIT FOR ALCOHOLIC BEVERAGE LICENSE RE SUNSET HOLLYWOOD | 9999-000 | | 8,500.00 | 36,080.52 |
| 11/10/21 | Asset #3 | ALSTON & BIRD LLP | OCTOBER 2021 ROYALTIES | 1129-000 | 3,939.32 | | 40,019.84 |
| 11/17/21 | Asset #13 | BELLA VITA HOSPITALITY LLC | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE | 1129-000 | 8,500.00 | | 48,519.84 |
| 11/18/21 | | To Account# XXXXXX6387 | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE | 9999-000 | | 8,500.00 | 40,019.84 |
| 11/19/21 | Asset #3 | REGAL ENTERTAINMENT GROUP | BALANCE OF FUNDS TO PURCHASE ALCOHOLIC BEVERAGE LICENSE | 1129-000 | 81,000.00 | | 121,019.84 |
| 11/19/21 | Asset #17 | BDO USA LLP | 2020 AUDIT FEE REFUND | 1129-000 | 15,181.00 | | 136,200.84 |
| 11/19/21 | Asset #17 | BDO USA LLP | 2020 AUDIT FEE REFUND | 1129-000 | 20,164.00 | | 156,364.84 |
| 11/19/21 | Asset #17 | BDO USA LLP | 2020 AUDIT FEE REFUND | 1129-000 | 26,836.00 | | 183,200.84 |
| 11/19/21 | | From Account# XXXXXX6387 | TRANSFER OF DEPOSIT OF REGAL CINEMAS FOR PURCHASE OF ALCOHOLIC BEVERAGE LICENSE | 9999-000 | 8,500.00 | | 191,700.84 |
| 11/19/21 | | From Account# XXXXXX6387 | DEPOSIT FROM REGAL CINEMAS INC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE | 9999-000 | 500.00 | | 192,200.84 |
| 11/19/21 | | To Account# XXXXXX6603 | ALSTON & BIRD LLP JULY & AUGUST ROYALTY PAYMENTS - (not estate funds) | 9999-000 | | 7,878.64 | 184,322.20 |

**Form 2**
**Cash Receipts and Disbursements Record**

| Case Number: | 21-15007 BB | Trustee: | EDWARD M. WOLKOWITZ |
|---|---|---|---|
| Case Name: | Pacific Theatres Exhibition Corp | Bank Name: | Signature Bank |
| | | Account: | ******4570 - Checking |
| Taxpayer ID#: | **-***3191 | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 11/19/21 | | To Account# XXXXXX6603 | ALSTON & BIRD LLP SEPTEMBER ROYALTY PAYMENT (not funds of estate) | 9999-000 | | 3,939.32 | 180,382.88 |
| 11/19/21 | | To Account# XXXXXX6603 | ALSTON & BIRD LLP OCTOBER ROYALTY PAYMENT (not estate funds) | 9999-000 | | 3,939.32 | 176,443.56 |
| 11/29/21 | Asset #13 | AMERICAN MULTI-CINEMA INC | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - EL SEGUNDO | 1129-000 | 9,000.00 | | 185,443.56 |
| 11/29/21 | Asset #13 | AMERICAN MULTI-CINEMA INC | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - LA JOLLA | 1129-000 | 8,500.00 | | 193,943.56 |
| 11/29/21 | | To Account# XXXXXX6603 | 2020 AUDIT FEE REFUND | 9999-000 | | 26,836.00 | 167,107.56 |
| 11/29/21 | | To Account# XXXXXX6603 | 2020 AUDIT FEE REFUND | 9999-000 | | 20,164.00 | 146,943.56 |
| 11/29/21 | | To Account# XXXXXX6603 | 2020 AUDIT FEE REFUND | 9999-000 | | 15,181.00 | 131,762.56 |
| 11/29/21 | | City of Boston | e-check for renewal of Liquor License LB-99352<br>PER ORDER ENTERED 11/22/2021 | 2990-000 | | 3,400.00 | 128,362.56 |
| 11/30/21 | | To Account# XXXXXX6387 | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - LA JOLLA | 9999-000 | | 8,500.00 | 119,862.56 |
| 11/30/21 | | To Account# XXXXXX6387 | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - EL SEGUNDO | 9999-000 | | 9,000.00 | 110,862.56 |
| 11/30/21 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 145.49 | 110,717.07 |

**Form 2**
**Cash Receipts and Disbursements Record**

| Case Number: | 21-15007 BB | Trustee: | EDWARD M. WOLKOWITZ |
|---|---|---|---|
| Case Name: | Pacific Theatres Exhibition Corp | Bank Name: | Signature Bank |
| | | Account: | ******4570 - Checking |
| Taxpayer ID#: | **-***3191 | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | Separate Bond: | N/A |

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Trans. Date | Check or Ref. # | Paid To / Received From | Description of Transaction | Uniform Tran. Code | Receipts $ | Disbursements $ | Checking Account Balance |
| 12/10/21 | Asset #3 | ALSTON & BIRD LLPONE ATLANTIC CENTER1201 W PEACHTREE ST SUITE 4900ATLANTA, GA 30309 | NOVEMBER 2021 ROYALTY PAYMENT | 1129-000 | 3,939.32 | | 114,656.39 |
| 12/13/21 | | To Account# XXXXXX6603 | ALSTON & BIRD LLP NOVEMBER ROYALTY PAYMENT (not funds of estate) | 9999-000 | | 3,939.32 | 110,717.07 |
| 12/31/21 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 184.18 | 110,532.89 |
| 01/11/22 | Asset #3 | ALSTON & BIRD LLP | DECEMBER 2021 ROYALTY PAYMENT | 1129-000 | 3,939.32 | | 114,472.21 |
| 01/11/22 | Asset #13 | FIRST REPUBLIC BANK | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - CULVER CITY (ISAIAS HERNAND) | 1129-000 | 9,000.00 | | 123,472.21 |
| 01/13/22 | | To Account# XXXXXX6387 | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - CULVER CITY (ISAIAS HERNAND) | 9999-000 | | 9,000.00 | 114,472.21 |
| 01/13/22 | | To Account# XXXXXX6603 | ALSTON & BIRD LLP DECEMBER 2021 ROYALTY PAYMENT | 9999-000 | | 3,939.32 | 110,532.89 |
| 01/13/22 | 1001 | INTERNATIONAL SURETIES, LTD | BOND # 016229730 TERM 1/04/22 - 1/4/23 | 2300-000 | | 97.86 | 110,435.03 |
| 01/26/22 | 1002 | JBK ENTERPRISES INC | CONSULTING FEE - SALE OF SHERMAN OAKS BEVERAGE LICENSE - PER ORDER ENTERED 8/11/2021 | 3731-000 | | 3,500.00 | 106,935.03 |
| 01/31/22 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 184.41 | 106,750.62 |

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 21-15007 BB | Trustee: | EDWARD M. WOLKOWITZ |
| --- | --- | --- | --- |
| Case Name: | Pacific Theatres Exhibition Corp | Bank Name: | Signature Bank |
| | | Account: | ******4570 - Checking |
| Taxpayer ID#: | **-***3191 | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 02/02/22 | Asset #17 | DECURION DISBURSEMENT | REF# 20220202B6B7261F00613302021713FT01 0000031652FROM: DECURION DISBURSEMENT ACCOUNT    ABA: 121000248  BANK:    OBI:  PT-06.30.21<br><br>BUSINESS INTERRUPTION CLAIM FOR ARCLIGHT BEACH CITIES 12/08/2019 | 1129-000 | 1,984.17 | | 108,734.79 |
| 02/02/22 | Asset #17 | DECURION DISBURSEMENT | REF# 20220202B6B7261F00613502021713FT01 0000031669FROM: DECURION DISBURSEMENT ACCOUNT    ABA: 121000248  BANK:    OBI:  PT-01.26.22<br><br>INSURANCE PREMIUM REFUND | 1129-000 | 64,578.95 | | 173,313.74 |
| 02/03/22 | | To Account# XXXXXX6603 | INSURANCE PREMIUM REFUND | 9999-000 | | 64,578.95 | 108,734.79 |
| 02/03/22 | | To Account# XXXXXX6603 | BUSINESS INTERRUPTION CLAIM FOR ARCLIGHT BEACH CITIES 12/08/2019 | 9999-000 | | 1,984.17 | 106,750.62 |
| 02/08/22 | | From Account# XXXXXX6387 | DEPOSIT FROM GROVE CINEMAS LLC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE # 14 | 9999-000 | 8,500.00 | | 115,250.62 |
| 02/08/22 | | From Account# XXXXXX6387 | DEPOSIT FROM AAB CINEMAS LLC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE AMERICANA # 18 | 9999-000 | 8,500.00 | | 123,750.62 |

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 21-15007 BB | Trustee: | EDWARD M. WOLKOWITZ |
|---|---|---|---|
| Case Name: | Pacific Theatres Exhibition Corp | Bank Name: | Signature Bank |
| | | Account: | ******4570 - Checking |
| Taxpayer ID#: | **-***3191 | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 02/09/22 | Asset #13 | BANK OF AMERICA (CASHIERS CHECK) | BALANCE OF PAYMENT FOR SALE OF LICENSE<br>ALCOHOL LICENSE AMERICANA # 18 | 1129-000 | 76,500.00 | | 200,250.62 |
| 02/09/22 | Asset #13 | BANK OF AMERICA (CASHIERS CHECK) | BALANCE OF PAYMENT FOR SALE OF LICENSE<br>ALCOHOL LICENSE THE GROVE # 14 | 1129-000 | 76,500.00 | | 276,750.62 |
| 02/16/22 | 1003 | JBK ENTERPRISES INC | CONSULTING FEES<br>SALE OF BEVERAGE LICENSE GROVE # 14<br>SALE OF BEVERAGE LICENSE AMERICANA # 18<br>PER ORDER ENTERED 8/11/2021 | 3731-000 | | 7,000.00 | 269,750.62 |
| 02/23/22 | Asset #13 | CALIFORNIA BUSINESS ESCROW INC | PROCEEDS SALE OF BEVERAGE LICENSE PASADENA | 1129-000 | 76,500.00 | | 346,250.62 |
| 02/23/22 | | From Account# XXXXXX6387 | DEPOSIT FOR SALE OF BEVERAGE LICENSE - PASADENA | 9999-000 | 8,500.00 | | 354,750.62 |
| 02/28/22 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 361.48 | 354,389.14 |
| 03/08/22 | Asset #14 | UNITED STATES TREASURY | TAX REFUND | 1129-000 | 250.28 | | 354,639.42 |
| 03/18/22 | Asset #17 | TIGER CAPITAL GROUP, LLC | REF#<br>20220318B6B7261F00038703180515FT01<br> 0000005082FROM: TIGER CAPITAL<br>GROUP, LLC        ABA:  121000248  BANK:<br>                           OBI:  CH 7<br>TRUSTEE ED WOLKOWITZCLIENT FINAL<br>SETTLEMENT220110OBI:  -A-<br>PACTHEATRES                      OBI: | 1129-000 | 379,378.31 | | 734,017.73 |

## Form 2
## Cash Receipts and Disbursements Record

| | | | | | | |
|---|---|---|---|---|---|---|
| **Case Number:** | 21-15007 BB | | | **Trustee:** | EDWARD M. WOLKOWITZ | |
| **Case Name:** | Pacific Theatres Exhibition Corp | | | **Bank Name:** | Signature Bank | |
| | | | | **Account:** | ******4570 - Checking | |
| **Taxpayer ID#:** | **-***3191 | | | **Blanket Bond:** | $5,000,000.00 (per case limit) | |
| **Period:** | 06/01/21 - 09/27/22 | | | **Separate Bond:** | N/A | |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br><br>Paid To / Received From | 4<br><br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 03/22/22 | | Tiger Commercial & Industrial | Per ORDER entered 2/09/2022 | 2990-000 | | 175,000.00 | 559,017.73 |
| 03/22/22 | | BLSF&Q Operations | Per ORDER entered 2/09/2022 | 2990-000 | | 80,564.82 | 478,452.91 |
| 03/24/22 | Asset #17 | AT&T | REFUND | 1129-000 | 747.90 | | 479,200.81 |
| 03/29/22 | Asset #13 | AMERICAN MULTI-CINEMA INC | BALANCE OF PAYMENT FOR SALE OF LICENSE<br>ALCOHOL LICENSE -ARCLIGHT LA JOLLA | 1129-000 | 76,500.00 | | 555,700.81 |
| 03/29/22 | | From Account# XXXXXX6387 | DEPOSIT FOR SALE OF BEVERAGE LICENSE - ARCLIGHT LA JOLLA | 9999-000 | 8,500.00 | | 564,200.81 |
| 03/29/22 | 1004 | JBK ENTERPRISES INC | CONSULTING FEES<br>SALE OF BEVERAGE LICENSE ARCLIGHT LA JOLLA<br>SALE OF BEVERAGE LICENSE AMERICANA # 18<br>PER ORDER ENTERED 8/11/2021 | 3731-000 | | 3,500.00 | 560,700.81 |
| 03/31/22 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 737.20 | 559,963.61 |
| 04/29/22 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 910.73 | 559,052.88 |
| 05/31/22 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 908.46 | 558,144.42 |
| 06/30/22 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 906.98 | 557,237.44 |
| 07/27/22 | Asset #13 | CA BUSINESS ESCROW INC | BALANCE OF PROCEEDS OF SALE OF LIQUOR LICENSE SANTA MONICA | 1129-000 | 76,500.00 | | 633,737.44 |

## Form 2
## Cash Receipts and Disbursements Record

| | |  | | |
|---|---|---|---|---|
| **Case Number:** | 21-15007 BB | **Trustee:** | EDWARD M. WOLKOWITZ | |
| **Case Name:** | Pacific Theatres Exhibition Corp | **Bank Name:** | Signature Bank | |
| | | **Account:** | ******4570 - Checking | |
| **Taxpayer ID#:** | **-***3191 | **Blanket Bond:** | $5,000,000.00 (per case limit) | |
| **Period:** | 06/01/21 - 09/27/22 | **Separate Bond:** | N/A | |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 07/27/22 | Asset #13 | CA BUSINESS ESCROW INC | BALANCE OF PROCEEDS FROM SALE OF LIQUOUR LICENSE CULVER CITY | 1129-000 | 81,000.00 | | 714,737.44 |
| 07/27/22 | | From Account# XXXXXX6387 | TRANSFER DEPOSIT FOR SALE OF LIQUOR LICENSE - SANTA MONICA | 9999-000 | 8,500.00 | | 723,237.44 |
| 07/27/22 | | From Account# XXXXXX6387 | TRANSFER DEPOSIT FOR SALE OF LIQUOR LICENSE - CULVER CITY | 9999-000 | 9,000.00 | | 732,237.44 |
| 07/29/22 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 925.12 | 731,312.32 |
| 08/03/22 | Asset #17 | AMERICAN EXPRESS TRAVEL | REFUND 4046724399 ARCLIGHT | 1129-000 | 2.09 | | 731,314.41 |
| 08/03/22 | Asset #17 | AMERICAN EXPRESS TRAVEL | REFUND 5043989889 GROVE # 14 | 1129-000 | 1.68 | | 731,316.09 |
| 08/03/22 | Asset #17 | AMERICAN EXPRESS TRAVEL | REFUND 3126450667 | 1129-000 | 1.92 | | 731,318.01 |
| 08/10/22 | Asset #17 | AMERICAN EXPRESS TRAVEL | REFUND | 1129-000 | 1.68 | | 731,319.69 |
| 08/10/22 | Asset #17 | CHEF WORKS | REFUNDS | 1129-000 | 353.22 | | 731,672.91 |
| 08/31/22 | Asset #13 | BANK OF AMERICA (CASHIERS CHECK) | BALANCE OF PAYMENT FOR SALE OF ALCOHOL LICENSE - EL SEGUNDO | 1129-000 | 81,000.00 | | 812,672.91 |
| 08/31/22 | | From Account# XXXXXX6387 | TRANSFER OF DEPOSIT FOR SALE OF LICENSE - EL SEGUNDO | 9999-000 | 9,000.00 | | 821,672.91 |

**Form 2**
**Cash Receipts and Disbursements Record**

| Case Number: | 21-15007 BB | | Trustee: | EDWARD M. WOLKOWITZ |
|---|---|---|---|---|
| Case Name: | Pacific Theatres Exhibition Corp | | Bank Name: | Signature Bank |
| | | | Account: | ******4570 - Checking |
| Taxpayer ID#: | **-***3191 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 08/31/22 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 1,188.76 | 820,484.15 |

|  |  |  |  |
|---|---|---|---|
| **ACCOUNT TOTALS** | **2,632,299.07** | **1,811,814.92** | **$820,484.15** |
| Less: Bank Transfers | 69,500.00 | 1,531,727.85 | |
| **Subtotal** | **2,562,799.07** | **280,087.07** | |
| Less: Payment to Debtors | | 0.00 | |
| **NET Receipts / Disbursements** | **$2,562,799.07** | **$280,087.07** | |

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 21-15007 BB | | Trustee: | EDWARD M. WOLKOWITZ |
| Case Name: | Pacific Theatres Exhibition Corp | | Bank Name: | Signature Bank |
| | | | Account: | ******6387 - SEGREGATED (DEPOSITS) |
| Taxpayer ID#: | **-***3191 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 08/09/21 | | From Account# XXXXXX4570 | DEPOSIT FROM REGAL CINEMAS INC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE | 9999-000 | 9,000.00 | | 9,000.00 |
| 08/09/21 | | From Account# XXXXXX4570 | DEPOSIT FROM GROVE CINEMAS LLC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE #14 | 9999-000 | 8,500.00 | | 17,500.00 |
| 08/09/21 | | From Account# XXXXXX4570 | DEPOSIT FROM AAB CINEMAS LLC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE AMERICANA # 18 | 9999-000 | 8,500.00 | | 26,000.00 |
| 09/14/21 | | From Account# XXXXXX4570 | DEPOSIT FOR SALE OF  ALCOHOLIC BEVERAGE LICENSE - PIZZANA | 9999-000 | 8,500.00 | | 34,500.00 |
| 11/08/21 | | From Account# XXXXXX4570 | ATLAN VENICE LLC DEPOSIT FOR ALCOHOLIC BEVERAGE LICENSE RE SUNSET HOLLYWOOD | 9999-000 | 8,500.00 | | 43,000.00 |
| 11/18/21 | | From Account# XXXXXX4570 | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE | 9999-000 | 8,500.00 | | 51,500.00 |
| 11/19/21 | | To Account# XXXXXX4570 | TRANSFER OF DEPOSIT OF REGAL CINEMAS FOR PURCHASE OF ALCOHOLIC BEVERAGE LICENSE | 9999-000 | | 8,500.00 | 43,000.00 |
| 11/19/21 | | To Account# XXXXXX4570 | DEPOSIT FROM REGAL CINEMAS INC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE | 9999-000 | | 500.00 | 42,500.00 |
| 11/30/21 | | From Account# XXXXXX4570 | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - LA JOLLA | 9999-000 | 8,500.00 | | 51,000.00 |

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 21-15007 BB | | Trustee: | EDWARD M. WOLKOWITZ |
| Case Name: | Pacific Theatres Exhibition Corp | | Bank Name: | Signature Bank |
| | | | Account: | ******6387 - SEGREGATED (DEPOSITS) |
| Taxpayer ID#: | **-***3191 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 11/30/21 | | From Account# XXXXXX4570 | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - EL SEGUNDO | 9999-000 | 9,000.00 | | 60,000.00 |
| 01/13/22 | | From Account# XXXXXX4570 | DEPOSIT FOR SALE OF ALCOHOLIC BEVERAGE LICENSE - CULVER CITY (ISAIAS HERNAND) | 9999-000 | 9,000.00 | | 69,000.00 |
| 02/08/22 | | To Account# XXXXXX4570 | DEPOSIT FROM GROVE CINEMAS LLC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE # 14 | 9999-000 | | 8,500.00 | 60,500.00 |
| 02/08/22 | | To Account# XXXXXX4570 | DEPOSIT FROM AAB CINEMAS LLC FOR SALE OF ALCOHOLIC BEVERAGE LICENSE AMERICANA # 18 | 9999-000 | | 8,500.00 | 52,000.00 |
| 02/23/22 | | To Account# XXXXXX4570 | DEPOSIT FOR SALE OF BEVERAGE LICENSE - PASADENA | 9999-000 | | 8,500.00 | 43,500.00 |
| 03/29/22 | | To Account# XXXXXX4570 | DEPOSIT FOR SALE OF BEVERAGE LICENSE - ARCLIGHT LA JOLLA | 9999-000 | | 8,500.00 | 35,000.00 |
| 07/27/22 | | To Account# XXXXXX4570 | TRANSFER DEPOSIT FOR SALE OF LIQUOR LICENSE - SANTA MONICA | 9999-000 | | 8,500.00 | 26,500.00 |
| 07/27/22 | | To Account# XXXXXX4570 | TRANSFER DEPOSIT FOR SALE OF LIQUOR LICENSE - CULVER CITY | 9999-000 | | 9,000.00 | 17,500.00 |

**Form 2**
**Cash Receipts and Disbursements Record**

| Case Number: | 21-15007 BB | | Trustee: | EDWARD M. WOLKOWITZ |
|---|---|---|---|---|
| Case Name: | Pacific Theatres Exhibition Corp | | Bank Name: | Signature Bank |
| | | | Account: | ******6387 - SEGREGATED (DEPOSITS) |
| Taxpayer ID#: | **-***3191 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 08/31/22 | | To Account# XXXXXX4570 | TRANSFER OF DEPOSIT FOR SALE OF LICENSE - EL SEGUNDO | 9999-000 | | 9,000.00 | 8,500.00 |

| | | | |
|---|---|---|---|
| **ACCOUNT TOTALS** | **78,000.00** | **69,500.00** | **$8,500.00** |
| Less: Bank Transfers | 78,000.00 | 69,500.00 | |
| **Subtotal** | **0.00** | **0.00** | |
| Less: Payment to Debtors | 0.00 | 0.00 | |
| **NET Receipts / Disbursements** | **$0.00** | **$0.00** | |

## Form 2
## Cash Receipts and Disbursements Record

| | | |
|---|---|---|
| **Case Number:** | 21-15007 BB | |
| **Case Name:** | Pacific Theatres Exhibition Corp | |

| | | |
|---|---|---|
| **Trustee:** | EDWARD M. WOLKOWITZ |
| **Bank Name:** | Signature Bank |
| **Account:** | ******6603 - SEGREGATED FUNDS (potentially BofA collateral) |

| | |
|---|---|
| **Taxpayer ID#:** | **-***3191 |
| **Period:** | 06/01/21 - 09/27/22 |

| | |
|---|---|
| **Blanket Bond:** | $5,000,000.00 (per case limit) |
| **Separate Bond:** | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | 5<br>Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 08/18/21 | | From Account# XXXXXX4570 | CA STATE SALES TAX REFUND (NOT ESTATE FUNDS) | 9999-000 | 1,301,347.81 | | 1,301,347.81 |
| 11/19/21 | | From Account# XXXXXX4570 | ALSTON & BIRD LLP JULY & AUGUST ROYALTY PAYMENTS - (not estate funds) | 9999-000 | 7,878.64 | | 1,309,226.45 |
| 11/19/21 | | From Account# XXXXXX4570 | ALSTON & BIRD LLP SEPTEMBER ROYALTY PAYMENT (not funds of estate) | 9999-000 | 3,939.32 | | 1,313,165.77 |
| 11/19/21 | | From Account# XXXXXX4570 | ALSTON & BIRD LLP OCTOBER ROYALTY PAYMENT (not estate funds) | 9999-000 | 3,939.32 | | 1,317,105.09 |
| 11/29/21 | | From Account# XXXXXX4570 | 2020 AUDIT FEE REFUND | 9999-000 | 26,836.00 | | 1,343,941.09 |
| 11/29/21 | | From Account# XXXXXX4570 | 2020 AUDIT FEE REFUND | 9999-000 | 20,164.00 | | 1,364,105.09 |
| 11/29/21 | | From Account# XXXXXX4570 | 2020 AUDIT FEE REFUND | 9999-000 | 15,181.00 | | 1,379,286.09 |
| 12/09/21 | | BANK OF AMERICA | PER ORDER ENTERED 12/03/2021 WIRE APPROVED BY UST - K MORRISON | 2990-000 | | 1,301,347.81 | 77,938.28 |
| 12/13/21 | | From Account# XXXXXX4570 | ALSTON & BIRD LLP NOVEMBER ROYALTY PAYMENT (not funds of estate) | 9999-000 | 3,939.32 | | 81,877.60 |
| 01/13/22 | | From Account# XXXXXX4570 | ALSTON & BIRD LLP DECEMBER 2021 ROYALTY PAYMENT | 9999-000 | 3,939.32 | | 85,816.92 |
| 02/03/22 | | From Account# XXXXXX4570 | INSURANCE PREMIUM REFUND | 9999-000 | 64,578.95 | | 150,395.87 |

Page: 15

**Form 2**
**Cash Receipts and Disbursements Record**

| Case Number: | 21-15007 BB | Trustee: | EDWARD M. WOLKOWITZ |
|---|---|---|---|
| Case Name: | Pacific Theatres Exhibition Corp | Bank Name: | Signature Bank |
| | | Account: | ******6603 - SEGREGATED FUNDS (potentially BofA collateral) |
| Taxpayer ID#: | **-***3191 | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period: | 06/01/21 - 09/27/22 | Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 02/03/22 | | From Account# XXXXXX4570 | BUSINESS INTERRUPTION CLAIM FOR ARCLIGHT BEACH CITIES 12/08/2019 | 9999-000 | 1,984.17 | | 152,380.04 |

|  |  | Receipts | Disbursements | Balance |
|---|---|---|---|---|
| **ACCOUNT TOTALS** | | 1,453,727.85 | 1,301,347.81 | $152,380.04 |
| Less: Bank Transfers | | 1,453,727.85 | 0.00 | |
| **Subtotal** | | 0.00 | 1,301,347.81 | |
| Less: Payment to Debtors | | | 0.00 | |
| **NET Receipts / Disbursements** | | $0.00 | $1,301,347.81 | |

| TOTAL - ALL ACCOUNTS | Net<br>Receipts | Net<br>Disbursements | Account<br>Balances |
|---|---|---|---|
| **Checking # ******4570** | 2,562,799.07 | 280,087.07 | 820,484.15 |
| **Checking # ******6387** | 0.00 | 0.00 | 8,500.00 |
| **Checking # ******6603** | 0.00 | 1,301,347.81 | 152,380.04 |
| | $2,562,799.07 | $1,581,434.88 | $981,364.19 |

# EXHIBIT "E"

## SETTLEMENT AND LICENSE AGREEMENT

This Agreement is made between Arclight Cinema Company ("Arclight Cinema"), a California corporation with a principal place of business at 120 North Robertson Boulevard, Los Angeles, CA 90048, and Arclight Films Pty. Ltd., Darclight Films Pty. Ltd., and Arclight Films International Pty. Ltd, Australian proprietary limited companies, and Arclight Films Canada, Inc., an Ontario corporation, all having a mailing address for purposes hereof at 8447 Wilshire Boulevard, Suite 101, Beverly Hills, CA 90211 (collectively "Arclight Films"). Arclight Cinema and Arclight Films are sometimes jointly referred to herein as "the Parties".

WHEREAS, Arclight Cinema has, for a number of years, operated under the Arclight Cinema trade name; has used the trademark and service marks ARCLIGHT and formatives of ARCLIGHT ("Arclight Cinema's Marks") in the United States and Europe for a variety of products and services related to motion picture development, production, marketing, sales, exhibition and distribution; and owns United States Trademark Registration Nos. 2,824,307, 2,870,777, and 2,831,062 and European Community Trademark Registration No, 002746410 covering some of these products and services;

WHEREAS, Arclight Cinema has granted a license to Arclight Creative Group, Inc. doing business as Arclight Productions and Arclight AB, a Swedish Company, for the use of the name and mark ARCLIGHT;

WHEREAS, subsequent to Arclight Cinema's use of the name ARCLIGHT CINEMA and mark ARCLIGHT, Arclight Films represents that, as part of its international business, it commenced operations in the United States under the corporate, trade, or fictitious names Arclight Films and Darclight Films and used in the United States the service marks ARCLIGHT and DARCLIGHT in relation to acting as a sales agent for motion pictures and motion picture rights in all media

1

forms, such as acting as sales agent for owners of intellectual property rights (including concepts, treatments, printed works, such as a novel or short story or other creative works, scripts, audio-visual works in progress, or completed audio-visual works related to or intended to be used in connection with motion pictures or other audio-visual works) to distributors, users of intellectual property rights, financing entities, and other entities which could otherwise enter into agreements with the owners of the intellectual property rights with respect to the further development and exploitation of the intellectual property rights.

WHEREAS, pursuant to a Settlement and License Agreement effective August 31, 2006 ("the 2006 License Agreement") between Arclight Cinema and Arclight Films, Arclight Cinema granted Arclight Films a license to use Arclight Cinema's Marks solely in connection with acting as sales agent for motion pictures and motion picture rights in all media forms  such as acting as sales agent for owners of intellectual property rights, specifically, film sales, marketing, and exploitation – but not distribution, production or exhibition – of motion pictures and motion picture rights in all media forms in all countries in which Arclight Cinema has rights in Arclight Cinema's Marks (hereinafter "License Agreement").

WHEREAS, Arclight Cinema terminated the License Agreement with Arclight Films effective March 17, 2011;

WHEREAS, Arclight Cinema filed suit against Arclight Films for, among other things, infringement of Arclight Cinema's mark ARCLIGHT, US Trademark Registration No. 2,831,062, styled *Arclight Cinema Company v. Arclight Films, PTY. LTD et al.*, Case Number CV11-06327 R (SHx) (hereinafter "the Lawsuit")'

WHEREAS, the parties are desirous of settling the Lawsuit and Arclight Films is desirous of obtaining a limited license from Arclight Cinema to use Arclight Cinema's Marks.

THEREFORE, in consideration of the promises, covenants, and

2

agreements set forth below and for other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**DEFINITIONS**

"**Arclight Territories**" means in all countries in which Arclight Cinema has rights in the marks Arclight or Formatives of Arclight.

"**Effective Date**" is March 17, 2011.

"**Formative**" means any trade name or service mark:

a)    which includes ARCLIGHT immediately followed by another word, term or design except "films",

b)    which includes the letters ARC, ARK, ARQ, ARCH, or other letter combinations producing the same sounds,

c)    which includes the letters DARK, DARC, DARQ, DARCH or other letter combinations producing the same sounds, or

d)    any mark confusingly similar to Arclight, the Licensed Trade Names or Licensed Marks or (a), (b), or (c) above.

"**License**" means the license granted in paragraph 1(a) — (e).

"**Licensed Trade Names**" means Arclight Films, Darclight and Darclight Films.

"**Licensed Marks**" means the marks Arclight Films, Darclight and Darclight Films.

"**Notice**" means the notice provided for in paragraph 13.

1.    License

3

a.    Arclight Cinema grants to Arclight Films a royalty-bearing, non-exclusive license, as limited herein, without the right to sublicense, to use the Licensed Trade Names and the Licensed Marks solely in connection with acting as a sales agent for owners of intellectual property rights, specifically, film sales and marketing and exploitation directly related to film sales -- but not distribution, production or exhibition -- of motion pictures and motion picture rights in all media forms now existing or hereafter devised in the Arclight Territories.

b.    Notwithstanding the prohibition in this Agreement on Arclight Films using the Licensed Marks or Licensed Trade Names in connection with "production", Arclight Films shall have the right to make trailers, promos, and/or audio-visual websites for any entity retaining Arclight Films for Arclight Films' Services. Any entity retaining Arclight Films for Arclight Films' Services may use the trailers, promos, and/or audio-visual websites made by Arclight Films for them in connection with such entity's distribution and commercial exploitation of motion pictures in respect of which Arclight Films acts as a sales agent.

2.    Restrictions on License

a.    The restrictions listed in this paragraph merely list some of the restrictions on the License and are not to be used, nor are they intended in any way to be used, to expand the License beyond the express terms set forth in paragraph 1.

b.    Arclight Films will not take a "producer" credit using Arclight, the Licensed Marks, or the Licensed Trade Names, or Formatives for any motion picture in whatever media or format and will not represent or promote itself as a "producer" using Arclight, the Licensed Marks, or the Licensed Trade Names, or Formatives.

4

c.    The License does not grant Arclight Films the right to use and Arclight Films expressly agrees not to use:

i.    ARCLIGHT alone, or "ARCLIGHT FILMS" wherein "ARCLIGHT" is highlighted in any way such that "ARCLIGHT" becomes a prominent feature of the usage, such as for example, by using different font size color or style.

ii.    ARCLIGHT, the Licensed Marks, the Licensed Trade Names, and Formatives in connection with cinema theatre services, motion picture exhibition services and/or any other services related to the operation, ownership, management, and/or running of movie theaters and with the terms "cinema," "theaters," "creative," "productions", "producer", "production", "distributor," "distribution," and synonyms thereof, provided Arclight Films shall be permitted to represent that a film it is selling is in production. Arclight Films may not take "presentation credit."

d.    Except as expressly permitted by this Agreement, Arclight Films agrees that it will not adopt, use or seek to register any business, trade, or fictitious name, or any trade or service marks, involving ARCLIGHT, the Licensed Marks, the Licensed Trade Names and any Formatives for any purpose during the term of this Agreement.

e.    Except as permitted by paragraph 1(b), the License does not grant Arclight Films the right to use Arclight Cinema's Marks, the Licensed Trade Names, the Licensed Marks or Formatives, in connection with the services relating to the following: (A) the production of motion pictures or other audio-visual works and/or acting as a "producer", "co-producer", "assistant producer", "associate producer", "executive producer", "co-executive producer" or any other language that would indicate that Arclight Films is a "producer", "co-producer",

5

"assistant producer", "associate producer", "executive producer", "co-executive producer" of motion pictures or other audio-visual works, or in the business of motion picture production, (B) exhibition of motion pictures or other audio-visual works, and (C) distribution or distribution services in connection with motion pictures or other audio-visual works.

f.      Arclight Films agrees not to represent itself as a producer, production company, distributor, distribution company, or exhibitor of motion pictures or other audio visual works, or, in conjunction with ARCLIGHT, the Licensed Trade Names, the Licensed Marks, or Formatives, and agrees not to utilize any other language that would indicate that Arclight Films is a producer, distributor or exhibitor of motion pictures or other audio visual works, or in the business of motion picture production, distribution or exhibition.

g.      Arclight Films shall not describe itself in any press release or other publicity, and shall not assist or encourage any media to describe Arclight Films as a producer, distributor or exhibitor of motion pictures or other audio visual works, or utilize any other language that would indicate that Arclight Films is a producer, distributor or exhibitor of motion pictures or other audio visual works or in the business of motion picture production, distribution or exhibition. Arclight Films shall be proactive in ensuring third party compliance with the terms of the restrictions in Paragraph 2. Arclight Films shall also engage in reasonable policing activity to ensure third party compliance with the terms of the restrictions in Paragraph 2. Should Arclight Films discover that a press release or other published information describes Arclight Films as a producer, distributor or exhibitor of motion pictures or other audio visual works or similar language, it shall promptly notify the publisher of the press release or other information and require the issuance of a correction or retraction, as

6

appropriate.  The failure of any particular publication or other electronic medium to publish such a correction or retraction, despite Arclight Film's best efforts to require the same shall not however constitute a breach of this sub-paragraph (f) by Arclight Films.

h.    Subject to the restrictions in Paragraph 2, the principals and any employee of Arclight Films, under their own names, and their own email addresses, i.e., they cannot conduct such business using the arclightfilms.com email address, shall be entitled to take producer or executive producer or co-producer or co-executive producer or associate producer or assistant producer credits, or any other individual credit, on any film or other audio-visual work in connection with a film (as well as all advertising, promotion, publicity and marketing materials pertaining to the same; including a picture's so-called "billing block") provided that such credit does not indicate or otherwise imply that Arclight Films is a producer or executive producer or co-producer or co-executive producer or associate producer, or recipient of the credit taken by the principal or employee, of the film or other audio-visual work in connection with a film.

i.    Arclight Films is not entitled to include, and if necessary, shall modify its existing web site to remove, any references which would suggest that Arclight Films is a producer, distributor or exhibitor of motion pictures or other audio-visual works or in the business of motion picture production, distribution or exhibition.  Arclight Films shall display a disclaimer on its web site(s) that states "Arclight Films is not a producer, distributor or exhibitor of motion pictures or other audio-visual works."

j.    Subject to the restrictions in this paragraph, Arclight Films may include an animated logo including the words "worldwide sales" in motion

7

pictures and trailers indicating that Arclight Films is acting as a sales agent for a particular motion picture ("Worldwide Sales Animated Logo"). For international films, i.e., films that are not shown or distributed in the United States, the Worldwide Sales Animated Logo may appear in the opening credits. For domestic films, i.e., films that are shown or distributed in the United States, the Worldwide Sales Animated Logo may only appear in the closing credits at the end of the film or trailer. Before the Worldwide Sales Animated Logo can appear on any film or trailer, the Worldwide Sales Animated Logo must be approved by Arclight Cinema in writing. Arclight Films may not take "presentation credit", i.e., "Arclight Films presents."

3.      Royalties/Payments

a.      Arclight Films agrees to pay to Arclight Cinema: the $30,000 lump sum payment it failed to pay under the 2006 License Agreement plus $10,000 in late payment compensation associated with the lump sum payment; $300 in late payment compensation for untimely paid royalties from October 2010 to February 2011 under the 2006 License Agreement; and $1,236.81 in royalty payments due for the period of March 1-16, 2011 for a total of $41,536,81

b.      The sum of $41,536.81 will be paid as follows:

i.      upon execution of this Agreement, Arclight Films will pay Arclight Cinema $15,536.81;

ii.      within five (5) days of the execution of this Agreement Arclight Films will pay Arclight Cinema $13,000;

iii.      by March 23, 2012 Arclight Films will pay Arclight Cinema $13,000.00.

c.      Arclight Films further agrees to pay Arclight Cinema $55,000 upon

8

execution of this Agreement for Arclight Cinema's reasonable attorneys' fees and costs associated with Arclight Films' breach of the 2006 License Agreement.

      d.      Arclight Films also agrees to pay Arclight Cinema an ongoing advance monthly royalty of $3,000 due no later than the last business day of the month preceding the month for which such payment will be applied.

          i.      The first royalty payment will be due on March 31, 2012 for the April 2012 payment.

          ii.      The monthly royalty will increase every October 31 by the greater of 3% or the U.S. government's CPI Index rate of inflation from the previous year. By way of example only, the monthly royalty payment due on October 31, 2012 will be at least $3090; the monthly royalty payment due on October 31, 2013 will be at least $3182.70; and so on.

          iii.      Arclight Films further agrees to pay Arclight Cinema retroactive monthly royalty payments for the time period covering March 17, 2011 through March 31, 2012, in the amount of $37,451.61. Arclight Cinema will apply the payment of $983.03 received from Arclight Films on April 6, 2011 that it has been holding in trust to the retroactive monthly royalty payment balance. Arclight Films will pay the remaining balance of retroactive monthly royalty payments of $36,468.58 upon execution of this Agreement

      e.      All payments shall be made by wire transfer on or before the day the payment is due or by check sent such that it is received on or before the day the payment is due.

          i.      Should a payment not be received by the day the payment is due, it will be deemed late.

          ii.      Should a check fail to clear, the payment will be deemed late.

iii.    Should a payment be late, the amount due will immediately increase by 10% and increase by 10% for every month it is late. By way of example only, if the December 31, 2011 payment is not made on time the amount due on January 1, 2012 will increase to $3300. If the December 31, 2011 payment is not received by January 31, 2012, the amount due on February 1, 2012 will increase to $3630, and so on. This 10% increase in the royalty is not a penalty but rather is an agreed to reasonable compensation to Arclight Cinema for the inconveniences associated with the late payment.

iv.    Any late payment shall result in an automatic termination of this Agreement, as specified more fully in Paragraph 4(b).

v.    The payment obligations in this Paragraph 3 shall survive termination of this Agreement.

4.    Term and Termination

a.    The term of the License shall be 5 years from the Effective Date and shall be renewed automatically for an additional 5 consecutive years immediately following the end of the initial 5 year term. Arclight Films may terminate the License any time Arclight Films abandons or permanently ceases use of all of the Licensed Marks and the Licensed Trade Names by sending Notice specifying the effective date of permanent cessation of use or abandonment. Arclight Films' rights and obligations under the License shall terminate when Notice is sent or the effective date of the permanent cessation of use, whichever is later. In the event of a termination due to abandonment or permanent cessation of use, Arclight Films shall be obligated to make its monthly royalty payment until Notice has been sent, the effective date of permanent cessation of use or abandonment, whichever is later. In the event Arclight Films abandons the Licensed Marks and Licensed Trade Names or ceases use of the Licensed Marks and Licensed Trade Names for more than six consecutive months without terminating the Agreement, Arclight Cinema may at its option terminate the License by sending Notice.

10

b.      Upon Arclight Cinema's determination that there has been a breach of this Agreement, the Agreement is deemed immediately terminated. Arclight Films shall not be entitled to an opportunity to cure any such breach, unless Arclight Cinema consents to Arclight Films' cure, which consent shall be in writing and in the sole discretion of Arclight Cinema, and which may be withheld for any reason.

c.      If this Agreement is terminated for any reason Arclight Films shall not be required to remove the uses of the Licensed Trade Marks or Licensed Trade Names permitted by this Agreement from any goods and services existing or contracted as of the date of termination.

5.   Ownership

a.      Arclight Films acknowledges Arclight Cinema's rights, title, and ownership of Arclight Cinema's Marks in the United States and its U.S. and European registrations for the marks ARCLIGHT and ARCLIGHT CINEMAS and agrees subject to this Agreement: (1) that Arclight Films will not knowingly do anything inconsistent with Arclight Cinema's rights, ownership, use or registration of Arclight Cinema's Marks; and (2) that all uses of the Licensed Marks and Licensed Trade Names by Arclight Films in the Arclight Territories shall inure to the benefit of Arclight Cinema.

b.      Arclight Films agrees that nothing in this Agreement shall give Arclight Films any right, title, or interest in or to the marks ARCLIGHT, the Licensed Marks, the Licensed Trade Names, or Formatives in the Arclight Territories or anywhere in the world other than the right to use the Licensed Trade Names and the Licensed Marks in accordance with this Agreement.

c.      Arclight Films agrees not to claim ownership of ARCLIGHT, the Licensed Marks, the Licensed Trade Names in Arclight's Territories or attack Arclight Cinema's title in or, subject to paragraph 5(f), seek to register

11

ARCLIGHT, the Licensed Trade Names, the Licensed Marks or the name or mark ARCLIGHT CINEMAS or any designation similar thereto in the field of motion pictures or in fields related thereto, including film exhibition and sales of film rights, in the U.S. or anywhere in the world except Australia.

      d.    Arclight Films also consents to and agrees not to oppose Arclight Cinema's use, registrations or applications for registration in the Arclight Territories of the marks DARCLIGHT, ARCLIGHT CINEMAS and ARCLIGHT and Formatives in the field of motion pictures or in fields related thereto; products and services related to motion picture development, production, marketing, sales, exhibition and distribution; and the goods and services covered by United States Trademark Registration Nos. 2,824,307, 2,870,777, and 2,831,062 and European Community Trademark Registration No. 002746410 and agrees to provide such reasonable cooperation and consents as Arclight Cinema may request at Arclight Cinema's expense to aid or permit in the registration of such marks, however, Arclight Cinema agrees not to use Arclight Films, Darclight or Darclight Films for motion picturesales services.

      e.    Arclight Films agrees to consent to the registration by Arclight Cinema of Arclight Cinema's Marks for motion picture theatre and exhibition services in Australia and to the extent necessary, hereby grants Arclight Cinema a perpetual royalty free license to use Arclight Cinema's Marks for motion picture theatre and exhibition services in Australia. If Arclight Cinema wants to operate theatres in Australia using Arclight Cinema's Marks, Arclight Cinema agrees to discuss the possibility of a partnership or other business relationship with Arclight Films in relation to operating cinemas in Australia and if no such partnership or other business relationship ensues, the license granted in this paragraph 5(e) shall be a non-exclusive license.

12

f.      Arclight Films can request that Arclight Cinema apply to register the Licensed Marks in Arclight Cinema's name in territories and countries not included in the Arclight Territories for film sales services.  If a registration issues, the country will be automatically included in the Arclight Territories. If Arclight Cinema elects not to apply to register a Licensed Mark at Arclight Films' request, Arclight Films may apply to register the Licensed Marks in its own name in such territories for film sales services at Arclight Films' expense. If a registration issues to Arclight Films, Arclight Films agrees to grant Arclight Cinema a perpetual royalty free license to use the licensed marks in that country for cinema and motion picture theatre services.

g.      Arclight Cinema agrees not to grant any license to use ARCLIGHT, the Licensed Trade Names or the Licensed Marks for films sales services without Arclight Films' consent which consent will not be withheld unless the license would adversely impact Arclight Films' then existing business or business which Arclight Films has written and concrete plans to commence within six months of the request for consent.

6.      Warranties and Representations

a.      Arclight Cinema represents and warrants that to the best of its knowledge and belief, it is the sole owner of Arclight Cinema's Marks and that it has, and shall have throughout the term of the License, the right to license the Licensed Trade Names and Licensed Marks to Arclight Films in accordance with the terms and provisions of this Agreement.

b.      The parties represent and warrant that to the best of their knowledge and belief the entering into this Agreement does not violate any agreements, rights or obligations of any person, firm or corporation.

7.      Quality Control

This paragraph shall not apply to the use of the Licensed Trade Names and the Licensed Marks by Arclight Films in effect prior to the Effective Date and

13

to the films Arclight Films has under contract as of the Effective Date.

a.      For quality control purposes, within 30 days of this Agreement, and thereafter at Arclight Cinema's request, but not more frequently than every six months, Arclight Films agrees to submit to Arclight Cinema for the approval of Arclight Cinema, which approval shall not be unreasonably withheld, samples of representative ways Arclight Films uses, has used and/or plans to use the Licensed Trade Names and Licensed Marks in the United States in accordance with the terms of this Agreement, which samples have not been previously approved by Arclight Cinema. Arclight Films warrants that it will not use the Licensed Trade Names or Licensed Marks on any film in the United States that would be considered a "pornographic" or "X- Rated" film or one that would be primarily shown in a so called "adult" movie theater.

b.      Arclight Cinema will submit any objections to such submission by Arclight Films within 30 days of such submission. If Arclight Cinema does not object within 30 days after submission, the lack of objection shall constitute approval and Arclight Films may use the Licensed Trade Names and Licensed Marks in accordance with the submitted samples in the United States provided the use is otherwise in accordance with the terms of this Agreement. If Arclight Cinema has a bona fide objection, Arclight Cinema may reasonably send Notice of the objection to Arclight Films setting forth the reason therefor and specifying the action that Arclight Films may take to overcome the objection.

c.      Arclight Films warrants that the quality of the goods and services Arclight Films provides in the United States that are associated with the Licensed Marks or the Licensed Trade Names including advertising, promotional or display material will be of equal or superior quality to any of the goods or services it was providing as of the Effective Date. The lack of financial success of any film shall not be considered in determining the quality of Arclight Films' goods or services.

d.      If there is a dispute concerning the quality of the goods and

14

services Arclight Films provides that are associated with the Licensed Marks or the Licensed Trade Names, a mutually agreed upon independent third party, preferably with renown and expertise in the film industry in determining the quality of the goods and services provided by a film sales company that are associated with licensed trademarks and trade names ("Expert"), will review and report to each of Arclight Films and Arclight Cinema, the quality of the goods and services Arclight Films is providing in connection with Arclight Films' use of the Licensed Trade Names and Licensed Marks. If the Expert determines and reports in writing (stating the basis for his or her conclusions) that the quality of the goods and services Arclight Films is providing in connection with Arclight Films' use of the Licensed Trade Names and Licensed Marks is less than it was providing as of the Effective Date, Arclight Films shall pay for the cost of the Expert's report (if the Expert does not so determine, Arclight Cinema shall pay for the cost of the Expert's report) and Arclight Cinema may send Notice to Arclight Films, giving Arclight Films 60 days from the date of its receipt of such Notice, to cure such lesser quality. If such lesser quality is not raised to the previous quality level to the reasonable satisfaction of the Expert within such period, this License shall immediately terminate as to such goods and services and Arclight Films must remove the Licensed Marks and the Licensed Trade Names from whatever material is associated with the goods and services the Expert determines is of such lesser quality.

8.    Confusion

If there is confusion regarding the parties' respective uses of the Licensed Marks and Licensed Trade Names, the party learning of such confusion agrees to send Notice to the other and the parties agree to take reasonable actions to mitigate, alleviate or correct such confusion.

9.    Assignment

a.    Except as otherwise provided in this Paragraph 9, this Agreement is not transferable or assignable in whole or in part.

15

b.      In connection with a sale of all or substantially all of the assets of all of the Arclight Films' entities to another entity, the License is transferable to such other entity, provided that such other entity, prior to the time of the desired transfer, was not using ARCLIGHT in its name, as a trademark or service mark, or in any other fashion, and such entity agrees in writing to be bound by all terms and obligations of this Agreement and Arclight Cinema gives written consent, which consent shall not be unreasonably withheld.

c.      Arclight Cinema may assign this Agreement to anyone in its sole discretion subject to the assignee agreeing in writing to be bound by all terms and obligations of this Agreement and will use reasonable efforts to notify Arclight Films in writing of such assignment, following the effective date thereof, but a failure to do so will not constitute a default or invalidate the assignment of this Agreement.

10.    Indemnity

a.      Arclight Cinema shall not be liable to Arclight Films, its licensees, successors or assigns for any claims arising out of or related to Arclight Films' use of the Licensed Trade Names and Licensed Marks. Arclight Films agrees to indemnify and hold harmless Arclight Cinema for, from and against any and all liability, claims, demands, costs, expenses, losses and damages incurred, arising out of, related to or otherwise concerning use of the Licensed Trade Names and Licensed Marks by Arclight Films or its licensees, successors and assigns.

b.      Arclight Films shall not be liable to Arclight Cinema, its licensees, successors or assigns for any claims arising out of or related to Arclight Cinema's use of Arclight Cinema's Marks.  Arclight Cinema agrees to indemnify and hold harmless Arclight Films for, from and against any and all liability, claims, demands, costs, expenses, losses and damages incurred, arising out of, related toor otherwise concerning use of Arclight Cinema's Marks by Arclight Cinema or its licensees, successors and assigns.

16

11.    Protection and Enforcement of Rights

a.    Each party shall apprise the other party as soon as practicable of any possible infringement of the Licensed Trade Names and/or the Licensed Marks which comes to the party's attention in relation to films sales services. Arclight Cinema, at its sole cost and expense, and in its own name, may prosecute and defend any action or proceeding which it deems necessary or desirable to protect the Licensed Trade Names and/or the Licensed Marks. Upon written request by Arclight Cinema, and at the expense of Arclight Cinema, Arclight Films shall join Arclight Cinema in any such action or proceeding. If compensatory damages are awarded to Arclight Cinema in relation to films sales services, Arclight Cinema shall first be reimbursed for its expenses and any balance of such moneys shall be divided 50/50 as between Arclight Cinema and Arclight Films.

b.    Arclight Films shall not commence any action or proceeding for infringement of the Licensed Trade Names and/or the Licensed Marks, nor shall Arclight Films defend any infringement action against the Licensed Trade Names and/or the Licensed Marks, unless it shall first make written demand upon Arclight Cinema to do so.  If Arclight Cinema elects not to take action against a potential infringer of the Licensed Marks or Licensed Trade Names that creates a likelihood of confusion with films sales services, or defend against alleged infringement in a timely manner, Arclight Films may prosecute and defend any such action or proceeding, at its sole cost and expense, and in its own name subject to Arclight Cinema's approval which shall not be unreasonably withheld. Upon written request by Arclight Films, Arclight Cinema shall join Arclight Films or be the plaintiff (if the jurisdiction does not allow Arclight Films to be a plaintiff) in any such action or proceeding, Arclight Cinema will  have the option to select lead trial counsel and all expenses and costs incurred by Arclight Cinema shall be borne by Arclight Films. Arclight Films shall be entitled to any compensatory damages awarded in a suit it prosecutes after reimbursement to Arclight Cinema

17

of any costs it incurs in such action. Arclight Films will not enter into any settlement of any action without Arclight Cinema's written consent which will not be withheld based on the monetary amount of the settlement.

c..    During the term of this License, at the request of Arclight Films, Arclight Cinema shall update Arclight Films, but not more frequently than once per year regarding the status of Arclight Cinema's Marks.

12.    Releases

a.    Effective upon execution of this Agreement and Arclight Cinema's receipt of the payments due from Arclight Films set forth in Paragraph 3, Arclight Cinema releases Arclight Films and its respective past and present officers, directors, employees, predecessors, subsidiaries, divisions, affiliates, agents, licensees and attorneys ("Arclight Films Releasees") from all claims and demands, known or unknown, that Arclight Cinema has or had against Arclight Films Releasees arising out of or in any way related to the subject matter of the Lawsuit or of this Agreement.

b.    Effective upon the execution of this Agreement, Arclight Films releases Arclight Cinema and its respective past and present officers, directors, employees, predecessors, subsidiaries, divisions, affiliates, agents, licensees and attorneys ("Arclight Cinema Releasees") from all claims and demands, known or unknown, that Arclight Films has or had against Arclight Cinema Releasees arising out of or in any way related to the subject matter of the Lawsuit or of this.

c.    In giving the releases set forth herein, the Parties acknowledge that they are aware of California Civil Code §1542, which reads:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

18

d.    The Parties hereby expressly waive all rights under California Civil Code §1542, or any other statute or common law principle of similar effect. Nothing in this paragraph shall prevent the Parties from asserting or pursuing any claim to enforce the terms of this Agreement.

e.    The Parties agree to execute and file the Dismissal With Prejudice attached hereto as Appendix 1, dismissing the Lawsuit within ten (10) days of receipt of the payments to Arclight Cinema as specified in Paragraph 3.

13.    Notice

Any notice hereunder shall be in writing and shall be deemed to have been duly given and samples deemed to have been submitted three days after deposit with UPS or other recognized international courier, or after being sent by facsimile transmission (with confirmation), addressed to the party for whom intended as follows:

For Arclight Cinema:

       Arclight Cinema Company
       120 North Robertson Boulevard
       Los Angeles, CA 90048
       Attention Chief Operating Officer

       With a copy to

       Arclight Cinema Company
       120 North Robertson Boulevard
       Los Angeles, CA 90048
       Attention: General Counsel

For Arclight Films:

       Arclight Films International Pty Ltd.
       8447 Wilshire Boulevard, Suite #101
       Beverly Hills, California 90211
       Attention: Gary Hamilton
       Telephone: 310- 777-8855
       Facsimile: 310-777-8882
       E-mail: gary@arclightfilms.com

19

or such change of address which one Party provides to the other in writing. A Party giving Notice shall also give Notice by e-mail.

14.    Governing Law, Jurisdiction and Venue

a.    This Agreement and any dispute, litigation, arbitration or mediation arising out of or related to this Agreement, whether the claims asserted in such dispute, litigation, arbitration or mediation are based on contract, tort, trademark law, equitable relief or any other basis, shall be governed by, and construed in accordance with, the laws of State of California, U.S.A. applicable to agreements made and to be fully performed therein (excluding the conflicts of laws rules).

b.    Any dispute, litigation, arbitration or mediation arising out of or related to this Agreement, whether the claims asserted in such dispute, litigation, arbitration or mediation are based on contract, tort, trademark law, equitable relief or any other basis, arising out of or related to this Agreement and/or related to the performance of obligations arising under this Agreement are irrevocably subject to the exclusive jurisdiction of the state and federal courts located in Los Angeles County, California, and the Parties hereto hereby submit to the personal jurisdiction and venue of these courts.  Arclight Films agrees service of process may be accomplished by sending the papers in accordance with the Notice provision in Paragraph 13.  In any such proceeding the parties hereto hereby agree not to raise any objections they may have, and do hereby waive any objection they may have, based on lack of personal jurisdiction, improper venue, or inconvenient forum.

c.    Either Party shall be entitled to seek monetary relief, injunctive or other equitable relief in the event of any breach or other failure to comply with the provisions of this Agreement.

d.    Before resorting to litigation or arbitration, the Parties agree to mediate their dispute in Los Angeles before a mutually agreed upon mediator and agree to take the procedural steps relating to such non-binding mediation

20

that the mediator requires. The Parties, subject to the conditions in this paragraph, shall each pay 50% of the fee of the mediator and any ancillary costs of the mediation such as the rental of venue. To initiate the mediation process, the initiating party shall send a letter to the other party requesting their participation in the mediation. If a mediation is not commenced within fourteen (14) days, absent an agreement in writing by both parties, the initiating party may pursue litigation or arbitration subject to the provisions of this Paragraph 14. If the mediator determines that one or the other party is entitled to any payment under this Agreement, the party the mediator determines should make the payment will be responsible for payment of all the costs of the mediation.

15.   Attorney's Fees

In the event of a dispute, litigation, arbitration or mediation arising out of or related to this Agreement, whether the claims asserted in such dispute, litigation, arbitration or mediation are based on contract, tort, trademark law, equitable relief or any other basis, the prevailing Party shall be entitled to and shall be awarded its reasonable costs, outside (e.g. "non-employee") attorney's fees and expenses including, but not limited to reasonable awards of such outside attorney's fees and expenses provided the party first requests mediation of the dispute. The plaintiff is the prevailing party if the mediation, arbitration or litigation results in a determination that the defendant owes any monies to plaintiff, the plaintiff is awarded equitable relief and/or there has been a breach of the Agreement. The defendant is the prevailing party only if the mediation, arbitration or litigation results in a determination that no monies are due the plaintiff, that the plaintiff is not entitled to equitable relief and there has been no breach of the Agreement. If the services of any outside attorney are required by any party to enforce a judgment rendered in connection with this Agreement, the judgment creditor shall be entitled to reasonable outside attorney's fees, costs and other expenses, and such fees, costs and expenses shall be recoverable as a separate item.

16.   Miscellaneous

a.   This Agreement may be amended only by a written instrument executed by the Parties hereto. The performance or observance of any term of this Agreement (whether generally or in a particular instance, whether retroactively or prospectively) may be waived only by a written instrument executed by the Party to be bound thereby.

b.   This Agreement may be executed simultaneously in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which counterparts shall together constitute but one agreement.

c.   The Parties acknowledge that they have had the benefit of advice of counsel and that their respective attorneys have fully explained the provisions of this Agreement and the obligations and duties hereunder.

d.   The Parties warrant and represent that they are free to enter into this Agreement. If any covenant, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by reason of any rule or regulation of law or public policy of any government, or agency of government, all other conditions and provisions of this Agreement shall, nevertheless, remain in full force and effect unless the invalid condition or provision materially alters the obligations of the Parties so as to materially depart from the original intent of the Parties in which case the Parties will attempt to renegotiate a clause that reflects the original intent of the Parties. If the Parties are unable to renegotiate the invalid clause, the Agreement shall immediately terminate.

e.   This Agreement constitutes the entire agreement between the Parties hereto with respect to the subject matter contained herein.  This Agreement supersedes all prior and contemporaneous agreements, comments, discussions and understandings between the Parties, whether written or oral, with respect to such subject matter.

22

f.    No Party hereto, nor any attorney of the party, shall be deemed the drafter of this Agreement for the purpose of interpreting or construing any of the provisions hereof, and no rule of construction resolving any ambiguity against the drafting party shall be applicable to this Agreement.

g.    The terms of this Agreement shall be effective throughout the U.S. and the rest of the world. This Agreement shall extend to and bind the Parties, their affiliates, related companies, successors, and assigns.

By their signatures below the individuals represent that they are duly authorized officers of the Parties and authorized to sign this Agreement and bind the Parties.

Arclight Cinema Company

Signature:_____
Print Name:_____
Title:_____
Date:_____

Arclight Films International Pty Ltd.

Signature: _____
Print Name: Brian Beckmann
Title: CFO
Date: 03-23-12

Arclight Films Pty Ltd.

Signature: _____
Print Name: Brian Beckmann
Title: CFO
Date: 03-23-12

Arclight Films Canada, Inc.

Signature: _____
Print Name: Brian Beckmann
Title: CFO
Date: 03-23-12

Darclight Films Pty. Ltd.

Signature: _____
Print Name: Brian Beckmann
Title: CFO
Date: 03-23-12

LEGAL02/32886218v1

**Appendix 1**

Steven D. Hemminger (SBN 110665)
**ALSTON & Bird LLP**
275 Middlefield Road
Suite 150
Menlo Park, California 94025
Tel: (650) 838-2029
Fax: (650) 838-2001
Email: steve.hemminger@alston.com

Casondra K. Ruga (SBN 237597)
**ALSTON & BIRD LLP**
333 S. Hope Street, 16th Floor
Los Angeles, California 90071
Tel: (213) 576-1000
Fax: (213) 576-1100
Email: casondra.ruga@alston.com

Attorneys for Plaintiff
ARCLIGHT CINEMA COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCLIGHT CINEMA COMPANY, a California corporation, <br><br> Plaintiff, <br><br> ARCLIGHT FILMS, PTY. LTD., an Australian corporation; DARCLIGHT FILMS PTY. LTD., an Australian company; ARCLIGHT FILMS INTERNATIONAL PTY. LTD, an Australian corporation; and ARCLIGHT FILMS CANADA, INC., an Australian corporation, <br><br> Defendants. | Case No. CV11-06327 R <br><br> STIPULATION FOR DISMISSAL WITH PREJUDICE; [PROPOSED] ORDER |

24

Plaintiff Arclight Cinema Company ("Plaintiff') and Defendants Arclight Films

Pty Ltd., Darclight Films Pty Ltd., Arclight Films International Pty. Ltd, and Arclight

Films Canada, Inc. (collectively "Defendants") (Plaintiff and Defendants are hereafter

collectively referred to as the "parties"), by and through their counsel of record,

hereby stipulate that the Defendants submit to the jurisdiction of this Court and that

the above-referenced case shall be dismissed with prejudice, with each party to bear

its own separate expenses, costs, and attorneys' fees.


Dated: March ____, 2012                    ALSTON & BIRD LLP


                                           By_____
                                           Steven D. Hemminger
                                           Attorneys for Plaintiff Arclight Cinema Company


Dated: March _23_, 2012


                                           By_____
                                           Jeffrey Kranzdorf
                                           Attorneys for Defendants Arclight Films Pty Ltd.,
                                           Darclight Films Pty Ltd., Arclight Films
                                           International Pty. Ltd, and Arclight Films Canada,
                                           Inc.


        IT IS SO ORDERED.


DATED:                                     _____
                                           HON. MANUEL L. REAL
                                           United States District Judge


25

# EXHIBIT "F"

# ASSIGNMENT AND LICENSE AGREEMENT

1.  Arclight Cinema Company ("Arclight Cinema"), a California corporation with a principal place of business at 120 North Robertson Boulevard, Los Angeles, CA 90048, and Arclight Creative Group, Inc., a California corporation, having its principal place of business at 6815 West Willoughby Avenue, Suite 206, Los Angeles, CA, 90038 and Arclight Creative Group, Inc., d/b/a Arclight Productions, ("Arclight Creative") for good and valuable consideration as reflected in the mutual consents and promises below, agree as follows:

2.  Arclight Creative has used ARCLIGHT in its name since it filed its first fictitious business name statement in 1997.  Arclight Creative agrees to transfer and assign, and does hereby transfer and assign, to Arclight Cinema and Arclight Cinema's successors and assigns, all right, title and interest that it has in and to all marks using the word ARCLIGHT in the United States, including its common law rights and the goodwill associated with the marks.  This assignment also includes, to the extent they exist, all of Arclight Creative's rights to sue for past, present and future infringement and, to the extent they exist, the right to collect and own any monetary or other damages as a result thereof.

3.  Arclight Creative, at Arclight Cinema's sole cost and expense, agrees to do any and all reasonable acts that Arclight Cinema reasonably requests in order to confirm, perfect and record Arclight Cinema's rights in the ARCLIGHT mark.

4.  License

4.a.    Arclight Cinema grants to Arclight Creative a royalty-free limited license under United States Trademark Application Serial No. 75/751235 and any Registration issuing therefrom, as set forth hereinafter, to use the mark ARCLIGHT in the U.S., and the limited right to continue to use ARCLIGHT as Arclight Creative is currently using it in its corporate and fictitious business names, with the right to use ARCLIGHT in the U.S. in connection with motion picture production and distribution services and the production and distribution of other audio-visual works (hereinafter "Arclight Creative's Goods and Services"). This license does not grant to Arclight Creative the right to use ARCLIGHT or formatives thereof in connection with the terms "cinema," "theaters," or synonyms thereof or in connection with Arclight Cinema's Goods and Services (as hereinafter defined).  This license does not give Arclight Creative the right to sublicense and Arclight Creative is expressly prohibited from granting any sublicenses to use ARCLIGHT in any manner to any third party without the prior express written consent of Arclight Cinema which consent shall be in the sole discretion of Arclight Cinema, and which may be withheld for any reason.

4.b.    The term of the license granted herein shall be 50 years and shall be renewed automatically for an additional 50 consecutive years immediately following the end of the initial 50 year term.  Arclight Cinema shall have the right to terminate this license upon a breach by Arclight Creative of any term of this

10/3/2003                                    1

license.  Upon Arclight Cinema's determination that there has been a breach of this license, Arclight Cinema shall Send Notice (defined hereinafter) to Arclight Creative, advising Arclight Creative of the breach and allowing 30 days for Arclight Creative to cure the alleged breach.  The parties shall negotiate in good faith with respect to the determination and cure of any alleged breach of this license.  If the breach is not cured within the 30-day period specified herein, Arclight Cinema shall be entitled, without prejudice to any of its other rights, including those conferred by this Agreement, to terminate this license at any time thereafter by sending a written notice of termination to Arclight Creative which termination will take effect immediately upon Sending Notice.

4.c.    Arclight Creative agrees that it will not knowingly do anything inconsistent with Arclight Cinema's ownership of the marks ARCLIGHT or ARCLIGHT CINEMAS and that all use of the mark ARCLIGHT pursuant to the license granted herein by Arclight Creative in the United States shall inure to the benefit of and be on behalf of Arclight Cinema.  Arclight Creative agrees that nothing in this Agreement shall give Arclight Creative any right, title or interest in ARCLIGHT other than the right to use ARCLIGHT in accordance with the license granted in this Agreement.

4.d.    With the exception of the use of ARCLIGHT by Arclight Creative in effect prior to the date of this license, Arclight Creative agrees to provide Arclight Cinema examples of representative ways Arclight Creative uses and/or plans to use ARCLIGHT in the United States in accordance with the terms of this agreement, and agrees to obtain Arclight Cinema's approval, which approval will not be unreasonably withheld, of the manner of using ARCLIGHT prior to the use of the mark in the United States after the date of this license, for quality control purposes.  At intervals not less than six months Arclight Cinema may by written request require Arclight Creative to submit additional representative ways, if any, that Arclight Creative uses and/or plans to use ARCLIGHT in the United States in accord with the terms of this Agreement, which representative ways have not been previously approved by Arclight Cinema.  In that event, Arclight Creative will promptly furnish samples of such use.  It is understood that a request pursuant to this paragraph does not require Arclight Creative to provide samples of each instance of use of ARCLIGHT, such as individual advertisements in trade publications or the placement of the ARCLIGHT mark on individual promotional items.  If Arclight Cinema does not object to the samples within 30 days after submission, the lack of objection shall constitute approval and Arclight Creative may use the mark in accordance with the samples in the United States provided the use is in accordance with the terms of this agreement.  Any objection by Arclight Cinema to such use shall not be unreasonable.  In the event of such objection, Arclight Cinema shall Send Notice of it to Arclight Creative reasonably setting forth the reason therefor and that reasonably specifies the action that Arclight Creative may take to overcome the objection.  Arclight Creative further agrees not to use the mark ARCLIGHT in the United States in combination with other marks without prior written approval of Arclight Cinema.

10/3/2003                                2

4.e    Arclight Creative warrants that all goods or services distributed or sold in the United States bearing ARCLIGHT and the manner in which the mark will appear on those goods and services, and all advertising, promotional or display material on which ARCLIGHT appears, conform, in all respects, to the samples approved by Arclight Cinema, and that Arclight Creative will not distribute or sell goods or services that are of an inferior quality.

4.f.    In connection with a sale of all or substantially all of the assets of Arclight Creative to another entity, this license is transferable to such entity, provided that such entity, prior to the time of the desired transfer, was not using ARCLIGHT in its name, as a trademark or in any other fashion, subject to the transferee agreeing in writing to be bound by all terms and obligations of this Agreement.

5.  Arclight Creative agrees not to use the marks ARCLIGHT or ARCLIGHT CINEMAS as a name or a mark, or any designation confusingly similar to ARCLIGHT or ARCLIGHT CINEMAS, in the U.S. or anywhere in the world, in connection with cinema theatre services, and/or any other services related to the operation, ownership, management and/or running of movie theaters and the goods and services identified in United States Patent and Trademark Office Application Serial Numbers 76-150,945 and 76-143,967 and/or for any goods or services identified in United States Application Serial Number 75-751,235 in International Classes 009 and 013 and services related to the preparation of special effects for film and theatre ("Arclight Cinema's Goods and Services").  In addition Arclight Creative agrees not to claim ownership of the mark ARCLIGHT in the United States, or, unless Arclight Cinema and Arclight AB have expressly abandoned ARCLIGHT or ARCLIGHT CINEMAS, attack Arclight Cinema's title in or seek to register the name or mark ARCLIGHT or ARCLIGHT CINEMAS or any designation similar thereto, in the U.S. or anywhere in the world, in connection with Arclight Cinema's Goods and Services.

6.  Arclight Cinema agrees to pay to Arclight Creative the sum of twenty thousand dollars ($20,000.00) within five (5) business days of receipt of an original fully signed copy of this Agreement.

7.  Arclight Creative consents to Arclight Cinema's use and registration of the name and marks ARCLIGHT and ARCLIGHT CINEMAS in all countries of the world.  Arclight Creative also consents to and agrees not to oppose Arclight Cinema's registration of the mark ARCLIGHT CINEMAS and ARCLIGHT in any country of the world.  Arclight Creative agrees to, contemporaneously with the signing of this Agreement file the attached withdrawal with prejudice of its opposition to the registration of the mark ARCLIGHT in class 41, Serial No. 76-150,945, Opposition No. 91154998.

8.  Arclight Cinema agrees not to consent to the use or registration of ARCLIGHT as a trade name, service mark or trademark in connection with Arclight Creative's Goods and Services after the effective date of this Agreement without the prior express written consent of Arclight Creative, which consent shall only be withheld subject to a showing that the consent will adversely impact Arclight Creative's existing business at

the time consent is requested. Arclight Creative acknowledges Arclight AB's and Arclight Inc.'s rights to use ARCLIGHT in the United States. Arclight Cinema agrees not to use the marks ARCLIGHT or ARCLIGHT CINEMAS as a name or mark, or any designation confusingly similar to ARCLIGHT, in connection with motion picture production services.

9.    If Arclight Creative becomes aware of someone it believes may be using the mark ARCLIGHT in connection with Arclight Cinema's Goods and Services, it agrees to Send Notice to Arclight Cinema. If Arclight Cinema becomes aware of someone it believes may be using the mark ARCLIGHT in connection with Arclight Creative's Goods and Services it agrees to Send Notice to Arclight Creative. Should Arclight Creative Send Notice to Arclight Cinema identifying someone it believes is infringing upon the rights granted to it in this Agreement, Arclight Cinema agrees to investigate the matter and promptly reach a decision and Send Notice to Arclight Creative as to whether it will take action against the potential infringer. If Arclight Cinema elects not to take action, Arclight Creative is authorized to take action against that potential infringer at its own expense. In such a case, Arclight Cinema agrees to reasonably cooperate with Arclight Creative in its efforts without agreeing to incur significant costs. Arclight Creative agrees to keep Arclight Cinema informed of its strategy and actions. Arclight Creative will not take any action that will jeopardize Arclight Cinema's rights or adversely affect its business or any action that Arclight Cinema, in its sole discretion objects to based on a good faith belief that the action will jeopardize its rights or may adversely affect its business. In the event of any monetary recovery against an infringer based upon Arclight Creative's actions, the proceeds will be allocated as follows: (1) to the parties to reimburse their expenses in pursuing the recovery, including attorneys' fees. If the recovery does not exceed the expenses, it will be allocated to the parties in proportion to their expenses; (2) after reimbursement of the parties' expenses, to the parties in proportion to their economic loss suffered by the infringement.

10.    If there is confusion regarding the parties' respective uses of the mark ARCLIGHT then the party learning of such confusion agrees to Send Notice to the other and the parties agree to take reasonable actions to mitigate, alleviate or correct such confusion. Additionally, the parties hereto agree to take all further actions, and sign all additional documents reasonably necessary to give full effect to the terms of this Agreement.

11.    Arclight Cinema shall not be liable to Arclight Creative, its licensees, successors or assigns for any claims arising from Arclight Creative's use of the name or mark ARCLIGHT. Arclight Creative agrees to indemnify and hold harmless Arclight Cinema for, from and against any and all liability, claims, demands, costs, expenses, losses and damages incurred or arising from or otherwise concerning use of the mark ARCLIGHT by Arclight Creative or its licensees, successors and assigns in connection with Arclight Creative's Goods and Services. Arclight Creative shall not be liable to Arclight Cinema, its licensees, successors or assigns for any claims arising from Arclight Cinema's use of the name or mark ARCLIGHT or ARCLIGHT CINEMAS. Arclight Cinema agrees to indemnify and hold harmless Arclight Creative for, from and against any and all liability, claims demands, costs, expenses, losses and damages

10/3/2003                                           4

incurred or arising from or otherwise concerning use of the mark ARCLIGHT and/or ARCLIGHT CINEMAS by Arclight Cinema or its licensees, successors and assigns in connection with Arclight Cinema's Goods and Services.

12. Either party shall be entitled to seek monetary relief, injunctive or other equitable relief, in a court of valid jurisdiction in the event of any material breach or other failure to comply with the provisions of this Agreement. If any of the parties to this Agreement brings an action against any other party to this Agreement to interpret or enforce the terms of this Agreement, the prevailing party shall be entitled to and shall be awarded its costs and reasonable attorneys fees and expenses including, but not limited to reasonable awards of attorneys' fees and expenses in the event of appeals. If the services of any attorney are required by any party to enforce a judgment rendered in connection with this Agreement, the judgment creditor shall be entitled to reasonable attorney's fees, costs and other expenses, and such fees, costs and expenses shall be recoverable as a separate item.

13. Any notice sent in accordance with this paragraph constitutes "Sending Notice" or "Send Notice." Any notice hereunder shall be in writing and shall be deemed to have been duly given and samples deemed to have been submitted three days after deposit with DHL or other recognized international courier, or after being sent by facsimile transmission (with confirmation), addressed to the party for whom intended as follows:

> Arclight Cinema Company
> 120 North Robertson Boulevard
> Los Angeles, CA 90048
> Attention: Ira Levin
> Telephone: (310) 855 8416
> Facsimile: (310) 652 6490
>
> Arclight Creative Group, Inc.
> 6815 West Willoughby Avenue, Suite 206,
> Los Angeles, CA, 90038
> Attention: Steven Kochones
> Telephone: (323) 464 7791
> Facsimile: (323) 464 7406

14. This Agreement and the respective rights and obligations hereunder of the parties hereto regarding Arclight Cinema's rights in as well as Arclight Creative's use of ARCLIGHT in the United States shall be governed by and interpreted and determined in accordance with the laws of the State of California.

15. This Agreement may be amended only by a written instrument executed by the parties hereto. The performance or observance of any term of this Agreement (whether generally or in a particular instance, whether retroactively or prospectively) may be waived only by a written instrument executed by the party to be bound thereby. This Agreement may be executed simultaneously in any number of counterparts, each

of which when so executed and delivered shall be deemed to be an original, but all of which counterparts shall together constitute but one agreement.

16. The terms of this Agreement shall be effective throughout the U.S. and the rest of the world.  This Agreement shall extend to and bind the parties, their affiliates, related companies, successors, and assigns.  The license granted herein shall terminate immediately upon Arclight Creative's abandonment of the use of ARCLIGHT. Should either party consider abandoning any of its rights in ARCLIGHT in any country, that party agrees to notify the other party to allow them the opportunity to negotiate an acquisition of the mark and associated good will, subject to a right of first refusal of Arclight AB to acquire the mark and associated good will with respect to the goods or services identified in United States Application Serial Number 75-751,235 in International Classes 009 and 013 and services related to the preparation of special effects for film and theatre.

17. This Agreement supersedes all prior agreements and understandings of the parties, oral or written, with respect to its subject matter.

18. By their signatures below the individuals represent that they are duly authorized officers of the parties and authorized to sign this Agreement and bind the parties.

**Arclight Cinema Company**

Signature: _____

Print Name: James D. Vandever

Title: _____ Secretary

Date: _____ October 6, 2003

**Arclight Creative Group, Inc.**

**Arclight Creative Group, Inc. d/b/a
Arclight Productions**

Signature: _____

Print Name: STEVEN M. KOCHONES

Title: PRESIDENT

Date: 10-8-03

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

In Re Application

Serial No. 76-150,945

Applicant: ArcLight Cinema Company

Mark:  ARCLIGHT (Intl. Class:  41)

Filed:  October 20, 2000

Published:  September 24, 2002

|  |  |  |
|---|---|---|
| ARCLIGHT CREATIVE GROUP, INC., a California Corporation d/b/a Arclight Productions | ) ) ) ) ) | |
| Opposer, | ) ) | Opposition No.: |
| v. | ) ) | 91,154,998 |
| ARCLIGHT CINEMA COMPANY, a California Corporation | ) ) ) | |
| Applicant. | ) ) | |

## REQUEST FOR DISMISSAL OF OPPOSITION

Arclight Creative Group, Inc., a California corporation having its principal

place of business at 6815 West Willoughby Avenue, Suite 206, Los Angeles, California

- 1 -

90038 and doing business as Arclight Productions, ("Opposer"), respectfully requests that its

Opposition to the mark ARCLIGHT shown in application Serial No. 76-150,945 be

dismissed, with prejudice and with each party to bear its own costs and attorneys' fees in the

opposition proceeding.  The parties have reached a settlement pursuant to which the

[Document Continued on Next Page.]

/  /  /  /

/  /  /  /

- 2 -

Opposition is being dismissed. Counsel for the parties and the parties thank the Trademark

Trial and Appeal Board for allowing this matter to be suspended so that the settlement could

be reached.

Respectfully submitted,

ARCLIGHT CREATIVE GROUP, INC.,

Dated: October **8**, 2003          By: _C. G. Gordon Martin_

C. G. Gordon Martin
California State Bar No. 66718

The Law Offices of C. G. Gordon Martin          Attorney for Opposer,
225 South Lake Avenue, Suite 300                ARCLIGHT CREATIVE GROUP, INC.
Pasadena, California  91101                     a California corporation, d/b/a Arclight
Telephone:  (626) 432-7286                       Productions
Facsimile:  (626) 432-7288

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Request for Dismissal of
Opposition" has been mailed first class, postage prepaid, this _8th_ day of October, 2003
addressed to:  Steven D. Hemminger, Esq., White & Case LLP, 3900 El Camino Real, 5 Palo
Alto Square, 10th Floor , Palo Alto, California 94306 .

_____

C. G. Gordon Martin
California State Bar No. 066718

## CERTIFICATE OF MAILING

Express Mail Label No: _EK 744459576 US_   Date of Deposit: _10/8/03_
I hereby certify that this correspondence or document is being deposited with the U. S. Postal Service as
EXPRESS MAIL, post office to addressee, postage prepaid, under 37 C. F. R. Section 1.10 in an envelope
addressed to Commissioner for Trademarks, 2900 Crystal Drive, Arlington, Virginia 22202-3514.

C. G. Gordon Martin
California State Bar No. 66718

- 3 -

# EXHIBIT "G"

TRADEMARK

# ASSIGNMENT AGREEMENT

Arclight Cinema Company ("Arclight Cinema"), a California corporation with a principal place of business at 120 North Robertson Boulevard, Los Angeles, CA 90048, and Arclight AB, a Swedish corporation with a principal place of business at P.O. Box 11023, S-16111, Bromma, Sweden and Arclight, Inc., a Delaware Corporation, having a mailing address at c/o David A. Weinstein, 1600 Broadway, Suite 2600, Denver, Colorado 80202 for good and valuable consideration as reflected in the mutual consents and promises below, agree as follows:

1.  Arclight AB represents that it is the exclusive owner of the mark ARCLIGHT for the goods and services covered by as well as the exclusive owner of U.S. Trademark Registration No. 2,511,519 for the mark ARCLIGHT, and all goodwill of the business associated with the mark for such goods and services.

2.  Arclight AB and Arclight, Inc. agree to transfer and assign, and do hereby transfer and assign, to Arclight Cinema and Arclight Cinema's successors and assigns, all of their right, title and interest in and to the mark ARCLIGHT in the United States, including Arclight AB's and Arclight, Inc.'s common law rights in the United States, U.S. Trademark Registration No. 2,511,519 for the mark ARCLIGHT and the goodwill associated with the mark.  This assignment also includes the right to sue for past, present and future infringement and the right to collect and own any monetary or other damages as a result thereto.

3.  Arclight AB agrees to execute and shall execute the Assignment attached as Attachment A for recordal with the U.S. Patent and Trademark Office, and at Arclight Cinema's sole cost and expense, Arclight AB and Arclight, Inc. shall do any and all further acts that Arclight Cinema reasonably requests in order to confirm, perfect and record Arclight Cinema's rights in the ARCLIGHT mark and Registration No. 2,511,519.

4.  License

4.a.    Arclight Cinema grants to Arclight AB a royalty-free limited license to use the mark ARCLIGHT in the U.S., and grants to Arclight, Inc., a Delaware corporation formed by a principal of Arclight AB, the limited right to continue to use ARCLIGHT as it is currently using it in its corporate name, with the right of each of the aforesaid entities to use ARCLIGHT in the U.S. in connection with the goods and services listed in U.S. Trademark Registration No. 2,511,519 (hereinafter "Arclight AB's Goods and Services").  This license does not grant to Arclight AB or Arclight, Inc. the right to use ARCLIGHT or formatives thereof in connection with the terms "cinema," "theaters," or synonyms thereof or in connection with Arclight Cinema's Goods and Services (as hereinafter defined). This license does not give Arclight AB or Arclight, Inc. the right to sublicense and Arclight AB and Arclight, Inc. are expressly prohibited from granting any sublicenses to use ARCLIGHT in any manner to any third party without the prior express written consent of Arclight Cinema.

1

TRADEMARK

4.b.    The term of the license granted herein shall be 50 years and shall be renewed automatically for an additional 50 consecutive years immediately following the end of the initial 50 year term.  Arclight Cinema shall have the right to terminate this license only upon a material breach by Arclight AB or Arclight, Inc. of any term of this license, subject to the following conditions: In the event Arclight AB or Arclight, Inc. shall, at any time fail to comply with the conditions applicable to them herein, Arclight Cinema shall have the right to notify Arclight AB or Arclight, Inc. as applicable of such default and Arclight Cinema's intention to terminate this license unless Arclight AB and/or Arclight, Inc. corrects such default or initiates and continues to pursue good faith efforts to correct such default within thirty (30) days from the date of Arclight AB's receipt of such notice. The notice should describe in reasonable detail what Arclight AB and/or Arclight, Inc. must do to correct the default.  If such default is not corrected within the aforementioned time period, and good faith efforts are not initiated during the aforementioned time period and continuously pursued to cure, Arclight Cinema shall be entitled, without prejudice to any of its other rights that this Agreement confers, to terminate this license at any time thereafter by sending a written notice of termination to Arclight AB which termination will take effect immediately.

4.c.    Arclight AB and Arclight, Inc. agree that neither of them will knowingly do anything inconsistent with Arclight Cinema's ownership of the mark ARCLIGHT and that all use of the mark ARCLIGHT by Arclight AB and Arclight, Inc. in the United States shall inure to the benefit of and be on behalf of Arclight Cinema. Arclight AB and Arclight, Inc. agree that nothing in this Agreement shall give Arclight AB or Arclight, Inc. any right, title or interest in the mark ARCLIGHT other than the right to use ARCLIGHT in accordance with the license granted in this Agreement.

4.d.    Arclight AB and Arclight, Inc. agree to provide Arclight Cinema examples of representative ways Arclight AB and/or Arclight, Inc. use and/or plan to use ARCLIGHT in the United States, and agree to obtain Arclight Cinema's approval, which approval will not be unreasonably withheld, of their manner of using ARCLIGHT prior to their use of the mark in the United States after the date of this license, for quality control purposes.  At Arclight Cinema's request regarding a use of the mark subject to approval hereunder, Arclight AB and/or Arclight, Inc. agree to submit: (1) a sample of such use and (2) samples of any advertising, promotional or display material for such use if the use had not been previously approved by Arclight Cinema.  If Arclight Cinema does not object to the samples within 10 days after submission, the lack of objection shall constitute approval and Arclight AB and Arclight, Inc. may use the mark in accordance with the samples in the United States.  Any Arclight Cinema objection to such use shall not be unreasonable.  In the event of such objection, Arclight Cinema shall promptly send written notice of it to Arclight AB and/or Arclight, Inc. that reasonably sets forth the reason therefor and that reasonably specifies the action that Arclight AB and/or Arclight, Inc. may take to overcome the objection. Arclight AB and Arclight, Inc. further agree not to use the mark ARCLIGHT in the United States in combination with other marks without prior written approval of

TRADEMARK

Arclight Cinema.  Arclight AB and Arclight, Inc. further agree to permit reasonable inspection of Arclight AB's and/or Arclight, Inc.'s United States operation upon reasonable advance written notice at Arclight Cinema's sole cost and expense and only to the extent that such inspection does not materially interfere with or delay the business operations of either entity.

4.e.    Arclight AB and Arclight, Inc. warrant that all goods or services distributed or sold in the United States bearing the mark ARCLIGHT and the manner in which the mark will appear on those goods and services, and all advertising, promotional or display material on which the mark ARCLIGHT appears, conform, in all respects, to the samples approved by Arclight Cinema, and that neither party will distribute or sell goods or services that are of an inferior quality.  Arclight AB and Arclight, Inc. further agree to comply with all laws and regulations applicable to their use of ARCLIGHT on the goods and services in the United States and obtain all appropriate government approvals pertaining to the sale, distribution, and advertising of the goods and services they offer in the United States bearing the mark ARCLIGHT.

5.  Arclight AB and Arclight, Inc. agree not to use the marks ARCLIGHT or ARCLIGHT CINEMA as a name or a mark, or any designation confusingly similar to ARCLIGHT or ARCLIGHT CINEMA, in the U.S. or anywhere in the world, in connection with cinematic services, management and running of movie theaters and/or goods and services distributed or offered by Arclight Cinema for sale at cinemas ("Arclight Cinema's Goods and Services").  In addition Arclight AB and Arclight, Inc agree not to claim ownership of the mark ARCLIGHT in the United States, or, unless Arclight Cinema has expressly abandoned ARCLIGHT or ARCLIGHT CINEMA, attack Arclight Cinema's title in or seek to register the name or mark ARCLIGHT or ARCLIGHT CINEMA or any designation similar thereto, in the U.S. or anywhere in the world, in connection with Arclight Cinema's Goods and Services.

6.  Arclight Cinemas agrees to pay to Arclight AB the sum of twenty-seven thousand five hundred dollars ($27,500.00) within two business days of receipt of an original fully signed copy of this Agreement.

7.  Arclight AB and Arclight, Inc. consent to Arclight Cinema's use and registration of the name and mark ARCLIGHT CINEMA in all countries of the world in which Arclight AB has prior rights, in connection with Arclight Cinema's Goods and Services.  Arclight AB and Arclight, Inc. also consent to and agree not to oppose Arclight Cinema's registration of the mark ARCLIGHT CINEMA and ARCLIGHT in any country of the world in connection with goods and services closely related to Arclight Cinema's Goods and Services.  Arclight AB and Arclight, Inc., while it is not believed necessary, do hereby grant a royalty free license to Arclight Cinema for a time period equivalent to the life of this Agreement to use the marks ARCLIGHT and ARCLIGHT CINEMA in countries where Arclight AB has prior rights, in connection with Arclight Cinema's Goods and Services, subject to and conditioned upon Arclight Cinema's compliance with all laws and regulations applicable to its use of ARCLIGHT on the goods and services, including registered user entries where applicable, in the countries

where Arclight AB has superior rights and obtain all appropriate government approvals pertaining to the sale, distribution, and advertising of the goods and services  it offers bearing the mark ARCLIGHT, Arclight Cinema shall be responsible for all costs related to its registration of the marks ARCLIGHT and ARCLIGHT CINEMA in any country as well as all pre-approved costs and/or expenses that Arclight AB or Arclight, Inc. reasonably incurs directly arising from and/or attributable to action that Arclight Cinema requests Arclight AB or Arclight, Inc. to take in connection with further manifesting the aforesaid consent and/or Arclight Cinema's registration efforts.  This Agreement does not give Arclight Cinema the right to and Arclight Cinema shall not transfer or assign to anyone in any manner whatsoever Arclight AB's consent or license as aforesaid or grant any sublicenses thereof without Arclight AB's prior written consent. Arclight Cinema agrees not to use the mark ARCLIGHT as a name or a mark, or any designation confusingly similar to ARCLIGHT, in any country other than the United States, in connection with Arclight AB's Goods and Services related to creating special effects or pyrotechnics.

8.  Arclight AB and Arclight, Inc., agree not to consent to the use of ARCLIGHT as a trade name, service mark or trademark in connection with any goods or services the same as or closely related to Arclight AB's Goods and Services, without the prior express written consent of Arclight Cinema.  Similarly, Arclight Cinema agrees not to consent to the use or registration of ARCLIGHT as a trade name, service mark or trademark in connection with any goods or services the same as or closely related to Arclight AB's Goods and Services without the prior express written consent of Arclight AB or Arclight, Inc.

9.  While the parties do not believe that there can be any confusion regarding use of the mark ARCLIGHT, if there is such confusion, then the party learning of such confusion agrees to notify the other and the parties agree to take reasonable actions to mitigate, alleviate or correct such confusion.  Additionally, the parties hereto agree to take all further actions, and sign all additional documents reasonably necessary to give full effect to the terms of this Agreement.

10. Arclight Cinema shall not be liable to Arclight AB or Arclight, Inc.'s, their licensees, successors or assigns for any claims arising from Arclight AB's or Arclight, Inc.'s use of or otherwise concerning the name or mark ARCLIGHT.  Arclight AB and/or Arclight, Inc. agree to indemnify and hold harmless Arclight Cinema for, from and against any and all costs, expenses, losses and damages incurred or arising from or otherwise concerning use of the mark ARCLIGHT by Arclight AB or its licensees, successors and assigns in connection with Arclight AB's Goods and Services.  Arclight Cinema agrees to indemnify and hold harmless Arclight AB and Arclight, Inc. for, from and against any and all costs, expenses, losses and damages incurred or arising from or otherwise concerning use of the mark ARCLIGHT and/or ARCLIGHT CINEMA by Arclight Cinema or its licensees, successors and assigns in connection with Arclight Cinema's Goods and Services.

TRADEMARK

11. Either party shall be entitled to seek monetary relief, injunctive or other equitable relief, in a court of valid jurisdiction in the event of any material breach or other failure to comply with the provisions of this Agreement

12. Any notice hereunder shall be in writing and shall be deemed to have been duly given and samples deemed to have been submitted three days after deposit with DHL or other recognized international courier, or after being sent by facsimile transmission (with confirmation), addressed to the party for whom intended as follows:

Arclight Cinema Company
120 North Robertson Boulevard
Los Angeles, CA 90048
Attention: Ira Levin, Esq.
Telephone:  (310) 855 8416
Facsimile:  (310) 652 6490

Arclight AB
PO Box 11023
S-16111 Bromma Sweden
Attention: Martin Högberg
Telephone:  011 46 8 ~~804036~~ 262420    MH
Facsimile:  011 46 8 ~~545 23348~~ 262732

Arclight Inc.
c/o David A. Weinstein, Esq.
1600 Broadway, Suite 2600,
Denver, Colorado 80202
Telephone: 303 863 8818
Facsimile: 303 863 8820

13. This Agreement and the respective rights and obligations hereunder of the parties hereto regarding Arclight Cinema's rights in as well as Arclight AB's and/or Arclight, Inc.'s use of the mark ARCLIGHT in North America shall be governed by and interpreted and determined in accordance with the laws (other than laws regarding conflict or choice of laws) of the State of California applied to contracts made and performed therein.  This Agreement and the respective rights and obligations hereunder of the parties hereto regarding Arclight Cinema's rights and/or Arclight AB's rights in the mark ARCLIGHT outside North America shall be governed by and interpreted and determined in accordance with the laws (other than laws regarding conflict or choice of laws) of Sweden applied to contracts made and performed therein.

14. This Agreement may be amended only by a written instrument executed by the parties hereto.  The performance or observance of any term of this Agreement (whether generally or in a particular instance, whether retroactively or prospectively) may be waived only by a written instrument executed by the party to be bound thereby. This Agreement may be executed simultaneously in any number of counterparts, each

5

TRADEMARK

of which when so executed and delivered shall be deemed to be an original, but all of which counterparts shall together constitute but one agreement.

15. The terms of this Agreement shall be effective throughout the U.S. and the rest of the world.  This Agreement shall extend to and bind the parties, their affiliates, related companies, successors, and assigns.  This Agreement shall terminate immediately upon one party's abandonment of its mark hereunder.  Should either party consider abandoning any of its right in any country, that party agrees to notify the other party to allow them the opportunity to negotiate an acquisition of the mark and associated good will.

16. This Agreement supersedes all prior agreements and understandings of the parties, oral or written, with respect to its subject matter.

17. By their signatures below the individuals represent that they are duly authorized officers of the parties and authorized to sign this Agreement and bind the parties.

**Arclight Cinema Company**

Signature: _____
          James D. Vandever,
          Secretary
Date: _____Dec. 19, 2001_____

**Arclight AB**

Signature: _____
Print Name: _Martin Högberg_
Title: _President_
Date: _____20/12  2001_____

**Arclight, Inc.**

Signature: _____
Print Name: _Martin Högberg_
Title: _President_
Date: _____20/12  2001_____

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the Application of:                      )
                                               )
Arclight AB                                    )
                                               )
Registration No. 2,511,519                     )
                                               )
Issued:  November 27, 2001                     )
                                               )
For:  ARCLIGHT                                 )
                                               )
_____        )

## ASSIGNMENT

Pursuant to the Assignment Agreement entered into between the parties, Arclight
AB, the owner of all rights, title and interest in, U.S. Trademark Registration No.
2,511,519, does hereby assign and transfer all of its right, title and interest in and to
U.S. Trademark Registration No. 2,511,519 to Arclight Cinema Company and all of the
goodwill associated with U.S. Trademark Registration No. 2,511,519.

Arclight AB hereby covenants and warrants that no other assignment has been
or will be executed in conflict herewith.  The undersigned represents that he is an officer
of Arclight AB and authorized to execute this Assignment on behalf of Arclight AB.

Arclight AB

_____  Date: December 20, 2001

Its: _____

# EXHIBIT "H"



**CLAS**
WORLDWIDE INFORMATION SERVICES

Better
Intelligence
Better
Decisions™

2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

# UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs, Federal Tax Liens, State Tax Liens, and Judgments |
| **Jurisdiction/Filing Office** | State of California, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Sep. 23, 2022 |
| **Last File Date** | Sep 25 2022 |
| **Subject Search Name** | ARCLIGHT CINEMA COMPANY |
| **Search Key Entered** | ARC*LIGHT* CINE* |

# Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of California, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the California Secretary of State.

### 1. UCC

| | | |
|---|---|---|
| **Document No.** | 20087148522320 | Lapses 2/25/2028 |
| **Filed** | 2/25/2008 | |
| **Debtor** | ARCLIGHT CINEMA COMPANY | |
| | 120 NORTH ROBERTSON BOULEVARD, 3RD FLOOR | |
| | LOS ANGELES CA 90048 | |
| **Secured Party** | BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT | |
| | 555 SOUTH FLOWER STREET, 11TH FLOOR | |
| | LOS ANGELES CA 90071 | |
| **Amendment Type** | Continuation | |
| **File No.** | 201373467177 | |
| **Filed** | 1/30/2013 3:27:22 PM | |
| **Amendment Type** | Continuation | |
| **File No.** | 201776038133 | |
| **Filed** | 9/5/2017 1:46:13 AM | |
| **Amendment Type** | Continuation | |
| **File No.** | U220224365629 | |
| **Filed** | 9/5/2022 7:21:28 PM | |
| **Amendment Type** | Termination | |
| **File No.** | U220225414836 | |
| **Filed** | 9/8/2022 5:23:37 PM | |
| **Amendment Type** | Lien Statement of Claim | |
| **File No.** | U220225709126 | |
| **Filed** | 9/9/2022 3:22:03 PM | |

### 2. UCC

| | | |
|---|---|---|
| **Document No.** | U200027138831 | Lapses 10/22/2025 |
| **Filed** | 10/22/2020 | |

**Debtor**  ARCLIGHT CINEMA COMPANY
6360 SUNSET BLVD
HOLLYWOOD CA 90028

**Debtor**  ARCLIGHT/SHERMAN OAKS
15301 VENTURA BLVD.
SHERMAN OAKS CA 91403

**Debtor**  PACIFIC THEATRES EXHIBITION CORP.
120 N. ROBERTSON
LOS ANGELES CA 90048

**Secured Party**  WEST CENTRAL FOODS INC.
12840 LEYVA STREET
NORWALK CA 90650

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

> CT Corporation System
> 1232 Q Street, 1st Floor
> Sacramento CA 95814
> *Melissa Guglielma*

**08-7148522320**

**02/25/2008 16:15**

**FILED**

CALIFORNIA
SECRETARY OF STATE

SOS

16020560002   UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| OR | 1a. ORGANIZATION'S NAME ArcLight Cinema Company | | | |
| | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 120 North Robertson Boulevard, 3rd Floor | Los Angeles | CA | 90048 | |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION California | 1g. ORGANIZATIONAL ID #, if any C2126888   ☐ NONE |
|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| OR | 2a. ORGANIZATION'S NAME | | | |
| | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any   ☐ NONE |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| OR | 3a. ORGANIZATION'S NAME Bank of America, N.A., as Administrative Agent | | | |
| | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 555 South Flower Street, 11th Floor | Los Angeles | CA | 90071 | |

4. This FINANCING STATEMENT covers the following collateral:

All Assets of the Debtor whether now owned or hereafter acquired.

5. ALTERNATIVE DESIGNATION (if applicable): ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR   ☐ SELLER/BUYER   ☐ AG. LIEN   ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable]   7. Check to REQUEST SEARCH REPORTS(S) on Debtor(s) [ADDITIONAL FEE]   [optional]   ☐ All Debtors   ☐ Debtor 1   ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA
CA-SOS                                    LA1: 1151310                    (019,368-967)

FILING OFFICE COPY  – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)          7464850-01 mg

## UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Corporation Service Company
800-858-5294

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703
USA

**DOCUMENT NUMBER:** 36377820002
**FILING NUMBER:** 13-73467177
**FILING DATE:** 01/30/2013 15:27
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
08-7148522320

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination.

**3.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c

**6. CURRENT RECORD INFORMATION:**

| OR | 6a. ORGANIZATION'S NAME | | | |
|----|-------------------------|--|--|--|
| | **6b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| OR | 7a. ORGANIZATION'S NAME | | | |
|----|-------------------------|--|--|--|
| | **7b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

| **7c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|-------------------------|----------|-----------|-----------------|-------------|

| **7d. SEE INSTRUCTIONS** | ADD'L DEBTOR INFO | **7e. TYPE OF ORGANIZATION** | **7f. JURISDICTION OF ORGANIZATION** | **7g. ORGANIZATIONAL ID#, if any** ☐ NONE |
|--|--|--|--|--|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this amendment.

| OR | a. ORGANIZATION'S NAME |
|----|------------------------|
| | BANK OF AMERICA, N.A., as Administrative Agent |

| | **b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|--|-------------------------------|----------------|-----------------|------------|

**10. OPTIONAL FILER REFERENCE DATA**
CA Sec. of State (B0868-0014) [73157113]

**FILING OFFICE COPY**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Gisella Melendez
800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Lien Solutions
2929 ALLEN PARKWAY, Suite#3300
HOUSTON, TX 77019
USA

**DOCUMENT NUMBER:** 63804860002
**FILING NUMBER:** 17-76038133
**FILING DATE:** 09/05/2017 01:46

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
08-7148522320

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:     **AND** Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record.    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a and 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Bank of America, N.A. as Administrative Agent | | | |
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
CA-0-60465201-53883847

**FILING OFFICE COPY**





**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: U220224365629
Date Filed: 9/5/2022

| Submitter Information: | |
|---|---|
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

| Amendment Action Information: | |
|---|---|
| Initial Financing Statement File Number | 087148522320 |
| Date Filed | 02/25/2008 |
| Amendment Action | Continuation |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | Bank of America, N.A. as Administrative Agent |
|---|---|

Optional Filer Reference Information:

88584549

B1077-7673 09/06/2022 4:54 PM Received by California Secretary of State

 


**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: U220225414836

Date Filed: 9/8/2022

| Submitter Information: | |
|---|---|
| Contact Name | Corp2000 |
| Organization Name | Corp2000 |
| Phone Number | (800) 482-1497 |
| Email Address | orders@corp2000.com |
| Address | 720 14TH ST<br>SACRAMENTO, CA 95814 |

| Amendment Action Information: | |
|---|---|
| Initial Financing Statement File Number | 087148522320 |
| Date Filed | 02/25/2008 |
| Amendment Action | Termination |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

Authorizing Secured Party Name          BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT

Optional Filer Reference Information:
Filed with: CA Secretary of State; Debtor: ArcLight Cinema Company

Miscellaneous Information:



U220225709126



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**INFORMATION STATEMENT (UCC 5)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U220225709126 |
| Date Filed: 9/9/2022 |

**Submitter Information:**

| | |
| --- | --- |
| Contact Name | Corp2000 |
| Organization Name | Corp2000 |
| Phone Number | (800) 482-1497 |
| Email Address | orders@corp2000.com |
| Address | 720 14TH ST<br>SACRAMENTO, CA 95814 |

**Initial Filing Information:**

| | |
| --- | --- |
| Initial Financing Statement File Number | 087148522320 |
| Date Filed | 02/25/2008 |
| Record Information to Which This Information Statement Relates | U220225414836 |

**Claim Information:**

Record filed by person not entitled to do so.

| | |
| --- | --- |
| Basis for Claim: | The record was an unauthorized filing by a third party due to clerical error. |

**Name of Party Filing This Information Statement:**

☐ If this Information Statement is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| | |
| --- | --- |
| Authorizing Secured Party Name | BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT |



U200027138831



## STATE OF CALIFORNIA
*Office of the Secretary of State, Alex Padilla*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U200027138831 |
| Date Filed: 10/22/2020 |

Submitter Information:

Contact Name

Organization Name

Phone Number

Email Address

Address                                          None

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| Pacific Theatres Exhibition Corp. | 120 N. Robertson<br>Los Angeles, CA 90048 |
| Arclight Cinema Company | 6360 Sunset Blvd<br>Hollywood, CA 90028 |
| Arclight/Sherman Oaks | 15301 Ventura Blvd.<br>Sherman Oaks, CA 91403 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| West Central Foods Inc. | 12840 Leyva Street<br>Norwalk, CA 90650 |

Indicate how documentation of Collateral is provided:
Attached in a File

Upload PDF as Collateral:
Pacific Theatres Exhibition Corp..pdf

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:
Not Applicable

Select an additional alternate Financing Statement type:
Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:
Not Applicable

Optional Filer Reference Information:

Miscellaneous Information:

Search to Reflect:

☐ Order a Search to Reflect

B0338-2039 10/22/2020 3:10 PM Received by California Secretary of State

B0338-2040 10/22/2020 3:10 PM Received by California Secretary of State


# west central

2020 E. 7TH. PLACE, LOS ANGELES, CA, 90021
PH: 213.629.3600 FX: 213.430.9253
SALES REP: BRYSON IGARTA
CREDIT APPLICATION AND AGREEMENT

*Pacific Theatres / Arclight Cinemas*                    *various*
BUSINESS TRADE NAME                                      BUSINESS TRADE ADDRESS

*Pacific Theatres Exhibition Corp*          *120 W Robertson Los Angeles CA 90048*
BUSINESS LEGAL NAME                         BUSINESS LEGAL ADDRESS

*310 855-8289*                                           *accountspayablegroup @*
PHONE NUMBER                  FAX NUMBER                 *decurion.com*
                                                        EMAIL ADDRESS

CHECK ON THE FOLLOWING: ( ) PARTNERSHIP ( ) PROPRIETORSHIP (X) CORPORATION ( ) LLC

*1993*
YR. ESTABLISHED          IF LESS THAN 1 YR. LIST PAST OR PRESENT BUSINESSES

*95-6103191*
FEDERAL TAX ID NUMBER          STATE TAX NUMBER

OFFICERS, PARTNERS, MEMBERS OR PROPRIETORSHIP: *Please see attached credit information sheet*

NAME                                          HOME ADDRESS

TITLE            SOCIAL SECURITY NUMBER          DRIVER LICENSE NUMBER

NAME                                          HOME ADDRESS

TITLE            SOCIAL SECURITY NUMBER          DRIVER LICENSE NUMBER

BANK INFORMATION: *Please see attached credit information sheet*

BANK                     BRANCH                    ACCOUNT NUMBERS

ADDRESS                                            PHONE NUMBER

TRADE REFERENCES:

NAME/ADDRESS                          NAME/ADDRESS

The undersigned agrees as part of the terms and provisions of this Credit Application and Agreement to personally guarantee payment for all goods and merchandise purchased by the applicant. The undersigned acknowledges, as part of this Credit Application and Agreement, he is entering into a continuing personal guarantee and thus is jointly and severally responsible with company applicant for the goods and merchandise sold to it by West Central Produce Inc. (hereinafter referred to as WCP).

It is expressly agreed by applicant and WCP that this agreement is entered into at WCP's place of business in Los Angeles County, California and shall be performed by payment from applicant to WCP at WCP's place of business.

The perishable agricultural commodities listed on our invoices are sold subject to statutory trust authorized by section 5 ( e ) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e ( e )). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

DATE     NAME (PLEASE PRINT)     TITLE (PLEASE PRINT)     AUTHORIZED SIGNATURE

DATE     NAME (PLEASE PRINT)     TITLE (PLEASE PRINT)     AUTHORIZED SIGNATURE

Please see reversed side

Page 2

For good and valuable consideration which is hereby acknowledged, which includes, but is not limited to WCP selling goods and merchandise to Company Applicant, I/We the undersigned are signing this Agreement in two capacities, both for the Company Applicant and as individuals. I/We, the undersigned, in our individual personal capacities, by this Agreement do expressly personally, unconditionally, jointly, severally, irrevocably and continually personally guarantee to pay the past, present and future indebtedness of the Company Applicant to WCP. In so doing, I/We the undersigned expressly warrant and represent that I/We have read and understand this entire agreement and it is our intention by signing this Agreement to personally guaranty payment of all past, present and future purchases, debts and obligations due from Company Applicant to WCP. The undersigned waives any right to revoke this guaranty. The undersigned hereby waives notice of and gives advance consent to (i) the acceptance of this guaranty, (ii) the release, discharge, or incapacity of Company Applicant or any obligor, co-maker, guarantor, or surety, (iii) the modification, extension, renewal, increase, or decrease in any of the obligations guaranteed, (iv) acceptance, release, substitution, sale, or abandonment of any collateral securing the obligations of Company Applicant or any obligor, co-maker, guarantor, or surety, (v) any adverse change in the financial or other condition of Company Applicant or any obligor, co-maker, guarantor, or surety, (vi) the extension, maintenance or increase of any credit granted by WCP to Company Applicant. The undersigned waives any right to require WCP to first proceed against Company Applicant, any other person, or any collateral before proceeding against the undersigned. The undersigned shall bear the sole responsibility for remaining informed about the financial and other condition of Company Applicant and about the balance and status of Company Applicant s account with WCP.

For the good and valuable consideration which is hereby acknowledged, by Company Applicant, Company Applicant grants WCP a security interest in all of the following property, wherever located and whether now owned or hereafter acquired or created ( Collateral ): (1) all accounts including, but not limited to, accounts receivable, open accounts, accounts stated, contract rights and/or any other rights to payments; (2) all chattel paper; (3) all deposit accounts including, but not limited to, savings, certificates of deposit and other similar accounts; (4) all equipment including, but not limited to, furniture, machinery, office equipment, tools and additions thereto; (5) all general intangibles including, but not limited to, causes of action, deposits, judgments, copyrights, goodwill, insurance policies, leases, service marks, tax refunds, trademarks, trade names and trade secrets; and (6) all inventory. WCP is authorized to file and record such financing statements or other documents as may be necessary to perfect or enforce its security interest. This security interest shall secure all past, present and future indebtedness and other obligations of Company Applicant to WCP.

If Company Applicant defaults under any obligation it has to WCP then WCP may immediately, and without notice to Company Applicant, foreclose on any of the secured property and may forthwith exercise any other remedies available to it by law. No delay by WCP shall act as a waiver of any rights it has against Company Applicant. Company Applicant hereby irrevocably appoints WCP as its attorney-in-fact to execute, deliver, and acknowledge any and all documents (including but not limited to control or other agreements with third parties), notices, instruments, and assignments to create, preserve, maintain, protect, perfect, transfer, or foreclose on the security interest granted herein and on Collateral and to receive, endorse, and negotiate all checks, drafts, money orders arising from the Collateral and to compromise, defend, sue on, enforce, and collect all rights and sums arising under the Collateral. This Power of Attorney shall terminate only when all secured obligations have been satisfied in full. Company Applicant shall maintain insurance on the Collateral and shall name WCP as loss payee on all such insurance and shall give WCP copies of all such insurance policies.

This Agreement shall be binding on and shall inure to the benefit of the successors, personal representatives, heirs, and assignees of the parties hereto except as otherwise expressly provided herein. If any provision of this Agreement is unenforceable, it shall not affect any other provision of the Agreement. This Agreement contains the entire understanding of the parties hereto relating to the subject matter contained herein and supersedes all prior and collateral agreements, understandings, statements and negotiations of the parties. Each party acknowledges that no representations, inducements, promises, or agreements, oral or written, with reference to the subject matter hereof have been made other than as expressly set forth herein. This Agreement cannot be changed, rescinded or terminated orally.

Company Applicant warrants, represents and acknowledges because of its business relationship with WCP it may from time to time receive contract pricing which is on more favorable terms and below list pricing. The contract pricing is expressly conditioned upon Company Applicants full and timely performance of all terms of sale as invoiced. Pursuant to the terms of this Agreement, if Company Applicant fails to pay WCP pursuant to the terms of the sale set forth on any invoices, the Company Applicant is then responsible to pay WCP the list price of the sold goods and merchandise, not the contract price on all outstanding and future invoices.

EXPRESS TERMS AND CONDITIONS

The information and statements in this Agreement are true, correct, and complete and are made for the purpose of inducing WCP to commence selling goods and merchandise to Company Applicant. WCP is hereby expressly authorized to obtain from time to time any credit reports or other information it considers necessary from any source concerning the statements in this Agreement or the financial or business condition of Company Applicant or the undersigned.

In consideration of, and in order to induce WCP to sell goods and merchandise to Company Applicant based on the foregoing Agreement, the Company Applicant promises to pay for all purchases on the terms as set forth on the invoices. If at any time, for any reason, the Company Applicant fails to pay for purchases when due, the Company Applicant agrees to pay and authorizes WCP to bill our account for interest computed at the rate of 1.5% per month or the maximum amount allowed by law whichever is greater. In the event it becomes necessary to incur collection costs or institute suit to collect any amount due under this Agreement or any portion thereof, the Company Applicant promises to pay such additional collection costs, charges and expenses including reasonable attorney's fees. The parties acknowledge this Agreement is entered into in the County of Los Angeles, State of California.

B0338-2041 10/22/2020 3:10 PM Received by California Secretary of State



B0338-2042 10/22/2020 3:10 PM Received by California Secretary of State

Attachment

(a) All present and future deposit accounts, accounts, contracts, contract rights, instruments, documents, chattel paper, open accounts receivable, book debts, notes, general intangibles, choses in action, tax refunds, and insurance proceeds; any other obligations or indebtedness owed to Debtor from whatever source arising; all rights of Debtor to receive any payments in the money or kind; all guaranties of the foregoing and security therefor; all of the right, title and interest of Debtor in and with respect to the goods, services, or other property that gave rise to or that secure any of the foregoing and insurance proceeds relating thereto, and all the rights of Debtor as an unpaid seller of goods and services, including, but not limited to, the rights of stoppage in transit, replevin, reclamation and resale, and all of the foregoing, whether now owned or existing or hereafter created or acquired;

    (b)    All goods, merchandise, and other personal property now owned or hereafter acquired by Debtor that are held for sale or lease, or are furnished or to be furnished under any contract of service or are raw materials, work-in-process, supplies, or materials used or consumed in Debtor's business wherever located, and all products thereof, and all substitutions, replacements, additions, or accessions therefor and thereto;

    (c)    All machinery and equipment and furniture and automobiles and fixtures, now owned or hereafter acquired by Debtor, and used or acquired for use in the business of Debtor, together with all accessions thereto and all substitutions and replacements thereof and parts therefor; and

    (d)    All cash or non-cash proceeds of any of the foregoing, including insurance proceeds."

12840 LEYVA STREET
NORWALK, CA  90650

B0338-2043 10/22/2020 3:10 PM Received by California Secretary of State

Alex Padilla
California Secretary of State

 Business Search - Entity Detail

The California Business Search is updated daily and reflects work processed through Sunday, February 24, 2019.
Please refer to document Processing Times for the received dates of filings currently being processed. The data
provided is not a complete or certified record of an entity. Not all images are available online.

## C0441867    PACIFIC THEATRES EXHIBITION CORP.

| | |
|---|---|
| Registration Date: | 11/16/1962 |
| Jurisdiction: | CALIFORNIA |
| Entity Type: | DOMESTIC STOCK |
| Status: | ACTIVE |
| Agent for Service of Process: | JILL E SAPERSTEIN |
| | 120 N ROBERTSON BLVD 3RD FL |
| | LOS ANGELES CA 90048 |
| Entity Address: | 120 N ROBERTSON BLVD 3RD FL |
| | LOS ANGELES CA 90048 |
| Entity Mailing Address: | 120 N ROBERTSON BLVD 3RD FL |
| | LOS ANGELES CA 90048 |

A Statement of Information is due EVERY year beginning five months before and through the end of November.

| Document Type ⇅ | File Date ⇵ | PDF |
|---|---|---|
| SI-NO CHANGE | 08/21/2018 | |
| SI-COMPLETE | 11/18/2015 | |
| RESTATED REGISTRATION | 12/20/2012 | |
| AMENDMENT | 10/04/1995 | |
| MERGER | 03/09/1992 | |
| MERGER | 05/03/1989 | |
| AMENDMENT | 10/12/1984 | |
| MERGER | 12/28/1971 | Image unavailable. Please request paper copy. |
| MERGER | 12/28/1971 | Image unavailable. Please request paper copy. |

| Document Type | ⇅ | File Date | ⇅ | PDF |
|---|---|---|---|---|
| MERGER | | 12/28/1971 | | Image unavailable. Please request paper copy. |
| MERGER | | 12/28/1971 | | Image unavailable. Please request paper copy. |
| AMENDMENT | | 12/03/1964 | | |
| AMENDMENT | | 04/15/1963 | | Image unavailable. Please request paper copy. |
| REGISTRATION | | 11/16/1962 | | Image unavailable. Please request paper copy. |

\* Indicates the information is not contained in the California Secretary of State's database.

- If the status of the corporation is "Surrender," the agent for service of process is automatically revoked. Please refer to California Corporations Code **section 2114** for information relating to service upon corporations that have surrendered.
- For information on checking or reserving a name, refer to **Name Availability**.
- If the image is not available online, for information on ordering a copy refer to **Information Requests**.
- For information on ordering certificates, status reports, certified copies of documents and copies of documents not currently available in the Business Search or to request a more extensive search for records, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Frequently Asked Questions**.

**Modify Search**    **New Search**    **Back to Search Results**

B0338-2044  10/22/2020 3:10 PM  Received by California Secretary of State

B0338-2045 10/22/2020 3:10 PM Received by California Secretary of State



# State of California
# Secretary of State

| | S |
|---|---|

## Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
### FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT -- READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FY91604**

# FILED

In the office of the Secretary of State
of the State of California

## AUG-21 2018

1. CORPORATE NAME

PACIFIC THEATRES EXHIBITION CORP.

2. CALIFORNIA CORPORATE NUMBER

C0441867

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

[✓] If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 17.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 6 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. | STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 5. | STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 6. | MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 7. | CHIEF EXECUTIVE OFFICER/ | | | | |
| 8. | SECRETARY | | | | |
| 9. | CHIEF FINANCIAL OFFICER/ | | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 10. | NAME | | | | |
| 11. | NAME | | | | |
| 12. | NAME | | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 15. | STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 08/21/2018 | HANNAH STEVENS | RPG COORDINATOR | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | | APPROVED BY SECRETARY OF STATE |
|---|---|---|



**CLAS** WORLDWIDE INFORMATION SERVICES

Better Intelligence Better Decisions™

2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

| | |
|---|---|
| **Type of Search** | UCCs, Federal Tax Liens, State Tax Liens, and Judgments |
| **Jurisdiction/Filing Office** | State of California, Secretary of State Uniform Commercial Code Division |
| **Estimated Currency Date** | Sep. 23, 2022 |
| **Last File Date** | Sep 25 2022 |
| **Subject Search Name** | PACIFIC THEATRES ENTERTAINMENT CORPORATION |
| **Search Key Entered** | PAC* THEAT* ENT* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of California, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the California Secretary of State.

**1. UCC**

| | | |
|---|---|---|
| **Document No.** | 20087148526243 | Lapses 2/25/2028 |
| **Filed** | 2/25/2008 | |
| **Debtor** | PACIFIC THEATRES ENTERTAINMENT CORPORATION | |
| | 120 NORTH ROBERTSON BOULEVARD, 3RD FLOOR | |
| | LOS ANGELES CA 90048 | |
| **Secured Party** | BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT | |
| | 555 SOUTH FLOWER STREET, 11TH FLOOR | |
| | LOS ANGELES CA 90071 | |
| **Amendment Type** | Continuation | |
| **File No.** | 201273276685 | |
| **Filed** | 9/4/2012 10:57:48 PM | |
| **Amendment Type** | Continuation | |
| **File No.** | 201776038091 | |
| **Filed** | 9/4/2017 11:54:36 PM | |
| **Amendment Type** | Continuation | |
| **File No.** | U220224367532 | |
| **Filed** | 9/6/2022 12:59:46 AM | |
| **Amendment Type** | Termination | |
| **File No.** | U220225415526 | |
| **Filed** | 9/8/2022 5:29:37 PM | |
| **Amendment Type** | Lien Statement of Claim | |
| **File No.** | U220225710017 | |
| **Filed** | 9/9/2022 3:29:37 PM | |

**2. Notice of State Tax Lien**

| | | |
|---|---|---|
| **Document No.** | U200039739739 | Lapses 12/28/2030 |
| **Filed** | 12/28/2020 | |

**Debtor** PACIFIC THEATRE ENTERTAINMENT CORPORATION
120 N ROBERTSON BLVD FL 3
LOS ANGELES CA 900483115

**Secured Party** EMPLOYMENT DEVELOPMENT DEPARTMENT
722 CAPITOL MALL
SACRAMENTO CA 95814

**3. Notice of State Tax Lien**

**Document No.** U210000380923                    Lapses 1/5/2031
**Filed** 1/5/2021

**Debtor** PACIFIC THEATRE ENTERTAINMENT CORPORATION
120 N ROBERTSON BLVD FL 3
LOS ANGELES CA 900483115

**Secured Party** EMPLOYMENT DEVELOPMENT DEPARTMENT
722 CAPITOL MALL
SACRAMENTO CA 95814

**Amendment Type** Erroneous Termination
**File No.** U210022683730
**Filed** 2/8/2021 9:27:38 PM

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**08-7148526243**
**02/25/2008 16:15**

**FILED**
CALIFORNIA
SECRETARY OF STATE

**SOS**

16021030002   UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Corporation System
1232 Q Street, 1ˢᵗ Floor
Sacramento CA 95814
*Melissa Guglielmana*

| 1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | | |
| Pacific Theatres Entertainment Corporation | | | | | |
| 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 120 North Robertson Boulevard, 3ʳᵈ Floor | | Los Angeles | CA | 90048 | |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | NONE |
| | | Corporation | California | C1877305 | |

| 2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names | | | | | |
|---|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | | |
| 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |

| 3. SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b) | | | | | |
|---|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | | |
| Bank of America, N.A., as Administrative Agent | | | | | |
| 3b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 555 South Flower Street, 11ᵗʰ Floor | | Los Angeles | CA | 90071 | |

4. This FINANCING STATEMENT covers the following collateral:

All Assets of the Debtor whether now owned or hereafter acquired.

| 5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING |
|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable] | 7. Check to REQUEST SEARCH REPORTS(S) on Debtor(s) [ADDITIONAL FEE]   [optional]   ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
CA-SOS                     LA1: 1151310                     (019,368-967)

**FILING OFFICE COPY** – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)      7164850-01 mg

# UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Gisella Melendez
800-331-3282

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CT LIEN SOLUTIONS
2727 ALLEN PARKWAY
HOUSTON, TX 77019
USA

**DOCUMENT NUMBER:** 34469900002
**FILING NUMBER:** 12-73276685
**FILING DATE:** 09/04/2012 22:57
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**

THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
08-7148526243

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination.

**3.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c

**6. CURRENT RECORD INFORMATION:**

| OR | **6a. ORGANIZATION'S NAME** | | | |
|----|------------------------------|-------------|-------------|--------|
| | **6b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| OR | **7a. ORGANIZATION'S NAME** | | | |
|----|------------------------------|-------------|-------------|--------|
| | **7b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

| **7c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|

| **7d. SEE INSTRUCTIONS** | ADD'L DEBTOR INFO | **7e. TYPE OF ORGANIZATION** | **7f. JURISDICTION OF ORGANIZATION** | **7g. ORGANIZATIONAL ID#, if any** ☐ NONE |
|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this amendment.

| OR | **a. ORGANIZATION'S NAME** | | | |
|----|------------------------------|-------------|-------------|--------|
| | Bank of America, N.A. AS ADMINISTRATIVE AGENT | | | |
| | **b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

**10. OPTIONAL FILER REFERENCE DATA**
CA-0-34637599-46780103

**FILING OFFICE COPY**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Gisella Melendez<br>800-331-3282 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>Lien Solutions<br>2929 ALLEN PARKWAY, Suite#3300<br>HOUSTON, TX 77019<br>USA | **DOCUMENT NUMBER: 63804440002**<br>**FILING NUMBER: 17-76038091**<br>**FILING DATE: 09/04/2017 23:54**<br><br>IMAGE GENERATED ELECTRONICALLY FOR XML FILING<br>THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY |

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
08-7148526243

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:                     **AND** Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record.     ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a and 7b and item 7c     ☐ ADD name: Complete item 7a or 7b, and item 7c     ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| **OR** | | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | | |
|---|---|---|---|---|
| | 7a. ORGANIZATION'S NAME | | | |
| | 7b. INDIVIDUAL'S SURNAME | | | |
| **OR** | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| **OR** | Bank of America, N.A. as Administrative Agent | | | |
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
CA-0-60464946-53883742

**FILING OFFICE COPY**



U220224367532



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U220224367532 |
| Date Filed: 9/6/2022 |

| Submitter Information: | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

| Amendment Action Information: | |
| --- | --- |
| Initial Financing Statement File Number | 087148526243 |
| Date Filed | 02/25/2008 |
| Amendment Action | Continuation |

**Name of Secured Party of Record Authorizing This Amendment:**

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | Bank of America, N.A. as Administrative Agent |
| --- | --- |

**Optional Filer Reference Information:**
88585621

B1077-7728  09/06/2022  4:56 PM Received by California Secretary of State




**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U220225415526 |
| Date Filed: 9/8/2022 |

---

Submitter Information:

| | |
| --- | --- |
| Contact Name | Corp2000 |
| Organization Name | Corp2000 |
| Phone Number | (800) 482-1497 |
| Email Address | orders@corp2000.com |
| Address | 720 14TH ST SACRAMENTO, CA 95814 |

Amendment Action Information:

| | |
| --- | --- |
| Initial Financing Statement File Number | 087148526243 |
| Date Filed | 02/25/2008 |
| Amendment Action | Termination |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT |
| --- | --- |

Optional Filer Reference Information:

Filed with: CA Secretary of State; Debtor: Pacific Theatres Entertainment Corporation

Miscellaneous Information:

B1086-2099  09/08/2022  5:29 PM Received by California Secretary of State



U220225710017



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**INFORMATION STATEMENT (UCC 5)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U220225710017 |
| Date Filed: 9/9/2022 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | Corp2000 |
| Organization Name | Corp2000 |
| Phone Number | (800) 482-1497 |
| Email Address | orders@corp2000.com |
| Address | 720 14TH ST <br> SACRAMENTO, CA 95814 |

Initial Filing Information:

| | |
| --- | --- |
| Initial Financing Statement File Number | 087148526243 |
| Date Filed | 02/25/2008 |
| Record Information to Which This Information Statement Relates | U220225415526 |

Claim Information:

Record filed by person not entitled to do so.

| | |
| --- | --- |
| Basis for Claim: | The record was an unauthorized filing by a third party due to clerical error. |

Name of Party Filing This Information Statement:

☐ If this Information Statement is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| | |
| --- | --- |
| Authorizing Secured Party Name | BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT |

B1088-3516  09/09/2022  3:29 PM  Received by California Secretary of State

RECORDING REQUESTED BY:
**STATE OF CALIFORNIA**
EMPLOYMENT DEVELOPMENT DEPARTMENT
1-888-745-3886

**WHEN RECORDED MAIL TO:**
**STATE OF CALIFORNIA**
**EMPLOYMENT DEVELOPMENT DEPARTMENT**
**LIEN GROUP, MIC 92G**
**PO BOX 826880**
**SACRAMENTO, CA 94280-0001**

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U200039739739 |
| Date Filed: 12/28/2020 |

# NOTICE OF STATE TAX LIEN
(Filed pursuant to Section 7171 of the Government Code)

PACIFIC THEATRE ENTERTAINMENT CORPORATION

120 N ROBERTSON BLVD
FL 3
LOS ANGELES CA 90048-3115

Secretary of State

Letter ID. L0349965280

Certificate No. G002547003

| TAX PERIOD | TAX | PENALTY | INTEREST | TOTAL |
| --- | --- | --- | --- | --- |
| 01/01/2020 to 03/31/2020 | $57,969.10 | $8,717.36 | $2,239.36 | $68,925.82 |

Interest calculated through 12/28/2020

The Director of the Employment Development Department hereby certifies the above is liable to the State of California for amounts due and required to be paid as determined under the provisions of the California Unemployment Insurance Code, the Revenue and Taxation Code, or both.

THE AMOUNT OF DELINQUENCY ABOVE SET FORTH SHALL BE A LIEN UPON ALL REAL OR PERSONAL PROPERTY AND RIGHTS TO SUCH PROPERTY, INCLUDING ALL AFTER-ACQUIRED PROPERTY AND RIGHTS TO PROPERTY BELONGING TO THE ABOVE NAMED.

Date: 12/28/2020

At Sacramento, California



The Director of the Employment Development Department has complied with all provisions of the California Unemployment Insurance Code in the computation and levy of the amount assessed and has caused this notice of lien to be issued by a duly authorized representative.

By _O Dumanska_

Authorized Representative
This agency has adopted the use of a facsimile signature as affixed above.

DE 2181 Rev. 5 (7-12)

B0356-2222  12/28/2020  9:58 PM  Received by California Secretary of State

B0357-3057 01/05/2021 12:56 AM Received by California Secretary of State

RECORDING REQUESTED BY:
**STATE OF CALIFORNIA**
EMPLOYMENT DEVELOPMENT DEPARTMENT
1-888-745-3886

**WHEN RECORDED MAIL TO:**
**STATE OF CALIFORNIA**
**EMPLOYMENT DEVELOPMENT DEPARTMENT**
**LIEN GROUP, MIC 92G**
**PO BOX 826880**
**SACRAMENTO, CA 94280-0001**

| For Office Use Only |
|---|
| **-FILED-** |
| File #: U210000380923 |
| Date Filed: 1/5/2021 |

## NOTICE OF STATE TAX LIEN
(Filed pursuant to Section 7171 of the Government Code)

PACIFIC THEATRE ENTERTAINMENT CORPORATION

120 N ROBERTSON BLVD
FL 3
LOS ANGELES CA 90048-3115

Secretary of State

Letter ID. <u>L1987202016</u>                    Certificate No. <u>G002543223</u>

| TAX PERIOD | TAX | PENALTY | INTEREST | TOTAL |
|---|---|---|---|---|
| 04/01/2020 to 06/30/2020 | $0.00 | $22.00 | $25.08 | $47.08 |

Interest calculated through 01/05/2021

The Director of the Employment Development Department hereby certifies the above is liable to the State of California for amounts due and required to be paid as determined under the provisions of the California Unemployment Insurance Code, the Revenue and Taxation Code, or both.

THE AMOUNT OF DELINQUENCY ABOVE SET FORTH SHALL BE A LIEN UPON ALL REAL OR PERSONAL PROPERTY AND RIGHTS TO SUCH PROPERTY, INCLUDING ALL AFTER-ACQUIRED PROPERTY AND RIGHTS TO PROPERTY BELONGING TO THE ABOVE NAMED.

Date: 01/05/2021
At Sacramento, California



The Director of the Employment Development Department has complied with all provisions of the California Unemployment Insurance Code in the computation and levy of the amount assessed and has caused this notice of lien to be issued by a duly authorized representative.

By _____
Authorized Representative
This agency has adopted the use of a facsimile signature as affixed above.

DE 2181 Rev. 5 (7-12)

STATE OF CALIFORNIA
Employment Development Department
1-888-745-3886

**WHEN RECORDED MAIL TO:**
**STATE OF CALIFORNIA**
**Employment Development Department**
**LIEN GROUP, MIC 92G**
**PO BOX 826880**
**SACRAMENTO, CA 94280-0001**

For Office Use Only
**-FILED-**

File #: U210022683730
Date Filed: 2/8/2021

**TO CANCEL ERRONEOUS LIEN**
**NO FEE REQUIRED**

Recorded without fee per
Gov. Code Sec. 27361.3

# RELEASE OF LIEN
## IMPOSED UNDER A CERTIFICATE OR NOTICE OF STATE TAX LIEN

CERTIFICATE NO.    G002543223

LETTER ID.    L1279453152

The Director of the Employment Development Department of the State of California hereby releases and certifies that there has been released all property from any lien imposed thereon by the filing and recording of that certain Certificate or Notice of Amount of tax, penalty, and interest due under Section 1703 of the California Unemployment Insurance Code or Section 7171 of the Government Code from:

## PACIFIC THEATRE ENTERTAINMENT CORPORATION

In the amount of $47.08    which was recorded on 01/05/2021

in volume/page U210000380923    of Official Records of the Secretary of State

THE DIRECTOR OF THE EMPLOYMENT
DEVELOPMENT DEPARTMENT OF THE
STATE OF CALIFORNIA HAS CAUSED
THIS RELEASE TO BE ISSUED BY THE
DULY AUTHORIZED REPRESENTATIVE.

Date: 02/08/2021
This document is produced on a laser printer.

By _____
Authorized Representative
This agency has adopted the use of a
facsimile signature as affixed above.

DE2184 Rev. 5 (7-12)

B0368-1518 02/08/2021 9:34 PM Received by California Secretary of State

# EXHIBIT "I"

*Execution Version*

# PARTICIPATION AGREEMENT

**THIS PARTICIPATION AGREEMENT** (this "**Agreement**"), is dated as of November 9, 2020, and is entered into by and among Bank of America, N.A. as a lender under the Credit Agreement referred to below (in such capacity, "**Lender**"), Bank of America, N.A. as administrative agent under the Credit Agreement referred to below (in such capacity, "**Administrative Agent**") and DT Participant, LLC, a Delaware limited liability company ("**Participant**").

## RECITALS

**WHEREAS**, reference is made to the Second Amended and Restated Credit Agreement dated as of November 30, 2018, as previously amended by that certain Amendment Number One to Second Amended and Restated Credit Agreement dated as of July 23, 2019, that certain Waiver and Amendment Number Two to Second Amended and Restated Credit Agreement dated as of September 16, 2020 and that certain Waiver, Consent and Amendment Number Three (the "**Third Amendment**") to Second Amended and Restated Credit Agreement of even date herewith (as so amended, the "**Credit Agreement**"), by and among Pacific Theatres Entertainment Corporation, a California corporation ("**Borrower**"), the financial institutions listed on the signature pages thereof as lenders ("**Lenders**"), Bank of America, N.A., as Administrative Agent and the Guarantors party thereto (together with Borrower, the "**Loan Parties**"). Capitalized terms used in this Agreement which are not defined herein shall have the meanings set forth in the Credit Agreement;

**WHEREAS**, pursuant to the Credit Agreement, Lender is providing to Borrower a revolving Commitment in the maximum amount of $13,500,000 and a Delayed Draw Term Loan Commitment in the maximum amount of $6,500,000, in each case, on the terms and subject to the conditions set forth in the Credit Agreement. All of the Borrower's Obligations, including the Obligations in connection with the Delayed Draw Term Loan Commitment, are secured by a Lien on the Collateral;

**WHEREAS**, Participant wishes to purchase from Lender, and Lender wishes to sell to Participant, an undivided, last-out, junior and subordinate 100% participation interest in the Delayed Draw Term Loan Commitment, on the terms and subject to the conditions set forth herein.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the agreements herein contained, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1. **Participation**.

(a)     Subject to the terms and conditions of this Agreement Lender agrees to sell to Participant, and Participant agrees to purchase from Lender an undivided last-out, junior and subordinate 100% interest in the Delayed Draw Term Loans outstanding at any time in a principal amount not to exceed $6,500,000 and all rights, remedies and benefits of the Loan Documents relating to payment of the principal amount of the Delayed Draw Term Loans and accrued interest

1

thereon, in each case with respect to the Delayed Draw Term Loan Commitment, and to the extent paid or payable by Borrower or received by Lender or Administrative Agent (whether from proceeds of Collateral, from any Guarantor or otherwise) (the "**Participation Interest**"). Participant acknowledges and agrees that under no circumstances shall Participant have the right to demand or require that Lender repurchase or otherwise redeem any of its Participation Interest. As used herein, "**Non-Participated Obligations**" means all of the Obligations other than the Participation Interest, including without limitation all Obligations consisting of, or relating to, the Commitment. As of the date of this Agreement, 100% of the Non-Participated Obligations together with the Commitments and other Obligations relating thereto are held by Lender.

(b)     The sale of the Participation Interest by Lender to Participant pursuant hereto is absolute, without recourse and, except to the extent otherwise expressly provided herein, without representation or warranty of any kind by Lender or Administrative Agent.  Participant shall be fully and irrevocably at risk to the extent of the Participation Interest.  This Agreement evidences a sale to Participant of the Participation Interest, and does not evidence or create, and shall not be construed as evidencing or creating, an extension of credit from Participant to Lender or Administrative Agent, a security issued by Lender or Administrative Agent, an investment by Participant in Lender, or a partnership, trust or fiduciary relationship between or among Participant, on the one hand, and Lender and/or Administrative Agent, on the other hand.

(c)     Notwithstanding any provision of this Agreement to the contrary, except as provided in Section 2 below, Participant shall not have any interest in (i) any principal, interest and reimbursement payments in connection with the Commitment, any Revolving Loans, any Swingline Loans or any Letters of Credit, and (ii) any fees (including, without limitation, any closing fees, facility fees, appraisal fees, attorneys' fees or examination fees), or other amounts payable by Borrower to Lender under the Credit Agreement or any of the other Loan Documents with respect to the Commitment, any Revolving Loans, any Swingline Loans, any Letters of Credit or any of the other Obligations (other than the Obligations with respect to the Participation Interest) or with respect to the Credit Agreement or any of the other Loan Documents (other than the Credit Agreement and the other Loan Documents as they relate to the Participation Interest).  For the avoidance of doubt, Participant shall not have any interest in any amounts payable under the Fee Letter, any other fee letter related to the Loan Documents, any fees payable in respect of any Letter of Credit, any Attorney Costs or any Accordion Fees.

**2.      Payments**.

(a)     All payments of every kind and all proceeds of Collateral and other amounts received by Lender or Administrative Agent, or paid by Borrower pursuant to the Credit Agreement or the other Loan Documents (including, without limitation, any amounts received by way of setoff, counterclaim, realization on Collateral, payments from any Guarantors or from the proceeds of any Collateral securing any Guaranties or otherwise) shall be applied first, to the Non-Participated Obligations in such order and manner as Lender or Administrative Agent, as applicable, shall elect and consistent with the Credit Agreement, and after Payment In Full of the Non-Participated Obligations , to the Participation Interest, except that, provided that no Default or Event of Default has occurred and is continuing under the Credit Agreement, Participant shall be entitled to 100% of all payments of interest on the Delayed Draw Term Loans (including without limitation interest, if any, at the Default Rate on the Delayed Draw Term Loans) to the

2

extent paid by Borrower or received by Lender or Administrative Agent (whether from proceeds of Collateral, from any Guarantor or otherwise).  In addition, after Payment In Full of all Non-Participated Obligations, all amounts paid by Borrower or otherwise received by Lender or Administrative Agent (whether from proceeds of Collateral, from any Guarantor or otherwise) shall be delivered to Participant for application against any remaining unpaid amount in respect of the Participation Interest until the Participation Interest has been repaid in full.

For purposes of this Agreement, "**Payment In Full**" or "**Paid In Full**" means, with respect to the Non-Participated Obligations (i) the payment in full in cash of all such outstanding Obligations, together with accrued and unpaid interest thereon, (ii) the termination, expiration, or cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to the Administrative Agent of a cash deposit, or at the discretion of the Administrative Agent a back-up standby letter of credit satisfactory to the Administrative Agent and the Issuing Lender, in an amount equal to 103% of the Letter of Credit Usage as of the date of such payment), (iii) the payment in full in cash of the accrued and unpaid fees, (iv) the payment in full in cash of all reasonable reimbursable Attorney Costs and other Obligations (other than contingent indemnification obligations not then due and owing and other obligations expressly stated to survive repayment of the Loans), together with accrued and unpaid interest thereon, and (v) the termination of the Commitments, if any, representing the Non-Participated Obligations.

(b)    During the existence of an Event of Default, Participant shall not be entitled, and neither Lender nor Administrative Agent shall be obligated, to deliver any amounts paid by Borrower or received by Lender or Administrative Agent (whether from proceeds of Collateral, from any Guarantor or otherwise) until the Non-Participated Obligations are Paid In Full.

(c)    Except as provided in Section 2(a) above, and notwithstanding anything in this Agreement to the contrary set forth in this Agreement or any of the Loan Documents, neither Lender nor Administrative Agent shall have any obligation to apply any payments, proceeds of Collateral, distributions in bankruptcy or other amounts received by Lender or Administrative Agent pursuant to the Credit Agreement, the other Loan Documents or otherwise, to the Participation Interest until all of the Non-Participated Obligations (including interest accruing at the then applicable rate provided in the Credit Agreement, and interest accruing at the then applicable rate provided in the Credit Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, with respect to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), have been Paid In Full.

(d)    Except as provided in Section 2(a) above, all payments with respect to the Obligations (including, without limitation, any payment by way of setoff, counterclaim, realization on Collateral or otherwise) received by Participant at any time shall be held in trust for the benefit of Lender or Administrative Agent, segregated from any other funds of Participant and shall be immediately forwarded to Administrative Agent for application to the Non-Participated Obligations.

(e)    If Lender or Administrative Agent pays an amount to Participant under this Agreement in the belief or expectation that a related payment has been or will be received by such Person, and such related payment is not received by such Person, then such Person will be entitled

to recover such amount from Participant, and Participant will immediately pay such amount to Lender, without set-off, counterclaim, or deduction of any kind by Participant.

**(f)** If any court of competent jurisdiction deems Lender or Administrative Agent to be the transferee of (i) a preferential transfer or fraudulent conveyance with respect to the Obligations, or (ii) another avoidable transfer with respect to the Obligations (including those arising under general equitable principles, claims or findings of lender liability or equitable subordination, but not including those resulting from a finding by a court of competent jurisdiction of lender liability or equitable subordination arising from the gross negligence or willful misconduct of Lender or Administrative Agent), then, to the extent Participant received payments from Lender or Administrative Agent hereunder as a result of such transfers, Participant shall repay to Lender or Administrative Agent on demand an amount equal to the amount of such transfers, together with interest at such rate, if any, as Lender or Administrative Agent is required to pay, without set-off, counterclaim, or deduction of any kind by Participant.  To the extent that any amounts previously paid in respect of the Obligations are recovered from Lender or Administrative Agent and not paid by Participant to Lender or Administrative Agent as set forth in this <u>Section 2(f)</u>, without limiting Lender's or Administrative Agent's other rights and remedies, such amounts shall be reinstated as part of the Non-Participated Obligations, repayable in accordance with the priorities established herein and in the Credit Agreement.

**3.**     <u>**Acknowledgments, Representations, Warranties and Covenants**</u>.

**(a)** Participant hereby acknowledges that Lender and Administrative Agent have made available to Participant copies of the Credit Agreement, the other Loan Documents and any other information or documentation that Participant has requested.

**(b)** Participant hereby represents, warrants, and covenants to Lender and Administrative Agent as follows:

(i)      This Agreement constitutes the legal, valid and binding obligation of Participant, and is enforceable in accordance with its terms;

(ii)     Participant's execution of this Agreement and the performance of its obligations hereunder will not require with respect to Participant any registration with, notice to, or consent or approval by any federal, state or local governmental or regulatory body;

(iii)    Participant is familiar with the Borrower and with transactions of the kind and scope reflected in this Agreement, the Credit Agreement and the other Loan Documents;

(iv)    Participant is a sophisticated investor and has made its own independent investigation and appraisal of the financial condition and affairs of Borrower, has conducted its own evaluation of the Credit Agreement and the other Loan Documents, the Obligations, the Collateral and the creditworthiness of Borrower, and has made its decision to acquire the Participation Interest independently and without reliance upon Lender or Administrative Agent;

4

(v)      Participant is acquiring the Participation Interest for its own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Participant has no present intention of selling, granting any participation in, or otherwise distributing the same (except that Participant may assign to any of its Affiliates all or any portion of the Participation Interest as provided in Section 9(c) below);

(vi)     Participant shall not obtain or seek to obtain any security interest in all or any portion of the Collateral independently of this Agreement;

(vii)    Independent of the loans and advances under the Credit Agreement, Participant shall not offer or provide or cause or permit any Affiliate of Participant to offer or provide, post-petition financing to Borrower under 11 U.S.C. Section 364, without Lender's and Administrative Agent's prior written consent; and

(viii)   Participant further acknowledges that Lender and/or Administrative Agent may possess material information not known to Participant regarding or relating to Borrower or its Affiliates or the Collateral, that it has not requested such information, and that Lender shall have no liability whatsoever with respect to non-disclosure of such information, whether before or after the date hereof.

**(c)**     Each of Lender and Administrative Agent hereby represents, warrants, and covenants to Participant as follows:

(i)       This Agreement constitutes the legal, valid and binding obligation of such Person, and is enforceable in accordance with its terms;

(ii)      Such Person's execution of this Agreement and the performance of its obligations hereunder will not require with respect to such Person any registration with, notice to, or consent or approval by any federal, state or local governmental or regulatory body;

(iii)    Lender is the sole legal and beneficial owner and holder of the Obligations subject to participation hereunder free and clear of any Lien and other adverse claims and Lender has made no other assignment, conveyance, transfer or grant of a participation in all or any portion of the Participation Interest, or of any interest therein, and (except as provided herein) has no obligation to do so;

(iv)    Except to the extent (if any) permitted pursuant to this Agreement the Lender shall have no recourse (A) to the Participant, except for (1) the Participant's breaches of its representations, warranties or covenants and (2) the Participant's expense sharing obligations as provided under Section 5(f), or (B) to the Participation Interest;

BN 42526527v2

(v)     Administrative Agent shall promptly deliver to Participant a true, correct and complete copy of any notice of an Event of Default issued to Borrower under the Credit Agreement; provided, however, that neither Lender nor Administrative Agent shall have any liability to Participant for failing to deliver any such notice; and

(vi)    Lender will not sell, transfer or assign any interest in the Delayed Draw Term Loan Commitment.

**4.    Management and Enforcement**.

(a)     Except as set forth in this Section 4, Participant shall not have any voting rights, or consent or approval rights, under the Credit Agreement or the other Loan Documents so long as any of the Non-Participated Obligations remain outstanding, and without limiting the foregoing, as between Lender and Participant, until such time as the Non-Participated Obligations have been fully paid in cash, satisfied and discharged, Administrative Agent shall have the exclusive right, in accordance with the Loan Documents, to carry out the provisions of the Credit Agreement and the other Loan Documents, and, without the consent of Participant, the Credit Agreement, the other Loan Documents and/or any term thereof may be amended, restated, supplemented, otherwise modified or waived in any respect, Administrative Agent shall enforce and collect the Obligations in accordance with the Credit Agreement, exercise and enforce all rights and privileges granted to Administrative Agent under the Credit Agreement and the other Loan Documents, and take or refrain from taking legal action to enforce or protect Participant's and/or Lender's interests with respect to the Credit Agreement, the other Loan Documents, the Collateral and the Obligations; provided, that, notwithstanding the foregoing, Lender will not, without the prior written consent of Participant, agree to or take any action which, directly or indirectly, would, or could reasonably be expected to:

(i)     Increase the amount of the Delayed Draw Term Loan Commitment, the Commitment or reduce the principal in respect of the Participation Interest;

(ii)    Change the interest rate applicable to the Delayed Draw Term Loan Commitment;

(iii)   Extend the date when any payment of principal, interest or other amount with respect to the Participation Interest is due;

(iv)    Release all or substantially all of the Collateral securing the Obligations (except (x) as may be required by the terms of the Loan Documents as in effect on the date hereof, (y) for the release in Lender's and Administrative Agent's sole discretion, of Collateral having a total fair market value for all such Collateral so released not to exceed $500,000 in any calendar year, and (z) following the occurrence of an Event of Default, in connection with sale of Collateral, so long as (1) the proceeds from the sale of such Collateral are applied to the Obligations in accordance with this Agreement and the Loan Documents and the Commitment is permanently reduced by a corresponding amount and (2) a copy of any written notice to be delivered

to the Borrower in connection with such sale of Collateral is concurrently provided to Participant;

(v)     Release any Guarantors;

(vi)     Amend, waive or otherwise modify the Delayed Draw Funding Conditions (as defined in Section 4(b) of this Agreement);

(vii)     Subordinate any Obligations to any other Indebtedness; or

(viii)     Change the recourse nature of the Delayed Draw Term Loans.

Except as provided in this Agreement, Participant shall not have, and shall not seek to exercise, any right of legal or equitable redress against any Loan Party in connection with the Participation Interest unless and until the Non-Participated Obligations are Paid In Full.

**(b)**     If Borrower submits a Request for Extension of Credit for a Delayed Draw Term Loan to Administrative Agent pursuant to <u>Section 2.01A</u> of the Credit Agreement, Administrative Agent shall not honor such request unless and until (i) Participant has confirmed in writing to Administrative Agent that the conditions to funding such Delayed Draw Term Loan set forth in <u>Sections 2.01A</u>, <u>4.02</u> and <u>4.03</u> of the Credit Agreement (collectively, the "**Delayed Draw Funding Conditions**") have been satisfied as determined by the Participant in its sole discretion (or waived by the Participant in its sole discretion) (each a "**Participant Funding Approval**"); and (ii) the Administrative Agent has received a funding wire from the Participant no later than 11:00 a.m. on the borrowing date set forth in such request in the amount approved by the Participant in accordance with the Delayed Draw Funding Conditions.  Without limiting the foregoing, neither Lender nor Administrative Agent shall have the right to deny or otherwise refuse a Participant Funding Approval based on Participant's waiver or determination of the satisfaction of any of the Delayed Draw Funding Conditions.

**(c)**     Participant acknowledges and agrees that after the Third Amendment Closing Date, Lender shall have no obligation in respect of the Commitment to make any Revolving Loans to Borrower unless and until (i) all available Delayed Draw Term Loans have been made to Borrower and the Delayed Draw Term Loan Commitment has terminated in accordance with the Loan Documents, and (ii) Administrative Agent shall have received such documents and information as Administrative Agent shall deem necessary or desirable in connection with Borrower's response to Covid-19, any Covid-19 measures and the effects thereof on Borrower's operations, which documents and information shall be acceptable to Administrative Agent in its sole and absolute discretion.

**(d)**     No failure or delay by any Person to exercise any power, right or privilege under this Agreement or under the Credit Agreement or any of the other Loan Documents will impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein. No single or partial exercise of any such power, right or privilege will preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies of Lender and Participant under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available to Lender against Participant or Participant against Lender, respectively.

7

(e)     Subject to <u>Section 4(b)</u>, Lender and Administrative Agent acknowledge and agree that the form and substance of any Leasehold Mortgages granted to the Administrative Agent pursuant to (and as such term is defined in) Section 6 of the Third Amendment shall be in form and substance reasonably acceptable to both the Participant and the Administrative Agent.

**5.      <u>Limitation of Liability</u>**.

(a)     Except for any express representation or warranty made by Lender and/or Administrative Agent in this Agreement, neither Lender nor Administrative Agent makes any representations or warranties of any kind, express or implied, nor assumes any responsibility or liability whatsoever, with regard to (i) the Credit Agreement, the other Loan Documents or the Obligations or the validity, genuineness, enforceability or collectability of any of them, (ii) the performance of, or compliance with, any of the terms or provisions of the Credit Agreement or any of the other Loan Documents, (iii) any of the property, books or records of any Loan Party, (iv) the validity, enforceability, perfection, priority, condition, value or sufficiency of any of the Collateral or (v) the present or future solvency or financial worth or condition of any Loan Party. Except for any express representation or warranty made by the Participant in this Agreement, Participant makes no other representations or warranties of any kind, express or implied, nor assumes any responsibility or liability whatsoever, with regard to the Credit Agreement, the other Loan Documents or the Obligations, except as expressly provided in this Agreement.

(b)     Neither Lender nor Administrative Agent has, nor will either have, any duty, either initially or on a continuing basis, to make any inquiry, investigation, evaluation or appraisal on Participant's behalf, nor will either Lender or Administrative Agent have any responsibility or liability with respect to the accuracy or completeness of any information provided to Participant which has been provided to Lender and/or Administrative Agent by Borrower, any other Loan Party or any other Person.

(c)     Neither Lender nor Administrative Agent will be deemed to be a trustee or agent for Participant in connection with this Agreement, the Credit Agreement, the other Loan Documents, the Obligations or the Collateral, nor will Lender or Administrative Agent be considered to have a fiduciary relationship with Participant by virtue of this Agreement or any other document or by operation of law.

(d)     Subject to <u>Section 4</u>, Lender and Administrative Agent may use their sole discretion in administering the Obligations and the Collateral, and in exercising or refraining from exercising any rights or taking or refraining from taking any actions to which Lender or Administrative Agent may be entitled under this Agreement, the Credit Agreement, the other Loan Documents or applicable law; provided that, with respect to the Collateral, Administrative Agent shall exercise the same care as it normally exercises with respect to collateral securing loans and other obligations in which no participations are sold.  In exercising such discretion, Lender or Administrative Agent may, without incurring any liability to Participant, rely upon the advice of legal counsel, accountants and other experts, including those retained by any Loan Party.

(e)     Unless the same arises from Lender's or Administrative Agent's gross negligence or willful misconduct established in a final non-appealable judgment issued by a court of competent jurisdiction, neither Lender nor Administrative Agent will be liable to Participant for

BN 42526527v2

any action or failure to act or any error of judgment, negligence, mistake or oversight on Lender's or Administrative Agent's part or on the part of any of Lender's or Administrative Agent's respective agents, officers, employees or attorneys, in each case as the foregoing relates to Lender's and/or Administrative Agent's management of its relationship with the Loan Parties or any other Person, including without limitation, with respect to any Participant Funding Approval or the Leasehold Mortgages, which Administrative Agent is obtaining at the direction of, and on the terms requested by, Participant.

(f)      Participant agrees to indemnify Lender and Administrative Agent from and against (i) any and all liabilities, losses, costs or expenses (as such expenses are incurred and including, without limitation, fees and expenses of Lender's and/or Administrative Agent's counsel) of any kind and nature whatsoever ("**Claims**") which may be imposed on, incurred by or asserted against Lender and/or Administrative Agent in any way relating to or arising from any transaction in respect of which the Participant shall have participated with Administrative Agent and/or Lender under this Agreement; and (ii) any and all Claims which may be imposed on, incurred by or asserted against Lender and/or Administrative Agent in any way relating to or arising out of transactions or other actions (including the enforcement of the provisions thereof) in respect of which the Participant shall have participated with Administrative Agent and/or Lender from and after the date of this Agreement under the Loan Documents; in each case, only to the extent of Participant's pro rata share of the Obligations; provided, that Participant shall not be liable for any of the foregoing to the extent they arise from Lender's and/or Administrative Agent's gross negligence or willful misconduct established in a final non-appealable judgment issued by a court of competent jurisdiction, or to the extent paid by, or on behalf of, any Loan Party.  If Lender or Administrative Agent recovers any amounts from any Loan Party in respect of which Participant have previously made a payment pursuant to this <u>Section 5(f)</u>, such Person agrees to pay over to Participant Participant's pro rata share of such recovered amounts. The provisions of this <u>Section 5(f)</u> shall survive termination of this Agreement.

**6.**     <u>**Obligations Unconditional**</u>. Participant's obligations under this Agreement are absolute, unconditional, and continuing, and will be unaffected by any one or more of the following, except to the extent set forth in <u>Section 4</u>: (i) any amendment or waiver of any term of the Credit Agreement or any of the other Loan Documents, (ii) any extension, indulgence, settlement or compromise granted or agreed to in relation to the Obligations; (iii) any release of any security for, or any guarantee of, any of the Obligations; (iv) the invalidity, unenforceability, or insufficiency of the Credit Agreement or any of the other Loan Documents; (v) any default by, or insolvency of, Borrower under the Credit Agreement or any of the other Loan Documents; (vi) any act or omission on Lender's or Administrative Agent's part relating to this Agreement, the Credit Agreement, any of the other Loan Documents, the Obligations or the Collateral; (vii) any failure to give notice to Participant of any of the foregoing; (viii) any requirement that Lender or Administrative Agent take any action against any Loan Party or their respective assets; (ix) any defenses at law or in equity which Participant may have to the full discharge of any of its obligations under this Agreement, or (x) the termination or expiration of this Agreement or the Credit Agreement.

7.   **Notices**.

All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder shall be in writing sent by email in PDF, by registered or certified mail, postage prepaid, return receipt requested, messenger, or reputable overnight courier addressed to the party to be so notified at its address set forth on <u>Exhibit A</u> hereto, or to such other address as such party may hereafter specify in accordance with the provisions of this <u>Section 7</u>. Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) when received or refused if sent by registered or certified mail or overnight courier, (b) on the date of sending by email in PDF if sent during business hours on a Business Day (otherwise on the next Business Day), and (c) on the date of delivery by messenger if delivered during business hours on a Business Day (otherwise on the next Business Day).

8.   **Insolvency Proceeding.**

In the event of a voluntary or involuntary bankruptcy, insolvency, receivership or other statutory or common law proceeding or arrangement involving any Loan Party, or the readjustment of such Person's liabilities or any assignment for the benefit of its creditors or any marshaling of such Person's assets or liabilities (collectively, an "**Insolvency Proceeding**"), Administrative Agent shall file a proof of claim in the Insolvency Proceeding with respect to Participant's Participation Interest in the Obligations (which may be separate from the proof of claim filed with respect to the other Obligations, as Administrative Agent shall determine) and Administrative Agent shall, subject to the Payment In Full of all Non-Participated Obligations as provided in this Agreement, remit to Participant any property or other distribution received by Administrative Agent on account of such claim. In the event of an Insolvency Proceeding, Administrative Agent is hereby irrevocably authorized and empowered to vote all claims on account of the Participation Interest, receive any payments or distributions from any Loan Party on account of the Obligations and take any and all actions determined, in Administrative Agent's sole discretion, to be necessary or advisable in any such Insolvency Proceeding. Notwithstanding the foregoing, in the event of an Insolvency Proceeding, Participant agrees that neither Lender nor Administrative Agent shall have any liability to Participant for, and Participant waives any claim it may hereafter have against Lender or Administrative Agent arising out of, (a) Lender's or Administrative Agent's consent to the use of cash collateral pursuant to Section 363 of the United States Bankruptcy Code (Title 11 U.S.C. 101 *et seq*., as amended from time to time, the "**Bankruptcy Code**"), (b) Lender's or Administrative Agent's agreement to extend additional credit to any Loan Party, as debtor-in-possession, or to a trustee, pursuant to Section 364 of the Bankruptcy Code, (c) Lender's or Administrative Agent's application of payments received in such case in compliance with the Credit Agreement, including the application to Obligations accruing after the commencement of such case (including without limitation interest, fees, costs and other charges, whether or not allowed as claims in such case), and (d) Lender's or Administrative Agent's election made pursuant to Section 1111(b)(2) of the Bankruptcy Code. In the event of any Insolvency Proceeding, the Participant agrees that (i) the term "Non-Participated Obligations" shall include without limitation all indebtedness, liabilities and obligations incurred to Lender or Administrative Agent in any such proceeding, and (ii) the term "Collateral" shall include without limitation all types of property referred to in the Loan Documents as Collateral and other assets of any Loan Party acquired after the commencement of any such Insolvency Proceeding.

10

9.    **Miscellaneous.**

(a)    Entire Agreement; Amendments.  This Agreement embodies the entire agreement and understanding among Lender, Administrative Agent and Participant relating to the subject matter hereof and supersedes any and all prior agreements and understandings with respect to the subject matter hereof.  No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written agreement of Lender, Administrative Agent and Participant.

(b)    Other Relationships.  Subject to any of the restrictions set forth in this Agreement, Lender and Administrative Agent may make loans or otherwise extend credit to, and generally engage in any kind of debtor-creditor relationship with, any Loan Party, and receive payment on such loans or extensions of credit and otherwise act with respect thereto without accountability to Participant in the same manner as if this Agreement did not exist.  The Administrative Agent and the Lender each acknowledges that Participant or one or more of its Affiliates (i) may be direct or indirect holders of the equity securities of the Loan Parties and (ii) may have other relationships, including extensions of credit, with the Loan Parties or their respective Affiliates.

(c)    Successors and Assigns.    Subject to Section 11, other participations in the Obligations may from time to time be granted in, or assignments or transfers made of, the Obligations or any portion thereof to any other Person; provided that the assignee or transferee thereof shall agree in writing to comply with all terms and provisions of this Agreement as if it were the Lender hereunder; provided further the Lender may not assign or transfer its interests in the Delayed Draw Term Loan Commitment, the Delayed Draw Term Loans and any of the Obligations related thereto without the prior written consent of the Participant.  Participant agrees that it will not sell, assign, grant a participation interest in, or otherwise transfer all or any portion of this Agreement or the Participation Interest, without the prior written consent of Lender and Administrative Agent; provided Participant may assign to any of its Affiliates all or any portion of this Agreement or the Participation Interest, without the prior written consent of Lender or Administrative Agent, so long as such Affiliate becomes liable for all of the Participant obligations hereunder and such Affiliate joins this Agreement (or enters into a new agreement in substantially the same form) pursuant to a joinder agreement reasonably acceptable to Administrative Agent.  This Agreement shall be binding upon and the parties hereto, and inure to the benefit of their respective successors and permitted assignees.

(d)    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law.  However, in the event any provision of this Agreement is or is held to be invalid, illegal or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

(e)    Section Titles.  Section and subsection titles in this Agreement are included for convenience of reference only and shall have no substantive effect.

BN 42526527v2

    **(f)**    <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED ACCORDANCE WITH, THE LAW OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE; PROVIDED THAT ADMINISTRATIVE AGENT AND LENDER SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

    **(g)**    <u>Venue</u>.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF CALIFORNIA SITTING IN LOS ANGELES OR OF THE UNITED STATES FOR THE CENTRAL DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO.  EACH PARTY HERETO WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

    **(h)**    <u>California Judicial Reference</u>.  If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Agreement, the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court.

    **(i)**    <u>Waiver of Right to Trial by Jury</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY

**10.**    **<u>Counterparts</u>**.  This Agreement and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument. Delivery of an executed

12

counterpart of a signature page to this Agreement by facsimile or in PDF or other means of electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement and shall be deemed to be an original signature. No party hereto or executing any consent attached to this letter shall raise the use of a facsimile machine or PDF or other means of electronic transmission to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine or PDF or other means of electronic transmission as a defense to the formation or enforceability of a contract and each of the parties forever waives any such defense.

**11.**    **Participant's Right To Purchase Non-Participated Obligations**.

      **(a)**    Upon the occurrence of a Default Trigger Event (as defined below), Administrative Agent shall deliver written notice of the same to Participant, provided that, if Participant obtains knowledge of a Default Trigger Event prior to receipt of such notice from Administrative Agent, Participant may deliver written notice of such Default Trigger Event to Administrative Agent (any such notice described above, a "**Trigger Event Purchase Notice**"). Upon receipt by the relevant party of a Trigger Event Purchase Notice and subject to the terms and conditions of this Section 11(a), Participant shall have the right to purchase the Non-Participated Obligations at par in an amount equal to the full amount of the Non-Participated Obligations then outstanding, including without limitation, all reasonable Attorney Costs and accrued and unpaid interest at any Default Rate that has been applied to such Obligations (the "**Trigger Event Purchase Price**"). If Participant elects in writing to purchase the Non-Participated Obligations for the Trigger Event Purchase Price, Participant's right to do so shall be subject to the following conditions: (a) such purchase shall close on or prior to the date that is ten (10) days after Participant's or Administrative Agent's, as applicable, receipt of the Trigger Event Purchase Notice; (b) Participant shall pay all reasonable costs and expenses incurred by Lender and Administrative Agent in connection with such purchase, including without limitation all reasonable and documented and out-of-pocket attorneys' fees incurred by Lender and Administrative Agent; (c) Administrative Agent shall have received from Participant all information and documents necessary to satisfy all "Know Your Customer" and other applicable law and/or regulations; and (d) Participant and Lender shall execute and deliver an Assignment and Acceptance together with such other agreements as Administrative Agent deems reasonably necessary or desirable to effectuate such purchase, all of which shall be in form and substance reasonably acceptable to Lender, Administrative Agent and Participant. As used herein, the term "**Default Trigger Event**" means (i) the occurrence of an Event of Default under Section 8.01(i) of the Credit Agreement, (ii) the occurrence of any Event of Default (other than under Section 8.01(i) of the Credit Agreement) that has not been cured within ten (10) calendar days after the occurrence thereof, or (iii) the delivery of a notice from Administrative Agent or Lender to the Borrower, following the occurrence of an Event of Default, regarding the sale of Collateral and/or exercise of any other remedies under the Loan Documents.

      **(b)**    (i) If the Lender or its Affiliates receives a bona fide written offer from a third party (a "**Third-Party Offer**") for the purchase and sale of all or a portion of the Non-Participated Obligations (the "**ROFR Offered Obligations**") and the Lender desires to accept and is permitted to effect such proposed purchase and sale pursuant to the Credit Agreement, the Lender shall deliver written notice of such Third-Party Offer (the "**ROFR Notice**") to Participant no less than ten (10) days prior to the date of the proposed sale. The date that the ROFR Notice is received by the Participant shall constitute the "**ROFR Notice Date.**" The ROFR Notice shall set forth the

name of the third party (including, if such information is not publicly available, information about the identity of the third party), the amount and type of the ROFR Offered Obligations, the purchase price for the ROFR Offered Obligations (the "**ROFR Offered Price**"), all details of the payment terms and all other terms and conditions of the proposed sale, provided that Participant enter into a reasonably acceptable confidentiality agreement with respect to any Third-Party Offer. The Lender may not conditionally accept any Third-Party Offer if such offer contemplates any consideration other than 100% cash consideration.

(ii)    The Participant shall have the right to purchase all (but not less than all), of the ROFR Offered Obligations together with any remaining Non-Participated Obligations, representing 100% of the Non-Participated Obligations (such final amount the "**ROFR Purchased Obligations**"), which such remaining Obligations will be purchased on the same terms and conditions, including at the pro rata purchase price as the ROFR Offered Price for such remaining Obligations (collectively for such ROFR Purchased Obligations, the "**ROFR Purchase Price**"). Within five (5) Business Days after the ROFR Notice Date (such 5th Business Day, the "**ROFR Expiration Date**"), the Participant may deliver a written notice to the Lender of its election to purchase the ROFR Purchased Obligations (the "**ROFR Purchase Election Notice**").  The delivery of the ROFR Purchase Election Notice shall constitute an irrevocable commitment to purchase such ROFR Purchased Obligations.  The Participant and the Lender shall thereafter set a reasonable place and time for the closing of the purchase and sale of the ROFR Purchased Obligations, which shall be not less than 10 days nor more than 20 days after delivery of the ROFR Purchase Election Notice (the "**ROFR Target Closing Date**") unless otherwise agreed by all of the parties to such transaction.

(iii)    The purchase price and terms and conditions for the purchase of the ROFR Purchased Obligations pursuant to this Section 11(b) shall be the ROFR Purchase Price and the other terms and conditions set forth in the applicable Third-Party Offer; provided, however, that (x) the Lender shall make representations and warranties concerning (A) Lender's valid title to and ownership of the ROFR Purchased Obligations, free and clear of all liens, claims and encumbrances, (B) Lender's authority, power and right to enter into and consummate the sale of the ROFR Purchased Obligations, (C) the absence of any violation, default or acceleration of any agreement to which Lender is subject or by which its assets are bound as a result of the agreement to sell and the sale of the ROFR Purchased Obligations, and (D) the absence of, or compliance with, any governmental or third party consents, approvals, filings or notifications required to be obtained or made by such Lender in connection with the sale of the ROFR Purchased Obligations, and (y) Administrative Agent shall have received from Participant all information and documents necessary to satisfy all "Know Your Customer" and other applicable law and/or regulations.  The Participant and Lender each agree to execute and deliver such instruments and documents and take such actions, as the Administrative Agent may reasonably request in order to effectively implement the purchase and sale of the ROFR Purchased Obligations hereunder.

(iv)    Notwithstanding the foregoing (A) if the Participant shall not have elected to purchase all of the ROFR Offered Obligations on or prior to the ROFR Expiration Date, then the Participant shall not have the right to purchase any of the ROFR Offered Obligations and the Lender may sell all, but not less than all, of the ROFR Offered Obligations after the ROFR Expiration Date; or (B) if the Participant fails to consummate the closing of the purchase and sale of the ROFR Purchased Obligations by the ROFR Target Closing Date and the Lender has

14

otherwise fully complied with the provisions of this Section 11(b), then the Participant shall not have the right to purchase any of the ROFR Offered Obligations and the Lender may sell all, but not less than all, of the ROFR Offered Obligations after the ROFR Target Closing Date, in each case, subject to the provisions of this Section 11(b).  Any such sale for the ROFR Offered Obligations shall not be at less than the ROFR Offered Price or upon terms and conditions more favorable, individually or in the aggregate, to the third party purchaser than those specified in the Third-Party Offer.

(v)    Notwithstanding anything to the contrary in this Agreement, after delivery of the ROFR Purchase Election Notice, the Participant may, by written notice to Lender, designate a nominee affiliated with Participant to purchase the ROFR Purchased Obligations on the ROFR Target Closing Date.

## 12.    **Assignment to Participant.**

Upon Payment In Full of the Non-Participated Obligations or purchase by the Participant of all of the Non-Participated Obligations as provided in Section 11, (a) Lender and Administrative Agent shall be obligated, upon Participant's request, promptly to assign to Participant, without recourse to Lender or Administrative Agent and without representation or warranty (other than fundamental representations with respect to such Obligations as set forth in Section 11(b)(iii)(A)-(D)) by Lender and/or Administrative Agent and without prejudice to Lender's and/or Administrative Agent's rights under this Agreement, all of Lender's and Administrative Agent's right, title and interest in respect of the Delayed Draw Term Loans and any remaining Delayed Draw Term Loan Commitments together with all other Obligations under the Loan Documents, including, without limitation, all Liens securing the Obligations, and (b) notwithstanding anything to the contrary set forth in any of the Loan Documents, Administrative Agent shall be entitled to immediately resign as agent under the Loan Documents.

*[signatures on next page]*

15

*Execution Version*

**IN WITNESS WHEREOF**, the parties hereto have executed this Participation Agreement as of the date first written above.

<u>**LENDER**</u>:

BANK OF AMERICA, N.A.

By:_____
Name: Sharad Bhatt
Title:   Senior Vice President

<u>**ADMINISTRATIVE AGENT**</u>:

BANK OF AMERICA, N.A.

By:_____
Name: Sharad Bhatt
Title:   Senior Vice President

<u>**PARTICIPANT**</u>:

DT PARTICIPANT, LLC

By:    DT Participant Holding, LLC,
       its sole member


       By:_____
       Name: Jasmine Upperman
       Title: Secretary

*Execution Version*

**IN WITNESS WHEREOF**, the parties hereto have executed this Participation Agreement as of the date first written above.

<u>**LENDER**</u>:

BANK OF AMERICA, N.A.

By:_____
Name: Sharad Bhatt
Title:   Senior Vice President

<u>**ADMINISTRATIVE AGENT**</u>:

BANK OF AMERICA, N.A.

By:_____
Name: Sharad Bhatt
Title:   Senior Vice President

<u>**PARTICIPANT**</u>:

DT PARTICIPANT, LLC

By:     DT Participant Holding, LLC,
        its sole member

By:_____
Name: Jasmine Upperman
Title: Secretary

*Signature Page –Participation Agreement*

*Execution Version*

## Exhibit A

Notices:

      If to Lender:

      Bank of America
      CA9-193-13-34
      333 S Hope Street, 13th Floor
      Los Angeles, CA 90071-1406
      Attn.: Jacob J Villere
      Email:  jacob.villere@bofa.com

      If to Administrative Agent:

      Bank of America
      CA9-193-13-34
      333 S Hope Street, 13th Floor
      Los Angeles, CA 90071-1406
      Attn.: Jacob J Villere
      Email:  jacob.villere@bofa.com

      With a copy to:

      Buchalter
      1000 Wilshire Boulevard, Suite 1500
      Los Angeles, CA 90017
      Attn.:  William Schoenholz, Esq.
      Email:  wschoenholz@buchalter.com

If to Participant:

DT Participant, LLC
120 N. Robertson Blvd.
3rd Floor
Los Angeles, CA 90048
Attn:  Legal Department
Email:  lhanna@decurion.com

With a copy to:

Sutton, Pakfar & Courtney LLP
450 N. Roxbury Drive, Suite 700
Beverly Hills, CA  90210
Attn:  Andrew Shiner
Email: ashiner@spcllp.com

2

# DT PARTICIPANT, LLC

120 N. Robertson Blvd.
Los Angeles, California 90048

May 7, 2021

Bank of America
333 S. Hope Street, 13th Floor
Los Angeles, CA 90071
Attention: Sharad Bhatt

      Re:   <u>First Amendment to Participation Agreement ("**First Amendment**")</u>

Reference hereby is made to:

(a)    the Second Amended and Restated Credit Agreement dated as of November 30, 2018, as previously amended by that certain Amendment Number One to Second Amended and Restated Credit Agreement dated as of July 23, 2019, that certain Waiver and Amendment Number Two to Second Amended and Restated Credit Agreement dated as of September 16, 2020, that certain Waiver, Consent and Amendment Number Three to Second Amended and Restated Credit Agreement dated as of November 9, 2020, and that certain Amendment Number Four to Second Amended and Restated Credit Agreement dated as of the date hereof (the "**Fourth Amendment**") (such Second Amended and Restated Credit Agreement, as so amended, the "**Credit Agreement**"), by and among Pacific Theatres Entertainment Corporation, a California corporation ("**Borrower**"), the financial institutions party thereto from time to time ("**Lenders**"), and Bank of America, N.A., as the administrative agent thereunder (in such capacity, "**Administrative Agent**"); and

(b)    the Participation Agreement dated as of November 9, 2020 (the "**Participation Agreement**"), by and among Bank of America, N.A., as the sole Lender under the Credit Agreement, the Administrative Agent and DT Participant, LLC, a Delaware limited liability company ("**Participant**").

Any capitalized term used in herein and not defined herein has the meaning assigned to it in the Participation Agreement, the Credit Agreement or the Fourth Amendment, as the context may require.

Pursuant to the Fourth Amendment, the Borrower has requested that the Lenders agree to provide, at their option and in their sole and absolute discretion, for funding of Protective Advances, as further defined in and under the Fourth Amendment. In connection the Fourth Amendment, Participant wishes to purchase from Lender, and Lender wishes to sell to Participant, an undivided, junior and subordinate 100% participation interest in the Protective Advances, on the terms and subject to the conditions set forth herein.

1.    Section 1(a) of the Participation Agreement is hereby amended and restated in its entirety as follows:

"(a)     Subject to the terms and conditions of this Agreement Lender agrees to sell to Participant, and Participant agrees to purchase from Lender (i) an undivided, junior and subordinate 100% interest in the Protective Advances outstanding at any time in a principal amount not to exceed $400,000.00, and all rights, remedies and benefits of the Loan Documents relating to payment of the principal amount of such Protective Advances and accrued interest thereon, in each case as provided under the Fourth Amendment, and to the extent paid or payable by Borrower or received by Lender or Administrative Agent (whether from proceeds of Collateral, from any Guarantor or otherwise) (the "**Protective Advance Participation Interest**"), and (ii) an undivided last-out, junior and subordinate 100% interest in the Delayed Draw Term Loans outstanding at any time in a principal amount not to exceed $6,500,000 and all rights, remedies and benefits of the Loan Documents relating to payment of the principal amount of the Delayed Draw Term Loans and accrued interest thereon, in each case with respect to the Delayed Draw Term Loan Commitment, and to the extent paid or payable by Borrower or received by Lender or Administrative Agent (whether from proceeds of Collateral, from any Guarantor or otherwise) (the "**Delayed Draw Participation Interest**" and together with the Protective Advance Participation Interest, collectively, the "**Participation Interest**").     The Participation Interest is in all respects junior, subordinate and last-out to the Non-Participated Obligations.  The Protective Advance Participation Interest is in all respects senior and prior to the interests of the Delayed Draw Participation Interest as set forth herein.  The Delayed Draw Participation Interest is in all respects junior, subordinate and last-out to the Protective Advance Participation Interest. Participant acknowledges and agrees that under no circumstances shall Participant have the right to demand or require that Lender repurchase or otherwise redeem any of its Participation Interest.  As used herein, "**Non-Participated Obligations**" means all of the Obligations other than the Participation Interest, including without limitation all Obligations consisting of, or relating to, the Commitment. As of the date of this Agreement, 100% of the Non-Participated Obligations together with the Commitments and other Obligations relating thereto are held by Lender."

**2.**     Sections 2(a), 2(b), 2(c) and 2(d) of the Participation Agreement are hereby amended and restated in their entirety as follows:

"(a)  All payments of every kind and all proceeds of Collateral and other amounts received by Lender or Administrative Agent, or paid by Borrower pursuant to the Credit Agreement or the other Loan Documents (including, without limitation, any amounts received by way of setoff, counterclaim, realization on Collateral, payments from any Guarantors or from the proceeds of any Collateral securing any Guaranties or otherwise) shall be applied <u>first</u>, to the Non-Participated Obligations in such order and manner as Lender or Administrative Agent, as applicable, shall elect and consistent with the Credit Agreement, <u>second</u>, after Payment In Full of the Non-Participated Obligations, to the Protective Advance Participation Interest, and <u>third</u>, after Payment In Full of the Protective Advance Participation Interest, the Delayed Draw Participation Interest.  In addition, after Payment In Full of all Non-Participated Obligations, all amounts paid by Borrower or otherwise received

2

by Lender or Administrative Agent (whether from proceeds of Collateral, from any Guarantor or otherwise) shall be delivered to Participant for application against any remaining unpaid amount in respect of the Participation Interest until the Participation Interest has been repaid in full, in accordance with the priority of payments set forth in this Section 2(a) for the Protective Advance Participation Interest and the Delayed Draw Participation Interest.

For purposes of this Agreement, "**Payment In Full**" or "**Paid In Full**" means (x) with respect to the Non-Participated Obligations (i) the payment in full in cash of all such outstanding Obligations, together with accrued and unpaid interest thereon, (ii) the termination, expiration, or cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to the Administrative Agent of a cash deposit, or at the discretion of the Administrative Agent a back-up standby letter of credit satisfactory to the Administrative Agent and the Issuing Lender, in an amount equal to 103% of the Letter of Credit Usage as of the date of such payment), (iii) the payment in full in cash of the accrued and unpaid fees, (iv) the payment in full in cash of all reasonable reimbursable Attorney Costs and other Obligations (other than contingent indemnification obligations not then due and owing and other obligations expressly stated to survive repayment of the Loans), together with accrued and unpaid interest thereon, and (v) the termination of the Commitments, if any, representing the Non-Participated Obligations, and (y) with respect to the Protective Advance Participation Interests (i) the payment in full in cash of the principal amount of all Protective Advances, together with accrued and unpaid interest thereon, and (ii) the payment in full in cash of all reasonable reimbursable Attorney Costs and other Obligations (other than contingent indemnification obligations not then due and owing and other obligations expressly stated to survive repayment of the Loans), together with accrued and unpaid interest thereon, related to the Protective Advances.

(b)     Participant shall not be entitled, and neither Lender nor Administrative Agent shall be obligated, to deliver any amounts paid by Borrower or received by Lender or Administrative Agent (whether from proceeds of Collateral, from any Guarantor or otherwise) until the Non-Participated Obligations are Paid In Full.

(c)     Notwithstanding anything in this Agreement to the contrary set forth in this Agreement or any of the Loan Documents, neither Lender nor Administrative Agent shall have any obligation to apply any payments, proceeds of Collateral, distributions in bankruptcy or other amounts received by Lender or Administrative Agent pursuant to the Credit Agreement, the other Loan Documents or otherwise, to the Participation Interest until all of the Non-Participated Obligations (including interest accruing at the then applicable rate provided in the Credit Agreement, and interest accruing at the then applicable rate provided in the Credit Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, with respect to Borrower, whether or not a claim

for post-filing or post-petition interest is allowed in such proceeding), have been Paid In Full.

(d)     All payments with respect to the Obligations (including, without limitation, any payment by way of setoff, counterclaim, realization on Collateral or otherwise) received by Participant at any time shall be held in trust for the benefit of Lender or Administrative Agent, segregated from any other funds of Participant and shall be immediately forwarded to Administrative Agent for application to the Non-Participated Obligations."

**3.**     Section 4(a)(ii) of the Participation Agreement is hereby amended and restated in its entirety as follows:

"(ii)  Change the interest rate applicable to any of the Delayed Draw Term Loan Commitment and the Protective Advances;"

**4.**     Section 4(a)(viii) of the Participation Agreement is hereby amended and restated in its entirety as follows:

"(viii)  Change the recourse nature of any of the Delayed Draw Term Loans and the Protective Advances."

**5.**     The proviso in the first sentence of Section 9(c) of the Participation Agreement is hereby amended and restated in its entirety as follows:

"provided further the Lender may not assign or transfer its interests in any of the Delayed Draw Term Loan Commitment, the Delayed Draw Term Loans, the Protective Advances and any of the Obligations related thereto without the prior written consent of the Participant."

**6.**     Section 11 of the Participation Agreement is hereby deleted in its entirety, is of no further force or effect, and Participant acknowledges and agrees that neither Lender nor Administrative Agent has any obligation thereunder.

7.     Section 12 of the Participation Agreement is hereby amended and restated in its entirety as follows:

"Upon Payment In Full of the Non-Participated Obligations, (a) Lender and Administrative Agent shall be obligated, upon Participant's request, promptly to assign to Participant, without recourse to Lender or Administrative Agent and without representation or warranty (other than fundamental representations with respect to such Obligations as set forth in Section 11(b)(iii)(A)-(D)) by Lender and/or Administrative Agent and without prejudice to Lender's and/or Administrative Agent's rights under this Agreement, all of Lender's and Administrative Agent's right, title and interest in respect of the Protective Advances, the Delayed Draw Term Loans and any remaining Delayed Draw Term Loan Commitments together with all other Obligations under the Loan Documents,

including, without limitation, all Liens securing the Obligations, and (b) notwithstanding anything to the contrary set forth in any of the Loan Documents, Administrative Agent shall be entitled to immediately resign as agent under the Loan Documents."

Notwithstanding anything to the contrary set forth in the Participation Agreement or any of the Loan Documents, no Protective Advance shall be made to Borrower without Administrative Agent's and Lender's express written consent, which may be granted or withheld in their sole and absolute discretion.

Participant hereby acknowledges that Lender and Administrative Agent have made available to Participant copies of the Fourth Amendment, the other Loan Documents and any other information or documentation that Participant has requested.

Participant hereby acknowledges and agrees that the representations and warranties contained in Section 3(b) of the Participation Agreement are true, correct and complete in all material respects (without duplication of any materiality qualifiers) on and as of the date hereof.

Lender and Administrative Agent hereby acknowledge and agree that the representations and warranties in Section 3(c) of the Participation Agreement are true, correct and complete in all material respects (without duplication of any materiality qualifiers) on and as of the date hereof.

Participant acknowledges and agrees that all Attorney Costs that Administrative Agent incurred in connection with this First Amendment or the Fourth Amendment shall be paid directly to Administrative Agent with the proceeds of the initial Protective Advance, if any.

Section 9 (as amended hereby) and Section 10 of the Participation Agreement shall apply to this First Amendment and are incorporated herein by this reference, *mutatis mutandis*.

[Remainder of page intentionally left blank]

5

**Yours truly.**

**DT PARTICIPANT, LLC**

By:    DT Participant Holding, LLC,
       its sole member

By: _____
Name: Jasmine Upperman
Title: _____Secretary_____

*[signatures continue on following page]*

First Amendment to Participation Agreement

**AGREED TO**:

**BANK OF AMERICA, N.A**., as Lender

By: _[signature]_____
Name:  <u>G. Christopher Miller</u>
Title:    <u>Senior Vice President</u>

**BANK OF AMERICA, N.A.**, as Administrative Agent

By: _[signature]_____
Name:  <u>G. Christopher Miller</u>
Title:    <u>Senior Vice President</u>

# DT PARTICIPANT, LLC

120 N. Robertson Blvd.
Los Angeles, California 90048

May 25, 2021

Bank of America
333 S. Hope Street, 13th Floor
Los Angeles, CA 90071
Attention: Sharad Bhatt

     Re:   Second Amendment to Participation Agreement ("**Second Amendment**")

Reference hereby is made to:

(a)    the Second Amended and Restated Credit Agreement dated as of November 30, 2018, as amended by that certain Amendment Number One to Second Amended and Restated Credit Agreement dated as of July 23, 2019, that certain Waiver and Amendment Number Two to Second Amended and Restated Credit Agreement dated as of September 16, 2020, that certain Waiver, Consent and Amendment Number Three to Second Amended and Restated Credit Agreement dated as of November 9, 2020, and that certain Amendment Number Four to Second Amended and Restated Credit Agreement dated as of May 7, 2021 (as so amended, the "**Credit Agreement**"), by and among Pacific Theatres Entertainment Corporation, a California corporation ("**Borrower**"), the financial institutions party thereto from time to time ("**Lenders**"), and Bank of America, N.A., as the administrative agent thereunder (in such capacity, "**Administrative Agent**"); and

(b)    the Participation Agreement dated as of November 9, 2020, as amended by that certain First Amendment to the Participation Agreement, dated May 7, 2021, in each case, by and among DT Participant, LLC, a Delaware limited liability company ("**Participant**"), Bank of America, N.A., as the sole Lender under the Credit Agreement and the Administrative Agent (collectively, the "**Participation Agreement**").

Any capitalized term used herein and not defined herein has the meaning assigned to it in the Participation Agreement or the Credit Agreement, as the context may require.

1.    Section 1(a) of the Participation Agreement is amended by deleting the amount "$400,000.00" and replacing such amount with "$1,593,500."

2.    Participant acknowledges and agrees that all Attorney Costs that Administrative Agent incurred in connection with this Second Amendment shall be paid directly to Administrative Agent with the proceeds of any further Protective Advance, if any.

3.    Section 9 and Section 10 of the Participation Agreement shall apply to this Second Amendment and are incorporated herein by this reference, *mutatis mutandis*.

**Yours truly.**

**DT PARTICIPANT, LLC**

By:    DT Participant Holding, LLC,
       its sole member

By: _____
Name:   Jasmine Upperman
Title:     Secretary

*[signatures continue on following page]*

**AGREED TO**:

**BANK OF AMERICA, N.A**., as Lender

By: _G. Christopher Miller_____
Name: <u>G. Christopher Miller</u>
Title:  <u>Senior Vice President</u>

**BANK OF AMERICA, N.A.**, as Administrative Agent

By: _G. Christopher Miller_____
Name: <u>G. Christopher Miller </u>
Title: <u>Senior Vice President  </u>

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, California 90034.

A true and correct copy of the foregoing document entitled **TRUSTEE'S MOTION FOR ORDER APPROVING (A) COMPROMISE WITH BANK OF AMERICA AND THE DT PARTIES; (B) SALE OF TRADEMARKS AND NAMES AND RELATED INTELLECTUAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, SUBJECT TO HIGHER AND BETTER BIDS, AND APPROVAL OF BID REQUIREMENTS; AND (C) ASSIGNMENT OF LICENSE AGREEMENTS; MEMORANDUM OF POINTS AND AUTHORITIES; SUPPORTING DECLARATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 21, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Kenechi R Agu    kagu@kralegal.com
- Shaun J Bauman    info@thela-lawyer.com
- Erin N Brady    erin.brady@hoganlovells.com, cindy.mitchell@hoganlovells.com;tracy.southwell@hoganlovells.com
- William S Brody    wbrody@buchalter.com, dbodkin@buchalter.com;IFS_filing@buchalter.com
- Andrew Browning    abrowning@lntlb.com
- Vincent V Frounjian    vvf.law@gmail.com
- Philip A Gasteier    pag@lnbrb.com
- David S Hagen    davidhagenlaw@gmail.com
- Marsha A Houston    mhouston@reedsmith.com, hvalencia@reedsmith.com
- Brian D Huben    hubenb@ballardspahr.com, carolod@ballardspahr.com
- William W Huckins    whuckins@allenmatkins.com, clynch@allenmatkins.com;igold@allenmatkins.com
- Jeffrey Huron    jhuron@dykema.com, ebailon@dykema.com;cacossano@dykema.com;DocketLA@dykema.com;agnanadesigan@dykema.com
- Daniel King    dking@theattorneygroup.com, r44432@notify.bestcase.com
- Jeffrey S Kwong    jsk@lnbyg.com, jsk@ecf.inforuptcy.com
- Kristen N Pate    bk@bpretail.com
- William F Salle    wfslaw@yahoo.com
- Jeffrey L Sumpter    jsumpter1@cox.net
- John N Tedford    jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.courtdrive.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Edward M Wolkowitz (TR)    emwtrustee@lnbyg.com, ecf.alert+Wolkowitz@titlexi.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

1

2

3  **2.  SERVED BY UNITED STATES MAIL**: On **October 21, 2022**, I served the following persons and/or
entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true
4  and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and
addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u>
5  <u>completed</u> no later than 24 hours after the document is filed.

6

7  | Hon. Sheri Bluebond |  |
|---|---|
| United States Bankruptcy Court |  |
8 | Edward R. Roybal Federal Building and Courthouse |  |
| 255 E. Temple Street, Suite 1534 / Courtroom 1539 |  |
9 | Los Angeles, CA 90012 |  |

10                                                                ☒ Service List served by U.S. Mail attached

11  **3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR**
**EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR,
12  on **October 21, 2022**, I served the following persons and/or entities by personal delivery, overnight mail
service, or (for those who consented in writing to such service method), by facsimile transmission and/or
13  email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight
mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

14
*None.*
15

16  I declare under penalty of perjury under the laws of the United States of America that the foregoing is
true and correct.
17

    October 21, 2022          Damon Woo                    */s/ Damon Woo*
18  *Date*                   *Type Name*                  *Signature*

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                              **F 9013-3.1.PROOF.SERVICE**

STATE OF CA - EDD
LIEN GROUP, MIC 92G
PO BOX 826880
SACRAMENTO, CA 94280-0001

EDD
Bankruptcy Group MIC 92E
P. O. Box 826880
Sacramento, CA 94280-0001

WEST CENTRAL FOODS INC.
12840 LEYVA STREET
NORWALK CA 90650

Arclight AB
Attention: Martin Hogberg
PO BOX 11023
S-16111 Bromma Sweden

Arclight Inc.
c/o David A. Weinstein, Esq.
1600 Broadway, Suite 2600
Denver, Colorado 80202

Arclight Productions
Attn. Steven Kochones
4450 Lakeside Drive, Suite 390
Burbank, California 91505

Arclight Creative Group, Inc.
6815 West Willoughby Ave, Suite 206
Los Angeles, CA 90038

Darclight Films Pty. Ltd.
Arclight Films Canada, Inc.
c/o Lucas L. Schneider, Esq.
STINSON LLP
1050 17th Street, Suite 2400
Denver, CO 80265

Arclight Films International Pty. Ltd.
Arclight Films Pty. Ltd.
c/o Lucas L. Schneider, Esq.
STINSON LLP
1050 17th Street, Suite 2400
Denver, CO 80265

Arclight Films International Pty. Ltd.
8447 Wilshire Boulevard, Suite #101
Beverly Hills, California 90211

DT Operator, LLC
Attn: Legal Department
120 N. Robertson Blvd.
Los Angeles, CA 90048

WinCal, LLC
Attn: Legal Department
120 N. Robertson Blvd.
Los Angeles, CA 90048